**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DIVISION OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VERONICA DICKERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 C 1419** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **HOLSTEN MANAGEMENT CORP.,** | ) | **Magistrate Judge Cox** |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RULE 56.1 STATEMENT**
**OF UNCONTESTED MATERIAL FACTS**

Pursuant to Local Rule 56.1(a)(3), defendant Holsten Management Corporation ("Holsten")

submits this Statement of Uncontested Material Facts in support of its Motion for Summary

Judgment on all claims brought against it by plaintiff Veronica Dickerson ("Dickerson").

**THE PARTIES**

1.      Holsten is an Illinois corporation doing business in Cook County. (Complaint

("Cmplt.") and Second Amended Answer ("Ans."), ¶ 4; Declaration (Decl.") of Jackie Taylor

Holsten at ¶ 2, attached in Def.'s Rule 56.1 Appendix as Exhibits ("Ex.") A, B, and C, respectively)[1].

2.      Dickerson is a citizen of Illinois and is a resident of Cook County.  (Cmplt. and Ans.,

¶¶ 5-6 & 14, Exs. A & B).

**JURISDICTION**

3.      The Court has jurisdiction over Dickerson's Title VII claim under 28 U.S.C. §§ 1331

---

[1]  All record sources referenced in this Statement are attached in Defendant's Rule 56.1 Statement Appendix
('App.") and will not be re-referenced in the record citations.

because the claims arises under 42 U.S.C. § §2000e *et seq*., and under §2000e-5(f)(3); it has jurisdiction over Dickerson's Equal Pay Act claim pursuant to 28 U.S.C. §1331 because the claim arises under 29 U.S.C. §206(d) and 215(a)(3), and under 29 U.S.C. §216(b). (Cmplt. and Ans., ¶ ¶ 2-4, Exs. A & B ). The Court is the proper venue for Dickerson's claims because she resides and was employed by Holsten within this judicial district, and the events giving rise to the claim occurred in this district.. (Cmplt. and Ans., ¶ 4, App. Exs. A & B); *see* 28 U.S.C. §1391; 42 U.S.C. §2000e-5(f)(3).

## PLAINTIFF'S EMPLOYMENT AT HOLSTEN

4.      Dickerson began working for Holsten in September 2001. (Cmplt. and Ans., ¶ 5-7, App. Exs. A & B; Dickerson Deposition ("Dep."), at 13, Ex. D). Holsten took over ownership of the Hilliard housing development ("Hilliard") at that time and Dickerson was kept on as an employee by Holsten. (Id., at 13-14). The Hilliard housing development is a four building high rise residential complex at 2031 S. Clark ("2031"), 2030 S. State ("2030"), 30 W. Cermak ("30"), and 2111 S. Clark ("2111") in Chicago. (Id., at 21-23). Two of the buildings contain senior housing and two contain family housing. (Holsten Decl., at ¶ 3, Ex. C).

5.      In the summer of 2004, Dickerson began working exclusively as a janitor at 2111, which is senior citizen residential housing. (Dickerson Dep., at 19, 36, Ex. D). She reported to the property manager. (Id., at 22). Prior to 2004, Dickerson's janitorial experience was working as a weekend janitor at Hilliard from 2000 to 2004 and working for a year as a janitor for a private company from 1999 to 2000. (Id., at 10-19).

6.      Dickerson received an employee handbook from Holsten in 2007. (Id., at 53-55). She was aware that she was an employee at will and knew that Holsten had an internal complaint

2

procedure set forth in the handbook. (Id., at 55-56; applicable handbook pages attached as Ex. E). Dickerson never filed a written complaint with Holsten regarding her claims in this litigation of sex discrimination or unequal pay. (Dickerson Dep., at 56, Ex. D). Dickerson was aware that Holsten employees could be disciplined or terminated for rudeness, lack of cooperation, insubordination, or failure to follow instructions. (Id.) She was also aware that belligerent speech, excessive arguing, and swearing are considered workplace violence as defined in the handbook. (Id., at 56-57)

### DICKERSON'S COMPLAINTS

7.      In 2006, Dickerson felt that Holsten gave new employees equipment, like carpet shampooers or floor strippers, she did not get when she asked for it. (Id., at 30-31). In 2008, Dickerson did get a floor stripper, but she was told to share it with the janitor who worked in 2030. (Id., at 31-32).

8.      Dickerson testified that she bought her own vacuum when she first started because "they said they didn't have funds at that time." (Id., at 31). Dickerson does not remember names of other janitors in 2006 who had asked for vacuums and were given them when she was not. (Id., at 34).

9.      Dickerson testified that she commented to Steve Johnson ("Johnson") in 2006 that she had not gotten a carpet cleaner she asked for while others did. (Id., at 32). Johnson was Vice-President for Field Operations for Holsten. (S. Johnson Dep., at 8,13, Ex. F). Dickerson said that Johnson asked her to be patient. (Dickerson Dep., at 32, Ex. D).

10.      In 2007 or 2008, Dickerson says that janitor Terry Hodges got a snow blower but she did not. (Id., at 35). Dickerson then said that Hodges found equipment left over from construction of the building and pieced stuff together to make a snow removal machine or found an old machine

3

and fixed it so that it ran.  (Id., at 37).

11.     Dickerson reported to the property manager at Hilliard in her job as janitor.  (Id., at 22).  Dickerson's property managers at Hilliard during the period  from 2004 to 2009 were  Loretta Ward  with  whom  she  had  no  problems  (Id., at 57-58),  Regina  Stewart  with  whom  she  had  no problems (Id., at 58-59), Rosette Starrou [sic: Stavrou] ("Stavrou") with whom she had a somewhat strained relationship (Id., at 59-60, 105), and Carol Redman ("Redman") with whom Dickerson had a poor relationship.  (Id., at 60, 112-114)

12.     Dickerson never made complaints about her treatment at Holsten to any of the above-named property managers.  (Id., at 60-61).  If Dickerson had a complaint or something she really needed, she would talk to Johnson.  (Id., at 60).

13.     Dickerson testified that she complained to Johnson in 2005 or 2006 when he came to Hilliard about her perception of unequal treatment in lack of work effort and poor results by similarly situated men working at Hilliard compared to her.  (Id., at 72-73).  Johnson would come to Hilliard maybe four times a year.  (Id., at 73).  From 2005 to 2007 or 2006 to 2008, Dickerson would ask Johnson maybe twice a year about getting a carpet machine.  (Id., at 73-74).  Dickerson says that, twice or three times, she pointed out to Johnson that male janitors had carpet machines which she did not.  (Id., at 74-75).

14.     Dickerson never filed a written complaint about men getting carpet machines but not her with anyone at Holsten.  (Id., at 75-76).  Dickerson never made a written complaint to anyone higher up at Holsten about the fact she did not have a snowblower while male janitors did because she did not want to make it bad for herself, i.e. she wanted to keep the peace and not have anyone mad at her by going over someone's head.  (Id., at 41).

## DICKERSON'S WORK PERFORMANCE

15.    Dickerson testified that, in 2008, that Hilliard property manager Stavrou, "had problems with me" and would call Dickerson to ask where she was. (Id., at 104-06). Dickerson testified that she would go upstairs to her own apartment sometimes and maybe get dinner ready or stuff like that. (Id., at 106). Dickerson further testified, "So in between my day, I would try to sneak up – not sneak, but just go up to my house and do things that I need to do for my family." (Id., at 106). Stavrou often told Dickerson she was looking for Dickerson but could not find her. (Id., at 109).

16.    Redman was the property manager to whom Dickerson reported from sometime in 2008 until her termination on May 1, 2009. (Id., at 110-11). Dickerson acknowledges that Redman had problems with Dickerson. (Id., at 110, 114). Redman criticized Dickerson's work performance. (Id., at 114). In 2009, Redman was always complaining to Dickerson that the bathrooms were not clean and looked bad. (Id., at 134-35). . Dickerson also acknowledged that Redman was concerned about the cleanliness of the main bathroom because she did not want people coming off the street and seeing it "messed up," but Dickerson did not feel that this bathroom was part of her duties, although she did it. (Id., at 114-115) Dickerson was also told the elevators needed to be cleaner because the residents were complaining. (Id., at 142).

17.    Dickerson described Redman as "mean and spiteful"and "real evil." (Id., at 112). Dickerson admits that Johnson met with her because Redman had so many complaints about Dickerson. (Id., at 113). Dickerson stated that Johnson told her to "do what she [Redman] asks you to do." (Id.). While Dickerson denied getting into disputes with Redman, Dickerson stated: "I would just try and talk up for myself, try to defend myself a little bit. You know, I would let her know, you

know, that I don't feel like she's treating me fair, you know." (Id., at 115-16).

18.     Dickerson acknowledged that in November 2008, Redman asked her to clean the management office at 2111, and Dickerson probably refused or said that she could not do it at that time. (Id., at 130). In response to whether Dickerson was angry in this exchange with Redman, Dickerson stated no, "But it – it got deeper because she [Redman] said, 'I don't think you're doing anything,' or 'I don't see you doing anything,' and Dickerson replied, 'Ms. Redman, you have no idea of how much work I have to do.'" (Id., at 130-31). Around this same time, Redman pointed out to Dickerson deficiencies in the cleanliness of the building, which Redman did all the time. (Id., at 132). Dickerson admitted getting mad at Redman once or twice and walking off when Redman demanded that Dickerson do something right away. (Id., at 132-33).

19.     Dickerson testified that Redman complained about garbage piled up in the chutes at the 2111, but said the only time this happened was when Dickeson had hurt her back or arm at the trash compactor at 2111 in January 2009. (Id., at 135-38). When the problem did not get better after two weeks of not doing anything more than 30 pounds as directed by her doctor, Johnson made it known to everyone to take turns in helping Dickerson empty the garbage at 2111, a practice that continued until May 1, 2009. (Id., at 139-41).

20.     Redman complained to Johnson about Dickerson and sent him emails dated November 13, 2008 and January 12, 2009 regarding complaints about Dickerson and stating that she was insubordinate. (Johnson Dep., at 82-83, 94, Ex. F; bates stamped email H 0047, Ex. G; and bates stamped email H 0046, Ex. H). Redman also sent another email dated March 16, 2009 to Johnson complaining about Dickerson's "constant insubordination." (Decl. of J. Holsten with email bates stamped H 0251, Ex. C).

6

21.    Prior to Dickerson going on vacation in April 2009, Redman asked Dickerson for the key to the room in which the cleaning supplies were kept. (Dickerson Dep., at 116-18, 148, Ex. D). Dickerson did not want to give Redman the key to this room since Dickserson had personal things in there, as well as the cleaning supplies. (Id., at 118-19). Dickerson suggested putting some supplies in a storage closet close by but Redman rejected this idea. (Id.).

22.    When Dickerson refused to give Redman the key to this supply room, Redman called another Holsten employee, Dan Charles, to get the key for the supply room from Dickerson. (Id., at 119). After talking with Charles, Dickerson agreed to give Redman the key. (Id., at 119, 124-25). However, that night Dickerson thought better of having given Redman the key to this room and went back to the supply room and changed the lock after hours. (Id., at 119-20, 124-25). Dickerson was then told to give Redman the key to the new lock, which Dickerson did. (Id., at 125-26).

23.    Dickerson had an encounter with Redman about 3 or 4 days before May 1, 2009. (Id., at 145). While on vacation, Dickerson came to Redman's office and "voiced her opinion" about Redman having someone remove rugs which Dickerson had placed by doors to prevent people from sliding on the "greasy floors." (Id., at 146-48).

24.    Johnson was advised that there had been a big argument in Redman's office between Dickerson and Redman with cursing and yelling. (Johnson Dep., at 105-06, Ex. F). He was also notified that there had been an incident around this time in the senior community room, with seniors present, between Redman and Dickerson where profanity was used. (Id., at 109).

### PLAINTIFF'S TERMINATION

25.    On May 1, 2009, Dickerson was called to the office at Hilliard where she met with Johnson and Lionel Spires. (Dickerson Dep., at 161-62, Ex. D). Johnson told Dickerson that she was

7

being terminated.  (Id.).

26.     Although Dickerson stated that no reference was made to the problems Dickerson and Redman had working together, Dickerson further testified that, "I was assured that Steve Johnson will be speaking to Ms. Redman right after me and today she would also be fired." (Id., at 162). Redman, in fact, was terminated on the same day as Dickerson.  (Resp. To Supp. Interrog., at Interrog. No. 3, Ex. I).  Dickerson was handed her termination letter and checks in an envelope. (Id., at 163). Dickerson hugged Johnson before she left the meeting.  (Id.).

27.     The termination letter Dickerson was given on May 1, 2009 stated no reason for her termination.  (Decl. of J. Holsten, at ¶ 5, with May 1, 2009 letter, Ex. C).

28.     Holsten discharged Dickerson due to her conduct which started in 2008 under property manager Stavrou, who had problems in being able to locate Ms. Dickerson during Dickerson's shift. (Resp. To Supp. Interrog., Interrog. No. 2, Ex. I).  When Redman became the property manager, she too had problems with Dickerson.  (Id.)  Redman sent emails dated November 13, 2008, January 12, 2009 and March 16, 2009 to Johnson complaining about Dickerson's insubordination to Redman and the recurring performance and attitude problems which she had with her.  (Johnson Dep., at 82-83, 94, Ex, F, with emails bates stamped H 0046 and 47, Exs. G & H; Decl. of J. Holsten with email bates stamped H 0251, Ex. C).  Holsten finally discharged Dickerson after an incident in late April 2009 in which Dickerson had a loud argument with Redman in Redman's office.  (Resp. To Supp. Interrog., Interrog. No. 2, Ex. I; Johnson Dep., at 105-06, 109, Ex. F).

29.     Over the last months of Dickerson's employment, Johnson was having to repeatedly address complaints that the women's bathroom for seniors was not clean which was a duty assigned to Dickerson and Dickerson was insubordinate to her supervisor. (Johnson Dep., at 44-45, 52, 60,

82-83, 94, 97, 114, Ex. F).

30.     At a 2009 meeting, Dickerson told Johnson that she really did not like Redman and wished she would just stay in her office.  (Id., at 97).  Johnson told Dickerson that Redman was her supervisor and that she needed to follow Redman's directions.  (Id., at 104).  Dickerson also said that she wanted to report directly to Johnson but he said that would not happen.  (Id., at 105).

31.     Dickerson believes she was terminated from Holsten because she needed help after she was hurt.  (Dickerson Dep., at 169, Ex. D).  Dickerson's only evidence as to why she was fired is that she was hurt and needed help to pull the dumpster.  (Id., at 172).  Dickerson stated that she is seeking an understanding of why Holsten fired her.  (Id., at 197).

32.     Dickerson admitted that many janitors were terminated at Hilliard during the period she was there.  (Id., at 181).

33.     In Dickerson's last months of employment she changed and was having continuing problems with her job.  (Johnson Dep., at 97, 114, Ex. F).

34.     Redman was also terminated from employment at Holsten on May 1, 2009. (Dickerson Dep., at 162, Ex. D).

### DICKERSON'S EEOC CHARGE

35.     Dickerson filed a discrimination charge with the United States Equal Employment Opportunity Commission ("EEOC") against Holsten on May 13, 2009.  (Id., at 45-46; EEOC Charge, Ex. J). The only statement of particulars in Dickerson's charge is:

> I began my employment with Respondent in September 2001.  I was employed as a Building Keeper. On May 1st, 2009, I was discharged.  Similarly situated male employees were retained."

> I believe that I have been discriminated against because of my sex, female, in violation of

Title VII of the Civil Rights Act of 1964, as amended.

Dickerson Dep., at 48, Ex. D ; Ex. J).  Dickerson testified that she included in the charge all the types of discrimination by Holsten that she felt that she was subjected to while employed there.  (Id., at 49, Ex. D).  Dickerson did not check the box for "retaliation" on her EEOC charge.  (Ex. J).

36.     The EEOC issued a Dismissal and Notice of Rights to Dickerson in relation to her charge of sex discrimination stating that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violation fo the statutes."  (Dickerson Dep., at 51-52; Dismissal, Ex. K).

**DICKERSON'S COMPENSATION**

37.     Holsten provided Dickerson with a rent-free four bedroom apartment in 2031 when she started as a janitor at 2111 in 2004.  (Dickerson Dep., at 127–28, 166, Ex. D). Since her discharge, Dickerson pays $561 in rent for this apartment.  (Id., at 128).

38.     Dickerson testified that Holsten from 2005 to 2009 also allowed her to use the apartment in room 102 of the 2111 building, where she kept cleaning supplies for the building, as a place where her children could also stay after school until she was done with her job at 2111. (Id., at 117-18, 122-23, 200).  In addition to cleaning supplies kept there, Dickerson put a bed and TV in this room so her kids could sleep, watch TV or play games until she was done working.  (Id., at 118).  She had her personal items in this supply apartment from 2005 to 2009.  (Id., at 200).

39.     Dickerson's salary from Holsten in 2009 when she was terminated was $38,850 per year.  (Id., at 166).  Holsten also provided her with a rent-free, four bedroom apartment in the 2031 building from 2004 until her May 1, 2009 termination, (id., at 127–28, 166), and Holsten provided her use of an additional apartment at 2111 where her children could stay after school until she was

10

done with work.  (Id., at 117-18, 122-23, 200).

40.    Dickerson never complained to Johnson or anyone else in upper management at Holsten regarding her rate of pay and, in particular, she never complained that she believed that she was being paid less than equivalent males.  (Id., at 256).

41.    Dickerson believes that the male employees who were equivalent to her and making more money were Donald Ivy, Calvin Loyd, and Terence Hodges.  (Id., at 257).[2]

42.    While Dickerson worked at Hilliard as a janitor at the 2111 building, there were six male janitors who worked at Hilliard: James Fuller hired 4/3/06 and terminated 5/1/07; Sean Manuel hired 5/7/07 and terminated 11/13/09; Marvin Thomas hired 3/10/08 and terminated 12/5/08; Juan Gonzalez hired 3/26/07 and terminated 1/21/10; Theodore King hired 4/9/08 and still employed;; and Telly Wiley hired 1/7/09 and still employed.  (Rev. Interrog. Resp., at Interrog. No. 3, Ex. L).  All of the foregoing male janitors were paid substantially less than Dickerson.  (Declaration (Decl.") of Cristina Zavala, at ¶ 7; H 0275-0307, 0404-407, Ex. M).

43.    Ivy began working for Holsten in 1994 and spent many years working at Holsten's South Shore property.  (Ivy Dep., at 4-5).  Ivy came to Hilliard in about 2005.  (Id., at 5).  Ivy holds the position of maintenance engineer.  (Id., at 4).   Ivy has been engaged in maintenance engineering and janitorial work since 1985.  (Id., at 4-5;  Ex. N (bates stamped H 1466-68).

44.    Dickerson contends she was more than a janitor because of what she did and one day she received a paper from Holsten saying "Angel, maintenance".  (Dickerson Dep., at 91, Ex. D).[3]

---

[2]  During part of Dickerson's deposition she was misnaming Donald Ivy as Mr. Ivory.  (Id., at 100).

[3]  Dickerson's nickname was "Angle."  (Id., at 253).

Although Dickerson claims that she on occasion performed maintenance engineer duties in addition to her janitor duties, she relied "I don't know" when asked if she was saying that she was a "maintenance engineer." (Id., at 91-92). Dickerson was not told by anyone that she had been promoted from being a janitor. (Id., at 96).

45.    Maintenance engineers at Holsten do more repair work while janitors do more cleaning, though there is some overlap if a job needs to be done, depending on available personnel. (Ivy Dep., at 23-24, 26, 34, Ex. O).

46.    Ivy made more money than Dickerson because he worked at Holsten much longer and held a different position than she did. (Id., at 37; J. Holsten Dep., at 51-52, Ex. P).

47.    Redman was also Ivy's supervisor, but he never had any problems with her. (Ivy Dep., at 28, Ex. O).

48.    Loyd began working for Holsten in 2000 at Hilliard doing janitorial work until November 2001. (Loyd Dep., at 7, 10-11, Ex. Q). Loyd also had his own cleaning company at this time called CEL Cleaning which was formed in 1996. (Id., at 11-12).

49.    In 2006, Holsten re-employed Loyd at Hilliard. (Id., at 13-14). Loyd was terminated on March 19, 2008 for financial reasons. (Id., at 17-18). Johnson was involved in Loyd's termination. (Id., at 17).

50.    Loyd lived in Lincolnwood and never lived on-site at Hilliard. (Id., at 29). Loyd did not receive a rent free apartment at Hilliard as part of his compensation. (Id., at 53). Dickerson also acknowledged that Calvin Loyd did not receive a rent free apartment from Holsten while he worked at Hilliard  because he lived in his own home. (Dickerson Dep., at 245-46, Ex. D).

51.    Hodges began working for Holsten in August 2000. (Revised Interrogatory Resp., at

Interrog. No. 3, Ex. L). Hodges was a maintenance engineer. (*Id.*). Dickerson testified that Hodges was a maintenance engineer. (Dickerson Dep., at 168-69, Ex. D). Dickerson also testified that Hodges was a janitor. (Id., at 91).

52.     Hodges salary in calendar year 2007 was $35,517.48. (Zavala Decl., at ¶ 5, with Holsten Compensation Report bates stamped H 0601, Ex. M). Hodges' employment with Holsten was terminated on December 17, 2008. (Rev. Interrog. Resp., at Interrog. No. 3, Ex. L). Hodges biweekly salary in calendar year 2008 was $1354.23. (Zavala Decl., at ¶ 6 and Holsten Compensation Report bates stamped H 0602-0606, Ex. M).

53.     The value of Dickerson's rent free apartment for 2006 was $6,288 (or $524/month), for 2007 it was $6,272 (or $522/month), and for 2008, it was $6,681 (or $556/month). (Zavala Decl., at ¶ 4, with Dickerson Occupant Ledger bates stamped H 0095-0104, Ex. M). Ms. Dickerson also had the use of the apartment at 2111 S. Clark where cleaning supplies were kept for that building for the use of her children after school from about 2005 to 2009. (Dickerson Dep., at 117-18, 122-23, 200, Ex. D).

54.     Holsten's payroll records show Dickerson, Ivy, Loyd and Hodges were paid the following cash amounts for the years indicated:

Calendar year 2006
    Dickerson     –     $34,966.83 or biweekly amount of $1,346.15
    Donald Ivy     –     $43,799.92
    Calvin Loyd     --     biweekly amount of $1,538.46
    Terrence Hodges --     biweekly amount of $1,269.23
Calendar year 2007
    Dickerson     --     $37,461.61
    Ivy     --     $46,223.91
    Loyd     --     $40,249.96
Calendar year 2008
    Dickerson     --      $37,000.08 or biweekly amount of $1,423.08

| | | |
|---|---|---|
| Ivy | -- | $45,964.61 |
| Loyd | -- | $1,538.46 |
| Calendar year 2009 | | |
| Dickerson | -- | biweekly amount of $1,423.08 or $1,494.23 |
| Ivy | -- | biweekly amount of $1,579.32 or $1,659.62 |

(Holsten Answer to Plaintiff's Requests to Admit, Nos. 1-8, and bates stamped pages cited therein,

Ex. R).

     55.    Dickerson is relying on Holsten's payroll records to establish the amount of her salary

versus that of Ivy, Loyd and Hodges. (Dickerson Dep., at 244-45, Ex. D).

                           Respectfully submitted,

                           /s/ Phillip H. Snelling
                           One of the Attorneys for
                           Holsten Management Corporation

Jeffrey B. Gilbert
Phillip H. Snelling
Johnson Jones Snelling
  Gilbert & Davis, P.C.
36 South Wabash, suite 1310
Chicago, IL 60603
(312) 578-8100