**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VERONICA DICKERSON,

    Plaintiff,

vs.      No. 10 C 01419

HOLSTEN MANAGEMENT    Judge Castillo
CORPORATION,
    Defendant.

    The deposition of VERONICA LEE DICKERSON,
VOLUME 1, called for examination pursuant to the Rules
of Civil Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
LAURA R. RENKE, Certified Shorthand Reporter for the
State of Illinois, at 36 South Wabash Avenue,
Suite 1310, Chicago, Illinois, on March 11, 2011, at
the hour of 11:28 o'clock a.m.

REPORTED BY:  LAURA R. RENKE, CSR, RDR, CRR, CLR
LICENSE NO.: 084-003184
JOB NO.: 157555

**Page 2**

1  APPEARANCES:
2
3  FUOCO LAW GROUP by
   STEVEN C. FUOCO, ESQ.
4  1055 Golf Avenue
   Highland Park, Illinois 60035
5  (847) 432-5297
   sfuoco@sbcglobal.net
6    Representing the Plaintiff;
7
8  JOHNSON JONES SNELLING GILBERT & DAVIS by
   PHILLIP H. SNELLING, ESQ.
9  36 South Wabash Avenue
   Suite 1310
10 Chicago, Illinois 60603
   (312) 578-8100
11 psnelling@jjsgd.com

   Representing the Defendant.

13 ALSO PRESENT:
14 LAURIE TAYLOR, ESQ.,
   Holsten Management Corp. in-house counsel.

**Page 3**

I N D E X

WITNESS             PAGE
VERONICA LEE DICKERSON
   Examination by Mr. Snelling ............... 4


E X H I B I T S

NUMBER             PAGE
Dickerson Deposition Exhibit
Exhibit 1  Application for Employment .......... 7
   (H 0203 - 0206)

Exhibit 2  Janitor Job Description ............ 21
   (H 0419 - 0421)
Exhibit 3  Charge of Discrimination ........... 45
Exhibit 4  Dismissal and Notice of Rights ..... 51
Exhibit 5  Employee Handbook for the Holsten .. 53
   Companies

Exhibit 6  Employee Handbook signature page ... 54
   (H 0141)
Exhibit 7  Complaint at Law ................... 61
Exhibit 8  5/1/09 e-mail from V Dickerson to .. 64
   stevejohnson@holstenchicago.com
   re 2111/30W hilliard floors
Exhibit 9  DuMore Supplies Inc. Packing List .. 67
Exhibit 10 Angel Dickerson Maintenance-2111 .. 95
   Clark Hilliard Apartments document

**Page 4**

1       (Witness administered an oath.)
2   THE WITNESS: Yes, I do.
3   VERONICA LEE DICKERSON,
4  having been first administered an oath, was examined
5  and testified as follows:
6     EXAMINATION
7  BY MR. SNELLING:
8   Q.  Hello, Ms. Dickerson.  My name is Phil
9  Snelling, and I represent the plaintiff in this case,
10 Holsten Management Corporation.  And I'm going to be
11 asking you a series of questions this morning/
12 afternoon.
13   The -- before we get started, have you ever
14 been deposed before, had your deposition taken
15 before?
16   A.  No.
17   Q.  Okay.  Let me explain a little bit about
18 the procedure before we get started.  The court
19 reporter's placed you under oath.  I'm going to be
20 asking you questions.  And your responses then are to
21 be the truthful responses to the questions that I've
22 asked.  Do you understand that?
23   A.  Yes.
24   Q.  Okay.  Is there any reason why you can't



**Page 5**

1  truthfully and intelligently answer the questions
2  that I'm going to be asking you this morning?
3      A.  No, no reason.
4      Q.  Okay.  You're not on any medication or any
5  other substances that would interfere with your
6  ability to truthfully and accurately answer the
7  questions today?
8      A.  Not at all, no.
9      Q.  Okay.  Great.
10         The way a deposition works is I'll ask the
11  question; you then give an answer.  And we'll try not
12  to talk over each other so that the court reporter
13  does not get frustrated.
14         If at any time you need to have a break,
15  just let me know, and we'll stop.  I'd only ask that
16  we not break in the midst of a question that's been
17  asked.
18         Outside of that, you know, it's not meant
19  to be any more grueling or emotionally taxing than
20  things are naturally.
21      MR. FUOCO:  Than a root canal?
22      MR. SNELLING:  Yes, than a root canal.
23  BY MR. SNELLING:
24      Q.  Can't say it's enjoyable, but it's probably

**Page 6**

1  better than that.
2      A.  All right.
3      Q.  Would you state and spell your name for the
4  record?
5      A.  My name is Veronica Dickerson.
6  V-E-R-O-N-I-C-A; middle name Lee, L-E-E; Dickerson,
7  D-I-C-K-E-R-S-O-N.
8      Q.  Ms. Dickerson, have you ever filed a
9  lawsuit before this one?
10      A.  No, never.
11      Q.  And could I have your date of birth?
12      A.  ████████
13      Q.  And what is your highest level of
14  educational attainment?
15      A.  I have a GED.
16      Q.  GED.
17         And briefly could you just relate your
18  employment history prior to becoming an employee at
19  Holsten?
20      A.  I was a VISTA worker.  I worked for VISTA
21  for three years.
22      Q.  And when would that be?
23      A.  VISTA is -- it's AmeriCorps VISTA.  It's to
24  help children and families.

**Page 7**

1      MR. SNELLING:  You know what?  To speed
2  this, let me have this marked as Exhibit 1 and see if
3  that aids the process here.
4         (Whereupon, Dickerson Deposition
5          Exhibit 1 was marked for
6          identification.)
7  BY MR. SNELLING:
8      Q.  Ms. Dickerson, I'm handing you what's been
9  marked as Deposition Exhibit 1 and ask if you can
10  identify this document.
11      A.  Identify it?
12      Q.  Can you identify it?
13      A.  Yes.
14      Q.  Okay.  And what is it?
15      A.  It's an application for employment.
16      Q.  Okay.  Is it your application for
17  employment?
18      A.  Yes, it is.
19      Q.  And does it bear your signature on the page
20  that's Bates-stamped H '205 on the side?
21      A.  Yes, it does.
22      Q.  And was this an employment application you
23  submitted to Holsten?
24      A.  Yes.

**Page 8**

1      Q.  And when I say Holsten, I'm referring to
2  the plaintiff in this case, Holsten Management
3  Corporation.  So I'll just refer to it as Holsten.
4  Is that okay?
5      A.  Okay.
6      MR. FUOCO:  You mean the defendant.
7      MR. SNELLING:  I'm sorry.  The defendant.
8      MR. FUOCO:  That's all right.
9      MR. SNELLING:  Yes.  Got to get myself
10  retooled.  The defendant in this case.
11  BY MR. SNELLING:
12      Q.  On the second page of the employment
13  application, you have some employment listed there.
14      A.  Yes.
15      Q.  Why don't we continue the yearly.  You've
16  worked at -- your first job was working at VISTA for
17  three years.  Is that correct?
18      A.  It was through Literacy Chicago.
19      Q.  Oh, it was through there.  Okay.  And what
20  is Literacy Chicago?
21      A.  Literacy Chicago is a not-for-profit
22  organization to help parents receive their GED
23  diploma and also childcare for the parents.
24      Q.  Okay.  And what did you do there?



VERONICA LEE DICKERSON

A. I was one of the childcare providers to
allow parents to get their GED.
Q. Okay. And you worked there, it says on
your form, from October '99. Is that correct?
A. Correct.
Q. And then when did -- are you still working
there, or when did you stop working there?
A. I did three years.
Q. Three years. So then that would be to
2002? Approximately.
MR. FUOCO: I object based on date of the
application.
MR. SNELLING: I'm just trying to get a
time frame for this.
BY MR. SNELLING:
Q. If you recall. If you worked for three
years and you began working October 1999, was that
approximately till October of 2002 that you worked at
Literacy Chicago?
A. Correct, correct.
Q. Okay. And then after that, where did you
work?
A. There I was with -- I was with Rebound.
Q. Okay. And what is Rebound?

Page 9

A. Rebound is a janitorial service.
Q. And what position did you occupy with
Rebound?
A. I was a janitor.
Q. And what time period was that for?
A. That was from September '99 until October
2000.
Q. Okay. And was Rebound a private company?
A. I believe so.
Q. And were -- what was their business
address?
A. 3030 East -- it starts with an -- Albany.
Q. Albany?
A. Uh-huh, yes, sir. 3030 East Albany.
Q. And was that -- what type of building was
that?
A. That's a senior citizen building.
Q. Okay. And is that where you performed
janitorial services?
A. No, that was just the base, the office.
Q. Okay. Where did you work as a janitor
then?
A. I worked on the West Side. I'm not sure of
the address anymore because I had more than one

Page 10

building.
Q. Okay. So you worked as a janitor for
approximately one year. Is that right?
A. No. I worked there at least two years. I
did Literacy Chicago from 9:00 to 5:00, and then I
did Rebound from 6:00 to 10:00.
Q. Okay.
A. So I was working two jobs for at least two,
maybe three straight years.
Q. Okay. So when your application says you
worked from September '99 to October 2000, that's
incorrect?
A. No, I would say that's correct.
Q. So you worked approximately one year for
Rebound as a janitor?
A. Yes.
Q. Okay. And you were paid -- it says
"Start." Oh, is that you started at 8:00?
A. No, I started at $8 an hour.
Q. $8 an hour?
A. Yes.
Q. Okay. And then it has "Reason for
Leaving." I can't really quite make out what that --
what's the reason you left that job?

Page 11

A. Loss of buildings. She lost the particular
buildings that I was working in.
Q. Okay. The person that owned Rebound?
A. Yes.
Q. Okay. After -- after Rebound, where did
you work?
A. After Rebound, I worked with Hilliard, on
Hilliard -- on Hilliard property.
Q. Okay. And who was your employer when you
went to work at Hilliard?
A. Loretta and Victor Shaw.
Q. And were they the owners of the Hilliard
housing development then?
A. The property manager. They were the
property manager.
Q. Okay.
A. Loretta Shaw was the property manager.
Q. Okay. Do you know who owned the Hilliard
buildings that you were working at?
A. I'm not sure. I believe the name was Green
at that time, but I'm not -- I'm not sure.
Q. Were your paychecks from Green, or
who signed the paychecks when you worked at Hilliard?
A. I don't know.

Page 12

**Sarnoff**
877.955.3855

3 (Pages 9 to 12)

Q. Okay. Do you know what company paid you?

A. Holsten paid me.

Q. Okay. Prior -- did you work at Hilliard buildings before Holsten earned them -- or owned them?

A. Yes.

Q. Okay. And prior to Holsten owning the Hilliard buildings, do you know who owned the buildings?

A. No, I don't.

Q. When did you begin working at Hilliard?

A. I began working at Hilliard in September 2001.

Q. And what was your position there?

A. My position there was an elevator operator, a desk clerk, and a weekend janitor.

Q. Looking back at Exhibit 1, on the first page, the date of the application. When did you fill that out? Do you recall?

A. September the 4th, '01.

Q. Okay. So were you working at the Hilliard building before September the 4th, 2001?

A. Yes.

Q. And that was in the position of elevator

Page 13

operator, desk clerk, and weekend janitor?

A. Correct.

Q. After filling out the employment application for Holsten, when did you begin work for Holsten? When were you employed?

A. I was -- I was working then. I never -- in September --

Q. Okay. So Holsten came on as a new owner of the Hilliard building --

A. And they just kept me on.

Q. Okay. And you filled out an application, and they kept --

A. Yes.

Q. -- you working there.

Okay. Going to the last page of Exhibit 1 -- where were you living at the time of 2001?

A. Where was I living?

Q. If you look at page 1, were you living at 2030 South State, Apartment 1305?

A. Yes.

Q. Okay. And is that part of the Hilliard complex?

A. Yes, it is.

Page 14

Q. And prior to living at 2030 South State, did you live at 2031 South Clark?

A. Correct.

Q. And is that part of the Hilliard complex?

A. Yes, it is.

Q. And how did you come to live at the Hilliard complex?

A. In 1985, I was told to -- I got a call from CHA, and it was February of '85. And they asked me could I get a $61 money order and be at 54 West Cermak. And I did. And I was given a clipboard and told to go up to Apartment 2006 and look at the apartment.

Q. So you got your original Hilliard apartment through Chicago Housing Authority. Is that correct?

A. Yes, sir.

Q. And as of September 2001, did you have seven dependents living with you? Is that correct?

A. I have seven children.

Q. Okay. And were they all minors in 2001?

A. Yes.

Q. Can you just give me their names and ages?

A. ▇▇▇▇▇▇▇▇▇. Her age is I believe 28.

Page 15

Q. Right now? Her age today is 28?

A. Her birthday is ▇▇▇▇

Q. Okay.

A. And then I have ▇▇▇▇▇▇ Her birthday is -- Dickerson. Her birthday is ▇▇▇▇

Q. Okay.

A. Then I have ▇▇▇▇▇▇▇▇ His birthday is ▇▇▇▇▇▇▇ -- okay.

MR. FUOCO: Not that.

THE WITNESS: Not this?

MR. FUOCO: Here you go.

THE WITNESS: Thank you.

MR. FUOCO: We can mark this if you want.

MR. SNELLING: You know what? It's probably not necessary.

THE WITNESS: Okay.

BY MR. SNELLING:

Q. You can just read them off.

A. Okay.▇▇▇▇▇▇▇▇

Q. ▇▇▇▇▇

A. ▇▇▇

Q. '87.

A. And then I have ▇▇▇▇▇▇▇▇

Page 16



**Page 17**

```
1      Q.
2      A.
3
4      Q.   Okay.
5      A.   Then I have
6  And she's
7      Q.   Okay.
8      A.   And I have
9  She's
10     Q.   Okay.
11     A.   And then I have
12  Dickerson.  And he's
13       Sorry.
14     Q.   That's all right.
15       Now, when you started working for Holsten
16  in September of 2001 --
17     A.   Mm-hmm.
18     Q.   -- what position did you have for Holsten?
19     A.   I was an elevator operator, a desk clerk,
20  and a weekend janitor.
21     Q.   And was there one particular building where
22  you performed these three functions?
23     A.   Yes.  The building was 2030 South State.
24  Oh.  Weekend janitor was 2030 South State.  And the
```

**Page 18**

```
1   elevator operator from 2:00 a.m. to 8:00 a.m. was
2   working on the elevators.
3      Q.   Okay.
4      A.   And the desk clerk was in building 30 West
5   Cermak from 11:00 to 7:00, 11:00 p.m. to 7:00 a.m.
6      Q.   Did there come a time when you started
7   working in a building at 2111 South Clark for
8   Holsten?
9      A.   Yes.
10     Q.   And when was that?
11     A.   That was -- that was, I believe -- it was
12  the summer of '04, I believe.
13     Q.   Okay.  And is that the building where
14  you've worked for Holsten since the summer of '04
15  till May of 2009?
16     A.   Yes.
17     Q.   Prior to Holsten owning the Hilliard
18  complex in 2001, how many women janitors were working
19  in the Hilliard building with you?
20     A.   None.
21     Q.   Now, other than -- let's go back to each of
22  your positions.  As an elevator operator, how long
23  did you stay in that position with Holsten?
24     A.   I would say a year.  I remember doing it a
```

**Page 19**

```
1   summer and a winter.
2      Q.   Okay.  And then what position did you have
3   with Holsten after the elevator operator position?
4      A.   The three jobs that I was doing for Holsten
5   all ended when I started working on the 2111 building
6   as a priority.
7      Q.   As a priority?  What do you mean?
8      A.   As -- as -- the summer of '04, when they
9   asked me if I could possibly do minor work for
10  building 2111 because there were no janitor there.
11  And the day that I said yes in the summer of '04,
12  that's when my other three jobs ended.
13     Q.   Okay.  So in the summer -- as I understand
14  it, in the summer of '04 when you began working as a
15  janitor at the 2111 South Clark building, from that
16  point on, you were exclusively a janitor for Holsten.
17  Is that correct?
18     A.   Yes.
19       MR. FUOCO:  Object to the form.
20  BY MR. SNELLING:
21     Q.   Okay.  Prior to that time, the summer of
22  2004, you had three positions at Holsten: elevator
23  operator, desk clerk, and weekend janitor.  Is that
24  correct?
```

**Page 20**

```
1      A.   Correct.
2      Q.   And was that during that whole period from
3   2001 to 2004 you held those three positions?
4      A.   Yes.
5      Q.   Why did you change positions in the summer
6   of 2004?
7      A.   For a better opportunity, to work at
8   building 2111.
9      Q.   Other than elevator operator, desk clerk,
10  weekend janitor, and then full-time janitor at
11  2111 South Clark, have you held any other positions
12  at Holsten?
13     A.   Volunteering.  I volunteered for particular
14  holidays, like Easter, to help with the Easter
15  decorations, helped with the health fairs.  Health
16  fairs and things come to the development, you know.
17     Q.   Did you hold any other paid positions?
18     A.   No.
19     Q.   Okay.  What -- when you started working as
20  a janitor at 2111 South Clark, what were the duties
21  of the janitor position that you held?
22     A.   I was told to -- not to go in the main part
23  of the building, just keep -- I didn't have to go up
24  in the building, just keep the first floor and
```

1   lobbies -- lobby looking good.
2   Q. Okay. So you were in charge of lobby
3   cleaning for 2111 South Clark?
4   A. Correct.
5   Q. And you didn't have to go to the upper
6   floors?
7   A. Correct.
8   Q. Were there any other duties?
9   A. Not at that -- outside duties, to keep the
10   front of the building clean, to water the plants on
11   the outside, to keep paper and debris and stuff out
12   of the parking lot. And, no, just do what I see
13   needs to be done.
14   MR. SNELLING: Okay. Can I have that
15   marked as Exhibit 2?
16   (Whereupon, Dickerson Deposition
17   Exhibit 2 was marked for
18   identification.)
19   BY MR. SNELLING:
20   Q. Okay, Ms. Dickerson. I've handed you
21   what's been marked as Deposition Exhibit 2, which is
22   a three-page document with -- having on the side
23   H '419, '420, and '421, and ask if you can identify
24   this document.

**Page 21**

1   A. It's a janitor job description.
2   Q. Okay. And is that a janitor job
3   description for Holsten?
4   A. I've never seen it before.
5   Q. In your job as a janitor, who did you
6   report to?
7   A. Whoever was the property manager.
8   Q. At the 2111 South Clark building that you
9   were a janitor at in the summer of 2004, was there
10   any other individual that was a janitor, or were you
11   the sole one?
12   A. I was the sole one.
13   Q. Did there come a time when there were more
14   than one janitor at 2111 South Clark?
15   A. No.
16   Q. And was that true of the other buildings in
17   the Hilliard complex?
18   A. No.
19   Q. Did they have more than one janitor at any
20   of the other buildings?
21   A. Yes.
22   Q. Okay. What buildings had more than one
23   janitor?
24   A. 2031 had more than one janitor, '31 South

**Page 22**

1   Clark. 2030 South State had two janitors, always had
2   two janitors. And 30 West Cermak always had two
3   janitors.
4   Q. Okay. If you were only responsible for
5   keeping the lobby area clean at 2111 South Clark, how
6   were the upper floors kept clean?
7   A. They would have someone to come in and out.
8   They would have -- you would see -- it was a service.
9   They had different people to come in and out and do
10   certain things.
11   Q. You mean a private company providing
12   janitorial service or what?
13   A. I wouldn't say it's a private company.
14   They just had people -- you got to know the people,
15   you know. You would look up, and they would be
16   there. And you would say, "Well, why are you here?"
17   And they would say, "Well, I'm here to clean the
18   carpet on Floor 13 and 7," you know.
19   Q. So more than one person was providing
20   janitorial services at 2111 South Clark at any given
21   time? There would be these other people coming in.
22   Is that correct?
23   MR. FUOCO: Object to form.
24   Go ahead.

**Page 23**

1   THE WITNESS: It wouldn't be any given
2   time. You wouldn't see them often. You would only
3   see them if the building was, like, falling.
4   BY MR. SNELLING:
5   Q. Okay.
6   A. Okay?
7   Q. If there were issues that needed a
8   janitor -- how many floors did 2111 South Clark have?
9   A. 16.
10   Q. 16. Okay. If there were issues with
11   messes in the hallways or garbage or any other type
12   of problem higher up in the building at 2111 South
13   Clark in 2004 or 2005, 2006 --
14   A. Mm-hmm.
15   Q. -- how -- who would handle that?
16   A. Me, Angel.
17   Q. Okay. So then your responsibilities were
18   more than just the lobby as a janitor. Is that
19   correct?
20   A. The lobby, that kind of played out after
21   like two or three weeks. Then I sprouted on to other
22   things. They just started me out like, "Well, all
23   you have to do is do this." And then each day, more
24   tasks were added on, you know. So I guess they were

**Page 24**

**Page 25**

1   just allowing me to get the basics of the lobby for a
2   couple of days, and then they would move me on to
3   other things and other floors and the laundry room
4   and the bathrooms and the compactor room and the
5   garbage.
6       Q.  So your duties could be anywhere in the
7   2111 South Clark building.  Is that correct?
8       A.  Or -- yes.
9       Q.  Okay.  And did your duties include sweeping
10  and mopping?
11      A.  Sweeping and mopping, yes.
12      Q.  Emptying trash?
13      A.  Yes.
14      Q.  Cleaning windows?
15      A.  And walls, yes.
16      Q.  And walls.  Dusting furniture, walls,
17  machinery?
18      A.  Yes.  Moving furnitures, stoves, cleaning
19  bathrooms, stripping floors, drywalling, boilers,
20  elevators, yes.
21      Q.  Okay.  Cleaning and maintaining storage
22  areas?
23      A.  Correct.
24      Q.  Collecting trash from each floor?

**Page 26**

1       A.  Yes.
2       Q.  And emptying trash cans into the Dumpsters?
3       A.  Collecting -- yes.
4       Q.  Okay.
5       A.  Elevator chutes cleaned, yes.
6       Q.  And then you said you had duties outside
7   the building, making sure the grounds were clean.  Is
8   that correct?
9       A.  Yes, mm-hmm.
10      Q.  Did you have -- you were to report
11  hazardous or emergency conditions that you came
12  across in the building?  Is that correct?
13      A.  No, I took care of them.
14      Q.  Okay.  And you were to prepare facilities
15  for events such as banquets and meetings.  Is that
16  correct?
17      A.  Yes, sir.
18      Q.  How about preparing empty rooms for
19  occupancy?
20      A.  I would go in and -- yes.
21      Q.  Okay.  Moving heavy furniture or equipment,
22  supplies?
23      A.  Yes.
24      Q.  Requisitioning supplies and equipment

**Page 27**

1   needed for cleaning and maintenance duties?
2       A.  Requisitioning?
3       Q.  Yeah.
4       MR. FUOCO:  Ordering.
5   BY MR. SNELLING:
6       Q.  Ordering.
7       A.  Yes.
8       Q.  Did you perform routine emergency
9   maintenance tasks in the building?
10      A.  Yes, I did.
11      Q.  Did you do basic -- repair basic building
12  or apartment systems such as switches and outlets and
13  breakers, fixtures?
14      A.  No.
15      Q.  Okay.  Any general carpentering, door
16  maintenance, floor repair?
17      A.  Yes.
18      Q.  Painting?
19      A.  Yes.
20      Q.  How about plumbing issues?
21      A.  Yes.
22      Q.  Did you maintain an inventory of cleaning
23  and toiletry supplies?
24      A.  Yes.

**Page 28**

1       Q.  Replace light bulbs and fuses?
2       A.  Yes.
3       Q.  Did you deliver notices as requested?
4       A.  Yes.
5       Q.  And assist with tours and building
6   inspections?
7       A.  Yes.
8       Q.  Now, for more technical issues like
9   electrical and stuff, was there someone else at
10  Holsten that had that responsibility for repairing
11  electrical or complicated plumbing or issues like
12  that?
13      A.  Off and on, not permanently.
14      Q.  Okay.  And who -- what would that position
15  be?
16      A.  Pardon me?
17      Q.  What would the Holsten employee performing
18  those services be called?
19      A.  I don't know.  We'd call each other -- they
20  said floaters.
21      Q.  Okay.
22      A.  I don't know.  They would be called from
23  other buildings.
24      Q.  Did you ever hear the term "maintenance

**Page 29**

1  engineer" applied to people performing that work?
2    A. No.
3    Q. Was there any type of engineering position
4  at the 2111 South Clark building while you were there
5  from 2004 to 2009?
6    A. Yes.
7    Q. And who was that person?
8    A. Who would fix outlets and things like that?
9    Q. Yeah.
10    A. That would be Joe. His name was Joe -- I
11  forget his last name. His name is Joe.
12    Q. Was he there the whole time, from 2004 to
13  2009, or did --
14    A. No. He -- he came and stayed. He came
15  from somewhere and stayed.
16    Q. Anyone else besides Joe performing that
17  type of function?
18    A. Kevin.
19    Q. Kevin?
20    A. Mm-hmm. With a K, Kevin. He did that type
21  of work.
22      And then -- and a -- and like maybe 2007 or
23  2008, then -- I can't remember. He's the janitor now
24  for building 2111 -- I mean for building 2030 South

**Page 30**

1  State. His name is -- I can't think of his name at
2  the time.
3    Q. Okay. All right.
4    A. His name Ivory.
5    Q. Ivory?
6    A. Mm-hmm, Mr. Ivory.
7    Q. Now, did you -- from 2004 when you became a
8  janitor at 2111 South Clark, did you ever make any
9  complaints to Holsten regarding your treatment in
10  that position?
11    A. Yes.
12    Q. Okay. And when was that?
13    A. It was on several different occasions. I
14  don't --
15    Q. When is the earliest complaint that you
16  recall making?
17    A. Maybe two years after I got there.
18    Q. So 2006?
19    A. Yes.
20    Q. Okay. And what was the nature of the
21  complaint?
22    A. Janitors would -- new people will come to
23  the site, to any one of the buildings, and they would
24  request something that I been asking them for all

**Page 31**

1  along, like a carpet shampooer or a floor stripper.
2  And I've been asking for this all along, and I've
3  been held off from it, but then one of the guys will
4  come, and they'll put a work order in, and they'll
5  get it right away. You know, I don't --
6    Q. Okay. So when you say one of the guys,
7  you're talking about other new janitors? Is that
8  what you're talking about?
9    A. Yes. A janitor, yes.
10    Q. Okay. So they would ask for some type of
11  equipment, and they would get it?
12    A. Yes.
13    Q. And when you had been asking for that type
14  of equipment, you didn't get it?
15    A. No.
16    Q. Did you ever get it?
17    A. No, I didn't get it. The whole time that I
18  was there -- I bought my own vacuum cleaner when I
19  first started. Okay? I had to go and get a vacuum
20  cleaner because they said they didn't have funds at
21  that time. They said I would be reimbursed, but I
22  wasn't, but it was no problem. Okay?
23      Something that I did finally get the whole
24  time that I was there was a stripper machine. Okay?

**Page 32**

1    Q. Mm-hmm.
2    A. But -- and I just got that, I believe, in
3  '08. And then I was told that I had to share it with
4  the janitor of 2030. And -- at least we got it.
5    Q. Okay. Going back to 2006, the first
6  complaint that you remember for the carpet cleaner
7  machine, was it?
8    A. Yes.
9    Q. Was that it? Who did you complain to?
10    A. I complained to -- I didn't complain. I
11  just asked why -- you know, why don't I get the
12  things that I ask for, but someone else can walk up
13  and ask for them and they get it?
14    Q. Okay. Who is that person that you made
15  that comment to?
16    A. Steve Johnson.
17    Q. And what did Steve Johnson reply?
18    A. "Be patient," or something to that sort.
19    Q. And were you ever then given a carpet
20  cleaner?
21    A. No.
22    Q. Never in the whole time you were there?
23    A. No.
24    Q. And how -- so how did you do cleaning of

1  the carpets?
2      A.  I would scrub it my own self.  I bought a
3  steamer, and I would put the water down there and
4  suds it up and then take the steamer and suck it up.
5      Q.  When you said you bought it, were you
6  reimbursed for that?
7      A.  No.
8      Q.  Did you ask to be reimbursed?
9      A.  No.
10     Q.  Why not?
11     A.  Because you would get remarks.  What made
12 me stop asking for the reimbursement for the vacuum
13 cleaner was that I -- I asked -- I asked -- I said
14 something about the vacuum cleaner one day, and Steve
15 Johnson, he kind of laughed a little bit and said,
16 "Don't wait on it," you know.
17     Q.  When was this?
18     A.  This was -- this was like two years after
19 the vacuum cleaner.
20     Q.  So that would be 2008?
21     A.  No, it wasn't that far.  It was maybe --
22 oh, maybe two thousand and -- two thousand and --
23 probably the summer of '05.  Probably the summer of
24 '05 because I got tired of sweeping, and I really

Page 33

1  needed a vacuum cleaner.
2      Q.  Okay.  Now, you had said before your first
3  complaint was in 2006.  Now you're saying the summer
4  of 2005?  Are you really sure?
5      MR. FUOCO:  Objection.  Argumentative.
6      THE WITNESS:  When I ordered the vacuum
7  cleaner, a little while later, I asked about it.  I
8  was kind of laughed off a little bit.  I probably
9  asked -- I asked about it again.
10     I learned not to buy anything and ask
11 for -- and look for reimbursement.  If you want it
12 and you really need it, get it if this is what you
13 want to do to clean your building.  And that's what I
14 would do.
15 BY MR. SNELLING:
16     Q.  And who were the other -- do you know the
17 names of the other janitors in 2006 that had vacuum
18 cleaners that requested them and they were given
19 them?
20     A.  No.  No, I don't remember.
21     Q.  Okay.  Besides the vacuum cleaner
22 complaint, what other complaints did you make to
23 Holsten?
24     A.  I -- well, the snow in front of 2111 main

Page 34

1  entrance.  There would be a snowbank there.  Okay?
2  And for years, I shoveled that snow, no help.  Wasn't
3  looking for no help.  It was what I needed to do, and
4  that's what I did.
5      And like -- and like '07 or maybe '08 --
6  well, me and Terry Hodges, we were like the main
7  janitors on Hilliard site for the four buildings of
8  Hilliard.  And Terry could order the things that he
9  needed to move the snow or whatever, but I didn't get
10 what I -- what I needed.  I didn't get what I needed.
11 And then Terry wouldn't come and do my part now that
12 we have a machine.  So ...
13     Q.  So Terry Hodge ordered a snowblower -- is
14 that what you're saying? -- or some type of snow
15 removal machine.
16     A.  Yes.
17     Q.  And when was that?
18     A.  About in '07 or '08.  Almost anything that
19 Terry ordered, he could get.
20     Q.  And was that a machine that only he could
21 use?
22     A.  It's not supposed to be like that, but
23 that's the way that it went.
24     Q.  And where -- what about -- there's four

Page 35

1  buildings, correct, in the Hilliard complex?
2      A.  But the buildings opened up slowly.  2111
3  opened up first.  That was the first building that
4  opened.
5      Q.  Okay.
6      A.  And I believe -- I believe the second
7  senior building, 30 West Cermak, was the second
8  building that opened, if I'm not -- I don't know.
9  No, it was a single building and a family building to
10 open first.
11     I'm not sure how it went.  I really wasn't
12 concerned about all those things.  I was just
13 concerned about this building.  That was my baby.
14     Q.  Okay.
15     A.  I was just keeping that going.
16     Q.  Was 2111 South Clark a senior building?
17     A.  Yes.
18     Q.  Okay.  And were the janitors in each
19 building responsible for cleaning the snow in front
20 of that building or the sidewalk snow?
21     A.  You're responsible for the inside and
22 outside of your building.
23     Q.  Okay.  And so up until 2007, all the
24 janitors had to manually shovel the snow from their

Page 36



**Page 37**

1  buildings. Is that correct?
2      A. Yes, mm-hmm.
3      Q. Okay. In 2007 or '8, you said that Terry
4  Hodge asked for a snow removal machine of some sort.
5  Is that correct?
6      A. We -- we -- yeah, he -- yeah. He -- he
7  had -- he have what he needed. He had what he
8  needed. We really didn't start getting good
9  equipment until Ivory came. That's -- but Terry had
10 whatever he needed to remove the snow. It just
11 wasn't sufficient. Okay? But it was -- it -- it got
12 us through. Okay?
13     Q. What do you mean, sufficient?
14     A. It was something that was already a part of
15 the building. It was something that was left over
16 before the construction. It was something that he
17 found and pieced together to make work or whatever.
18     Q. So Terry Hodge created a snowblower -- is
19 that what you're saying? -- or a snow removal
20 machine.
21     A. No, he didn't -- he didn't create one. He
22 found one and fixed it or got it to working and stuff
23 like that.
24     Q. And so he only removed snow from his

**Page 38**

1  building? Is that what you're saying?
2      A. No. He -- he would -- he would move --
3  they would -- they would have to do the walkways for
4  the seniors and stuff to get through the main parts
5  and things like that. But this -- this part over
6  here (indicating), which was a collector of snow --
7  okay? It just was -- if you pull the cameras during
8  the wintertime, then you can see how the snow piled
9  up, particularly at this part right here
10 (indicating).
11     Q. Yeah.
12     A. And instead of someone, now that we have
13 machines, coming to do this, they still left that for
14 Angel to do. That's what I'm saying.
15     Q. Now, who is the "they"?
16     A. Dennis Banks, Terrence Hodges, and whoever
17 was appointed to do the snow. Kevin, with a K, if he
18 was appointed, he didn't do it. He wasn't going to
19 do it.
20         It was just like we -- when we didn't have
21 anything, everybody pulled together and did what they
22 were supposed to do. Then when we did get the
23 machines, the men only did just what they needed to
24 do. They didn't do no extra. They didn't want to do

**Page 39**

1  no extra. Okay? So after they did the sidewalks or
2  whatever, then they would pass the machine around.
3  "Here. You can do your building now." You know what
4  I'm saying? Or, "Here. You can do this right here."
5          And there were no particular janitor
6  because 30 West Cermak was off and on with a janitor.
7  They couldn't seem to find a good placement to
8  staying put. So they would take turns or either --
9  they would help and get that done because they didn't
10 want the property manager on them. You know what I'm
11 saying? But then when it came to giving me the
12 machine, I couldn't get the machine, and nobody
13 wanted to come around and do my part, you know.
14     Q. What year are we talking about now?
15     A. We're talking about the year of '07,
16 definitely in '08 when we had brand-new snowblower
17 machines.
18     Q. Now, there's more than one machine?
19     A. Yes.
20     Q. And who had those machines?
21     A. The family building, Ivory, and 30 West
22 Cermak.
23     Q. And who did you ask to be able to use the
24 machine or have somebody use the machine at your

**Page 40**

1  building?
2      A. I would go to the property manager.
3      Q. Who was?
4      A. Who was either Rosette or Ms. Redman.
5      Q. Okay. And what would you say; what would
6  they say?
7      A. I would say, "Can someone do the walkway on
8  my building? I did it this morning" -- because I'm
9  always up at 2:00 or 3:00 in the morning when it's
10 going to snow. And I said, "I've already done it,
11 but it's steady coming down. Can you get someone to
12 do the front of my building?"
13         "No, no. Everybody's responsible for their
14 own," whatever.
15         And that was no problem because I still did
16 it. I got it. I handled it. I got it. I did
17 those -- I did that building seven straight years.
18     Q. Did you ever talk to Ivory about the
19 problem with getting a snowblower?
20     A. In 2008 -- was it 2008? In 2008, Ivory was
21 so beautiful. He -- he was -- he had -- they all had
22 their big snowblowers, and he had this little small
23 contraption that you can plug up and just shovel it a
24 little bit. And he gave me that. He gave me that.



**Page 41**

1    Q. So you were able to use that machine?
2    A. Yeah -- yes.
3    Q. Did you ever make a written complaint
4  regarding this to anyone higher up in Holsten about
5  the snowblower -- snow removal problem?
6    A. No.
7    Q. Why not?
8    A. I didn't want to make it bad on myself. I
9  just wanted to keep peace. I didn't want to make
10 nobody mad at me, so I don't want to go over nobody's
11 head. I just -- I didn't, no.
12   Q. Okay. Besides the carpet cleaner and the
13 snow removal equipment, any other complaints that you
14 had with Holsten regarding how you were treated?
15   A. No. It's just certain things that would go
16 on, like when me and Ms. Redman -- Ms. Redman wasn't
17 a very happy person. And so I would try and go and
18 talk to Steve Knox about particular things and
19 different ways that she would walk up on me. And
20 Steve Johnson -- I mean, Steve Knox called Steve
21 Johnson one day because it was a really terrible day.
22   And when I went back to ask Steve Knox,
23 "What did Steve Johnson say about the problem?"
24 because it was just terrible, that Steve Knox said,

**Page 42**

1  "Steve Johnson said, 'Just stay out of it. It's a
2  catfight.'"
3    What do you mean a cat? As long as I'm
4  here and y'all know that I love this building and
5  these people and do the best I can, I couldn't see
6  why they couldn't help me more.
7    Q. What year was that?
8    A. That was the year Ms. Redman was there.
9  That was 2009.
10   Q. 2009?
11   A. Mm-hmm.
12   Q. And who was Steve Knox?
13   A. Steve Knox was -- he leased. He worked in
14 leasing.
15   Q. And what did he have to do with janitorial
16 duties?
17   A. He didn't have anything to do with
18 janitorial duties. But he -- he had a better chance
19 of reaching Steve Johnson than -- than me.
20   Q. Were you -- could you call Steve Johnson?
21   A. Yes, I could call Steve Johnson and leave a
22 voice mail or something like that. I'm sure he was
23 always busy because I never really got him, you know.
24   Q. Was Steve Johnson a vice president at

**Page 43**

1  Holsten?
2    A. I believe so.
3    Q. Was anyone else present in 2009 when you
4  had this conversation with Steve Knox relating what
5  Steve Johnson supposedly said to him about a
6  catfight?
7    A. No, not -- no.
8    Q. That was just you and Steve Knox?
9    A. It was just me and Steve Knox.
10   Q. And this was regarding a problem that you
11 were having with Ms. Redman as your supervisor. Is
12 that correct?
13   A. Correct.
14   Q. All right. Anything -- any other
15 complaints to Holsten regarding your treatment at
16 any -- in your janitorial positions besides these?
17   A. Holsten just wanted me seen and not heard.
18   Q. I'm sorry?
19   A. Holsten wanted me seen and not heard. I
20 did a good job. They liked when I present myself to
21 the best -- guests and visitors, but they didn't want
22 to hear from me.
23   Q. Okay. And who told you that?
24   A. That's the conclusion that I came up with

**Page 44**

1  myself.
2    Q. And when did you come to that conclusion?
3    A. I came to that conclusion -- I came to that
4  conclusion -- I don't know -- after -- after I saw
5  they wasn't interested in the things that I said that
6  I needed, just they're not trying to hear from you.
7    Q. Okay. Any other incidents besides the ones
8  that you've related where you felt that you weren't
9  treated properly by Holsten --
10   A. No.
11   Q. -- or while you worked at Holsten?
12   A. No.
13   Q. And do you have any documents regarding any
14 of these complaints that you've talked about that
15 haven't been produced to me in this case?
16   MR. FUOCO: Object to the form of that.
17 BY MR. SNELLING:
18   Q. Okay. Do you have any document -- have you
19 provided your lawyer with all documents regarding
20 these complaints?
21   A. Yes.
22   Q. Do you have any other documents regarding
23 these complaints?
24   A. No.

1  Q. And in response to our document production
2  request to you, have all the documents that you have
3  regarding complaints against Holsten been produced to
4  us, to Holsten?
5  A. Yes.
6  Q. Okay. Now, have you ever filed a Charge of
7  Discrimination against any of your employers?
8  A. No, never.
9  MR. FUOCO: Including Holsten?
10  BY MR. SNELLING:
11  Q. Let me hand you what we'll mark as
12  Exhibit 3.
13  (Whereupon, Dickerson Deposition
14  Exhibit 3 was marked for
15  identification.)
16  BY MR. SNELLING:
17  Q. Handing you what's been marked Deposition
18  Exhibit 3 and ask if you can identify this document.
19  A. This is a Charge of Discrimination.
20  Q. Okay. And is it a Charge of Discrimination
21  that you filed?
22  A. Correct.
23  Q. Okay. And it says -- does it bear your
24  signature at the bottom of the page?

Page 45

1  A. No. But he told me I need me a lawyer. My
2  granddad said that I need me a lawyer.
3  Q. Okay. And did you go to the EEOC and file
4  this Exhibit 3? Is that correct?
5  A. Yes, I did.
6  Q. Okay. And in the particulars section, in
7  the second -- bottom half of the document, is your
8  statement of the particulars in that section of this
9  document accurate?
10  A. Yes.
11  Q. The document states, "I was employed as a
12  Building Keeper." That's at Holsten. Is that
13  correct?
14  A. Correct.
15  Q. Okay. What's a building keeper?
16  A. I kept the building. I took care of the
17  building.
18  Q. Okay. Was that a job title at Holsten that
19  you had?
20  A. No. It -- no.
21  Q. How did you come up with the term "building
22  keeper"?
23  A. Because I cared for the entire building.
24  MR. FUOCO: I would object. It presumes

Page 47

1  A. Yes, it does.
2  Q. And did you complete this form on or about
3  May 13th, 2009?
4  A. Yes.
5  Q. Okay. And is this Charge of Discrimination
6  directed against Holsten Management Company?
7  A. Yes.
8  Q. How did you come to file this charge,
9  Ms. Dickerson? What prompted it?
10  MR. FUOCO: Remember, conversations with me
11  are privileged and are not to be disclosed.
12  So to the extent it would call for a
13  conversation between the two of us, you don't have to
14  testify to that. But anything else, please.
15  THE WITNESS: I felt that Holsten treated
16  me unfair.
17  BY MR. SNELLING:
18  Q. Okay. Were you directed to the EEOC by any
19  person?
20  A. My granddad.
21  Q. Your grandfather?
22  A. Yeah.
23  Q. And did you talk to a lawyer before you
24  filed this charge?

Page 46

1  the fact that she wrote this.
2  BY MR. SNELLING:
3  Q. Okay. Did you -- did you give this
4  statement? Did you write this statement in the
5  particulars?
6  A. Yes.
7  Q. Now, in the particulars, you say, "On
8  May 1st, 2009, I was discharged. Similarly situated
9  male employees were retained."
10  A. Mm-hmm.
11  Q. Okay. What -- who were the similarly
12  situated male employees?
13  A. All the males that was working there when I
14  were working there on the day that I was fired.
15  Q. In May of 2009?
16  A. Yes.
17  Q. Okay. And that you believe that you were
18  discriminated against because of your sex, female.
19  A. Correct.
20  Q. Okay. And that's the only statement of
21  discrimination that's in this document. Is that
22  correct?
23  MR. FUOCO: Objection. Legal conclusion.
24  BY MR. SNELLING:

Page 48

**Page 49**

1    Q.  Do you have any other facts that you stated
2  in this document?
3        MR. FUOCO:  Object to form.
4        Go ahead.
5  BY MR. SNELLING:
6    Q.  I'm sorry?
7        Okay.  Did you include in this charge all
8  the types of discrimination by Holsten that you felt
9  you were subjected to while an employee there?
10    A.  Yes.
11    Q.  Now, the only form of sex discrimination
12  that you list in this charge is that you were
13  discharged on May 1st, 2009, while similarly situated
14  male employees were retained.  Is that correct?
15    A.  Mm-hmm, correct.
16    Q.  And you filed this charge within two weeks
17  of being terminated, so the facts of your employment
18  would be fresh in your mind at that time.  Is that
19  correct?
20    A.  Pardon me?
21    Q.  Okay.  You filed this charge on May 13th,
22  2009?
23    A.  I did.  But the lady wrote this up because
24  I don't speak like this, "similarity situated male

**Page 50**

1  employees were retained."
2    Q.  Okay.
3    A.  I did tell her that I was the only one
4  fired but they kept everyone else.
5    Q.  All right.
6    A.  But she wrote this up in her own words.
7    Q.  Okay.
8    A.  Okay?
9    Q.  But in your words, were there any other --
10  did you complain to the EEOC regarding any other
11  types of discrimination that you were subjected to at
12  Holsten?
13    A.  I -- I -- I explained to her -- she asked
14  me why did I think that I was discriminated against
15  and why would I want to file a charge.
16    Q.  Right.
17    A.  And I explained to her the reasons why.
18    Q.  Okay.  And what are the reasons why?  You
19  were the only -- you were a woman, and you were
20  discharged from Holsten, and none of the men were
21  discharged?
22    A.  I was told that the new property manager
23  had brought in his own cleaning crew, and for that
24  reason, they're going to have to let me go, only me.

**Page 51**

1  So if he brought in his own cleaning crew, then why
2  not get rid of everyone?
3    Q.  Okay.
4    A.  Okay?  But they only let me go.
5    Q.  All right.  And that's the only form of
6  discrimination that you discussed with the EEOC.  Is
7  that correct?
8    A.  Correct.
9    Q.  Now, your Charge of Discrimination was
10  dismissed by the EEOC, wasn't it?
11    A.  It was dismissed?
12    Q.  Yes.
13        MR. FUOCO:  Objection.  Misstates.
14        MR. SNELLING:  Okay.  Can I have that
15  marked as Exhibit 4?
16              (Whereupon, Dickerson Deposition
17              Exhibit 4 was marked for
18              identification.)
19  BY MR. SNELLING:
20    Q.  Handing you what's been marked as
21  Deposition Exhibit 4 and ask if you can identify this
22  document, Ms. Dickerson.
23    A.  This is Dismissal and Notice of Rights.
24    Q.  And did you receive this from the EEOC?

**Page 52**

1    A.  Correct, yes.
2    Q.  Okay.  And I take it you received it
3  sometime after November 20th, 2009, the date that it
4  bears at the bottom.  Is that correct?
5    A.  Correct.
6    Q.  And is it correct that the -- in the text,
7  a box is marked with an X that "The EEOC issues the
8  following determination:  Based upon its
9  investigation, the EEOC is unable to conclude that
10  the information obtained establishes violation of the
11  statutes."  Is that correct?
12    A.  Yes.  But it say something else [as read]:
13  "This does not certify that the response is in
14  compliance with the status.  No finding is made as to
15  any other issue that might be conclusive as having
16  been raised by this charge."
17    Q.  Okay.  And that's a box that's checked,
18  correct?
19    A.  Correct.
20    Q.  When you were employed by Holsten, did you
21  receive an employee handbook from Holsten?
22    A.  Yes, I did.
23  ///
24  ///

```
 1        (Whereupon, Dickerson Deposition
 2         Exhibit 5 was marked for
 3         identification.)
 4  BY MR. SNELLING:
 5    Q.  Handing you what's been marked as
 6  Deposition Exhibit 5 and ask if you can identify this
 7  document, Ms. Dickerson.
 8    A.  This is the employee handbook for Holsten.
 9    Q.  Okay.  And is Exhibit 5 a document that you
10  were given by Holsten?
11    A.  Yes.
12    Q.  Okay.  And if you could open up the -- I'll
13  represent to you that this is a document that was
14  produced to me in response to our production request.
15  Does the second page have a copy document that has
16  your name on it?
17    A.  Correct.
18    Q.  Is that your writing, "Angel Dickerson"?
19    A.  Yes.
20    Q.  When did you get this document, Exhibit 5?
21    A.  I got this book -- I got this book maybe in
22  '06/'07.
23    Q.  And who did you get it from?
24    A.  I got it from our janitor maintenance
```
Page 53

```
 1  meeting for all Holsten janitors and maintenance.
 2    Q.  And were these handed out at that time?
 3    A.  Yes.
 4    Q.  Okay.  And you obviously kept your copy.
 5  Is that correct?
 6    A.  Correct.
 7    Q.  And did you read it?
 8    A.  Yes.
 9    Q.  Let me hand you what's been marked -- what
10  we'll mark as Exhibit 6.
11        (Whereupon, Dickerson Deposition
12         Exhibit 6 was marked for
13         identification.)
14  BY MR. SNELLING:
15    Q.  Hand you this document, Ms. Dickerson --
16  it's marked as Exhibit 6 -- and ask if you can
17  identify this document.
18    A.  This is -- Exhibit 6.  Hmm.  Plan
19  maintenance by Holsten.
20    Q.  It's a one-page document that on the side
21  has the Bates stamp H '141?
22    A.  Correct.
23    Q.  Okay.  And at the bottom, it appears to
24  have your signature.  Is that your signature?
```
Page 54

```
 1    A.  Yes.
 2    Q.  Okay.  And it bears the date 11/30/07.  Is
 3  that correct?
 4    A.  Yes.
 5    Q.  Did you sign this document?
 6    A.  That's my signature, mm-hmm.
 7    Q.  Okay.  And what -- was the meeting of the
 8  janitorial personnel on or about November 30th, 2007?
 9        MR. FUOCO:  Objection.  Misstates.
10        Go ahead.
11        THE WITNESS:  I don't know.  We had these
12  meetings yearly.  After we received this book, we
13  were told to bring the book back.
14  BY MR. SNELLING:
15    Q.  Okay.
16    A.  So I don't know what particular -- I don't
17  know.
18    Q.  Okay.  But at one of -- at some point --
19    A.  At one of the meetings.
20    Q.  -- you signed Deposition Exhibit 6.
21    A.  Okay.
22    Q.  Is that correct?
23    A.  Yes.
24    Q.  Okay.  Now, in reading the Holsten employee
```
Page 55

```
 1  handbook, Exhibit 5, were you aware that your
 2  employment at Holsten was as an at-will employee?
 3        MR. FUOCO:  Objection.  Requires legal
 4  conclusion.
 5  BY MR. SNELLING:
 6    Q.  Go ahead and answer.
 7    A.  At-will?
 8    Q.  Yes.
 9    A.  Yes.
10    Q.  Did you know that Holsten had an internal
11  complaint review procedure set forth at page 10 of
12  this document?
13    A.  Yes.
14    Q.  Okay.  Did you ever file a written
15  complaint with Holsten regarding your claims of sex
16  discrimination or unequal pay?
17    A.  No.
18    Q.  Ms. Dickerson, were you aware from
19  Exhibit 5, the employee handbook, that Holsten
20  employees could be disciplined or terminated for
21  rudeness, lack of cooperation, insubordination, or
22  failure to follow instructions?
23    A.  Yes.
24    Q.  Ms. Dickerson, were you aware that
```
Page 56

1  belligerent speech, excessive arguing, and swearing
2  are considered workplace violence as defined in the
3  employee handbook?
4      A.  Definitely.
5      Q.  Did you have any problems in the
6  performance of your work at Holsten?
7      A.  None.
8      Q.  Other than the issues that we've already
9  discussed of complaints, did you make any complaints
10 to your supervisor at Holsten regarding any problems
11 you were suffering at the workplace at Holsten other
12 than the instances that you already discussed?
13     A.  No.
14     Q.  Now, you said your supervisor was -- when
15 you started in 2004, was that Rosette Starrou?
16     A.  No.  When I -- when I started -- when I
17 started, it was Loretta Ward.
18     Q.  Loretta Ward?
19     A.  Loretta Ward.
20     Q.  And that's in the summer of 2004?
21     A.  Correct.
22     Q.  And how long was she your supervisor?
23     A.  Maybe a year.  I'm not sure.  She got sick.
24     Q.  Okay.  And what was her position?

Page 57

1      A.  I would say maybe a year.
2      Q.  So that would be maybe 2005 to 2006 are we
3  talking about?
4      A.  Yes, possibly.
5      Q.  Okay.  And is she a woman?
6      A.  She is.
7      Q.  And did you have any problems with her?
8      A.  No.
9      Q.  And who replaced Regina Stewart in that
10 position?
11     A.  No one for a while.  And then Rosette came.
12     Q.  Okay.  Rosette.  And how -- Starrou?  Is
13 that her last name?
14     A.  Something.
15     Q.  You just knew her as Rosette.
16     A.  Correct.
17     Q.  Okay.
18     A.  I just called her boss lady.
19     Q.  Okay.  And how long was she your
20 supervisor?
21     A.  Not long.  Just a couple of months, if that
22 much.
23     Q.  And would this have been in 2006?
24     A.  Let me see.  I don't believe so.  Let me

Page 59

1      A.  She was the property manager.
2      Q.  For?
3      A.  Holsten.
4      Q.  For 2111?
5      A.  For Hilliard Towers.
6      Q.  For all four of the Hilliard
7  buildings?
8      A.  Correct.
9      Q.  Okay.  And Loretta Ward, was that a woman?
10     A.  Yes.
11     Q.  And did you have any problems with her?
12     A.  None.
13     Q.  And she left after a year because of
14 illness?  Is that correct?
15     A.  Yeah.  I'm not sure of the right time, but,
16 yeah, she was sick with cancer.
17     Q.  Okay.
18     A.  She passed away.
19     Q.  All right.  And who replaced her?
20     A.  Regina Stewart.
21     Q.  And how long was she -- was she then the
22 property manager?
23     A.  She was acting manager.
24     Q.  Acting.  And how long was she in that role?

Page 58

1  see.  The summer of '9, '8 -- no, Rosette was like in
2  '08.
3      Q.  '08?
4      A.  Yeah, '07 or '08.  I'm not sure.
5      Q.  Okay.  Other than Loretta Ward, Regina
6  Stewart, Rosette, did you have any other supervisors?
7      A.  Carol Redman.
8      Q.  And was she your last supervisor --
9      A.  Correct.
10     Q.  -- at Holsten?
11         Okay.  Did you ever make any complaints to
12 Loretta Ward regarding your treatment at Holsten?
13     A.  No.
14     Q.  Did you ever make any complaints to Regina
15 Stewart regarding your treatment at Holsten?
16     A.  No.
17     Q.  What about with regard to Rosette?  Did you
18 ever make any complaints to her about your treatment
19 while you were employed at Holsten?
20     A.  No, they was the property manager.  If I
21 had a complaint, I would talk to Steve Johnson, or if
22 I had something that I really needed, I would talk to
23 Steve Johnson.  The property manager already had so
24 much more to do.

Page 60

1    Q.  Okay.  But the property managers were your
2  direct supervisors, correct?
3    A.  The property manager was the boss, yes.
4    Q.  Okay.  All right.  And with regard then to
5  your last property manager or supervisor, Carol
6  Redman, did you ever complain to her about any
7  problems that you were having in your treatment at
8  Holsten?
9    A.  No.
10    Q.  We don't need to mark this as an exhibit.
11  This is the complaint in this case.
12    MR. FUOCO:  You're going to have her
13  comment about it?
14    MR. SNELLING:  Yeah.  I was going to ask
15  her --
16    MR. FUOCO:  We should mark it then.
17    MR. SNELLING:  Okay.
18    Want to mark that as Exhibit 7?
19    (Whereupon, Dickerson Deposition
20       Exhibit 7 was marked for
21       identification.)
22  BY MR. SNELLING:
23    Q.  Okay.  I've handed you what's been marked
24  as Exhibit 7 and ask if you can identify this

Page 61

1    A.  Okay.
2    Q.  Is that correct?
3    A.  Yes.
4    Q.  Okay.  So who did you -- so as not to
5  repeat ourselves, are there any instances regarding
6  this that you haven't testified to already?
7    A.  No.
8    Q.  In other words, the carpet cleaner, the
9  snow removal equipment, and the --
10    MR. FUOCO:  Vacuum?
11  BY MR. SNELLING:
12    Q.  Oh, and the Steve Knox comment that he
13  related to you.  Are there any other instances of
14  unequal treatment that are facts that support your
15  allegation in paragraph 12?
16    A.  No.
17    Q.  Ms. Dickerson, are there any written
18  documents that support your allegations in
19  paragraph 12 regarding complaints about unequal
20  treatment?
21    MR. FUOCO:  Objection.  Requires legal
22  conclusion; requires speculation.
23  BY MR. SNELLING:
24    Q.  Are there any documents that you have that

Page 63

1  document.
2    A.  United States District Court for the
3  Northern District of Illinois, Eastern Division.
4  It's no number right here (indicating).
5    Q.  Okay.  There's a -- if you look, it's a
6  four-page complaint --
7    A.  Okay.
8    Q.  -- that section of the exhibit.  Is this
9  your complaint in this lawsuit?
10    A.  Yes, it is.
11    Q.  And have you seen it before?
12    A.  Yes, I have.
13    Q.  Are the statements in it accurate?
14    MR. FUOCO:  Object to the conclusory nature
15  of it and requires speculation.
16    THE WITNESS:  Yes.
17  BY MR. SNELLING:
18    Q.  Okay.  If you could look at paragraph 12 on
19  page 2 of the complaint.  It states before May 1st,
20  2009, you frequently complained to defendant about
21  unequal treatment and the lack of needed equipment to
22  your work at 2111 South Clark, which similarly
23  situated men doing the same work as you had to use at
24  other buildings.  Do you see that?

Page 62

1  show facts supporting the allegation in paragraph 12
2  of your complaint?
3    A.  Only an e-mail that I sent to Steve
4  Johnson.
5    Q.  Okay.  And when was that e-mail?
6    A.  That e-mail was the day of me being fired,
7  as a matter of fact, May 1st, 2009.
8    MR. SNELLING:  Could we have this marked as
9  Exhibit 8?
10    (Whereupon, Dickerson Deposition
11       Exhibit 8 was marked for
12       identification.)
13  BY MR. SNELLING:
14    Q.  Okay.  I've handed you what's been marked
15  as Deposition Exhibit 8 and ask if you can identify
16  this document.
17    A.  This is an e-mail that I e-mailed to Steve
18  Johnson.
19    Q.  Okay.  And what's the date of it?
20    A.  The date is May 1st, 2009, Friday.
21    Q.  And it's regarding Hilliard floors?
22    A.  Correct.
23    Q.  Okay.  And why did you send this e-mail to
24  Steve?

Page 64

1    A.  Because the floors were really, really
2  greasy.  We would get a greasy residue that would be
3  so strong that it would come through the mats that we
4  had on the floors.
5        And we had help there, which were EarnFare
6  workers.  But it was -- the problems were so terrible
7  at that time with Ms. Redman and her intervening with
8  the workers that they had given us.
9        The EarnFare workers were workers that were
10  placed on a property to help the main workers of
11  Holsten get the buildings the way they need to be.
12  And Ms. Redman was interfering in that.  She was
13  allowing them to leave.  They were playing around.
14  They were hiding out, you know, when things needed to
15  be done.
16        So then I hear that the lady upstairs --
17  which is really old, and she was on a cane.  And she
18  came, and her cane didn't touch the rug.  I actually
19  touched the floor, and it slipped out from up under
20  her.  And that's just ridiculous when we need to be
21  doing what it is we need to be doing, you know.
22        So I had to let Steve know because so many
23  other people were giving him so many different ideas
24  and things like that, and I needed to tell him what

**Page 65**

1  that I put in to order a blower or a cleaning machine
2  and was denied from DuMore or something like that.
3  It wasn't approved.
4    Q.  Okay.  Hold on one second.
5    A.  But then I look up, and another building
6  has been approved for it.
7        How did you get that?
8        MR. SNELLING:  Can I have this marked as
9  Exhibit 9?
10            (Whereupon, Dickerson Deposition
11             Exhibit 9 was marked for
12             identification.)
13  BY MR. SNELLING:
14    Q.  Ms. Dickerson, I'm handing you what's been
15  marked as Exhibit 9 and ask if you can identify
16  this -- these two page -- two pages of documents.
17    A.  This is -- this is a work order from -- not
18  a work order.  This is a receipt from DuMore Supplies
19  on -- on a floor machine.
20    Q.  Okay.
21    A.  Mm-hmm.
22    Q.  And what does this document have to do with
23  your claims in this case?
24    A.  This document don't have anything to do

**Page 67**

1  actually it needs.  Like my mats, I would put my
2  mats -- my mats up every day.  I would roll them.
3  And I had 18, 19, 20-some mats.  And I would roll
4  them.  As often as you can let the floor breathe with
5  the air blowing on it was good.  To leave the mat in
6  place would allow the greasiness to build up, and it
7  would come through the mat.
8        And although my building was okay and
9  together, the same treatment not being given to
10  30 West Cermak, they were tracking the grease around
11  to 2111, they were still putting both of the
12  buildings in danger for the people.
13    Q.  Is this the document, the e-mail that you
14  reference that you sent to Steve Johnson --
15    A.  Correct.
16    Q.  -- regarding any other facts or
17  documentation you have supporting your allegation in
18  paragraph 12?
19    A.  Paragraph 12?
20    Q.  Yes.
21    A.  Correct.
22    Q.  Other than Exhibit 8, do you have any other
23  document supporting your allegation in paragraph 12?
24    A.  Only -- only my -- only the work orders

**Page 66**

1  with me.  Well, the way that Hilliard was that
2  each building was supposed to have enough finances to
3  order the things that they wanted -- okay? -- which
4  is not true in most cases.  All right?
5        Me, I use less.  I ordered less.  Okay?
6  Steve Johnson have told us time and time again when
7  we go to the meetings and things how to use the
8  materials.  Okay?  Some people pour almost a whole
9  half a gallon of stuff in a bucket to clean with.
10  Okay?  I did not do that.  A lot of the stuff that
11  DuMore had was concentrated.  Therefore, you needed
12  very little.  Okay?  You need water for cleaning, and
13  you just need a little.  All right?
14        So I had my storage thing set up whereas
15  though I can almost get -- I had almost everything
16  that I needed other than machines.  Okay?  Far as me
17  ordering smell good and cleaning sponges to keep the
18  walls and everything clean, I was fine on that.
19  That's because I ordered my stuff properly.  Okay?
20        So seeing that I had the lowest building of
21  ordering things like that, a lot of the machines --
22  and I would get the call, and they would let me know
23  too.  "Oh, yeah.  We ordered a so-and-so and
24  so-and-so, but we're going to have it delivered to

**Page 68**



1 your building," you know.
2    So this doesn't -- this is nothing
3 (indicating), you know, because -- and then the
4 majority of the time, you will see my name on a lot
5 of these paperworks because the majority of the time,
6 no one else is around to even get their supplies.
7 And I hate for their supplies to go back to DuMore,
8 so I would sign off on the paper for them and just
9 leave it back there. And I'll say, "I've got your
10 supplies for you," you know, and they'll come and get
11 it and they'll take it to their building because I
12 hated for them to miss out on their stuff.
13    Q. Okay. So it looks like in September of
14 2008 --
15    A. Mm-hmm.
16    Q. -- DuMore delivered a Koblenz floor
17 machine.
18    A. Mm-hmm.
19    Q. What is a Koblenz floor machine?
20    A. This is a floor machine for stripping that
21 I had asked for on numerous occasions that I did not
22 get. But then when Marvin Thomas, I believe his
23 name, came to 30 West Cermak, he needed a floor
24 machine because he said he knew how to do floors.

**Page 69**

1 And they ordered it and sent it to 2111. And this is
2 the machine that they said that me and Marvin would
3 be sharing.
4    Q. Okay. And it came to 2111 South Clark?
5    A. Correct.
6    Q. So then you did have a floor stripping
7 machine you could use? Is that correct?
8    A. Yes.
9    Q. Okay. And then what's the second page?
10 Appears to be conserving light bulbs. What does this
11 have to do with the claims in this case?
12    A. Light bulbs? I don't -- I don't know. I
13 would order -- everybody need light bulbs.
14    Q. Okay. And you got light bulbs that you
15 needed -- is that correct? -- if you ordered them.
16    A. Of course. They're on the floor where the
17 seniors got to go inside their houses.
18    Q. Okay.
19    A. They're going to complain if we don't.
20    Q. Okay.
21    MR. FUOCO: And, Phil, I think the request
22 was so broad asking for supply-type documents that we
23 gave you whatever there was.
24 BY MR. SNELLING:

**Page 70**

1    Q. All right.
2    A. But I didn't use all light bulbs. I used
3 two in here and one in there and two in there and one
4 in there. I didn't just order stuff crazy.
5    Q. Okay. Going back to your supervisor --
6 supervisors, did you ever make a complaint about not
7 getting equipment to Ms. -- to Rosette?
8    A. No.
9    Q. How was your relationship with Rosette?
10    A. Somewhat strained.
11    Q. And why was that?
12    A. Rosette -- Rosette always wanted to see you
13 doing something. She always wanted to see you doing
14 something. And she never took the time out to see
15 what it is you actually have to do.
16    Q. So you -- she -- did she criticize you for
17 not doing something when she saw you?
18    A. No, she would call me for small things,
19 such as Rosette pet peeve was that she hated to see
20 any little lint on any of the carpets through the
21 lobby.
22    Q. Right.
23    A. Okay? So she would just call me constantly
24 for little small things like that, you know, when I

**Page 71**

1 had so many more bigger things that I was taking care
2 of probably most of the time that she called. But I
3 would still come. And I didn't have time to get a --
4 I'd just bend down and just pick the stuff, you know,
5 so I can go back to doing what it was I was doing.
6    Q. So she was particular?
7    A. Only with the carpeting. That just
8 really -- she didn't really say anything else, you
9 know.
10    Q. Okay. So she was particular about anything
11 that appeared on the carpet.
12    A. Yes.
13    Q. And was that true of all the buildings?
14    A. I have no idea.
15    Q. Okay. Any other problems with her that you
16 recall?
17    A. I don't have -- no.
18    Q. Okay. Going back to your complaint,
19 Exhibit 7, if I can refer you to paragraph 13.
20    A. 13. Okay.
21    Q. Where you -- this complaint states, "Before
22 May 1st, 2009, plaintiff frequently complained to
23 defendant about unequal treatment in the lack of work
24 effort and poor results by the similarly situated men

**Page 72**



Sarnoff.
877.955.3855

1   working at the other three buildings that defendant
2   allowed." Do you see that?
3       A.  Yes, I do.
4       Q.  Who did you complain to when you say that,
5   "complained to defendant"?
6       A.  I was -- I would -- I would speak to Steve
7   Johnson when he would come because he -- he made --
8   he would come in and out of the building. He -- I
9   would speak to Steve Johnson.
10      Q.  And when -- when did you first raise these
11  issues about unequal treatment in lack of work effort
12  and poor results with Mr. Johnson?
13      A.  I would say maybe -- about maybe a year or
14  two after I was there, after --
15      Q.  Okay. So that would be in 2005 or 2006 was
16  when you first raise --
17      A.  Yeah. Possibly, yes.
18      Q.  And how often did Mr. Johnson come
19  to Hilliard?
20      A.  I guess we would see him maybe -- maybe
21  four -- four times a year. Maybe -- could be a
22  little more too.
23      Q.  And what did you complain to him about
24  specifically?

Page 73

1   don't? How often did you make that complaint to him?
2       A.  Well, I -- I made that -- I probably did
3   the finger thing maybe -- I don't know. Maybe --
4   maybe twice. Maybe twice, two or three times.
5       Q.  Okay. And did you ever provide anything in
6   writing regarding the carpet machine or your
7   complaint of unequal treatment regarding lack of work
8   effort or poor results --
9       MR. FUOCO: Objection.
10  BY MR. SNELLING:
11      Q.  -- to Mr. Johnson?
12      MR. FUOCO: Objection. Presumes need.
13      THE WITNESS: Well, I didn't have to point
14  it out because Steve Johnson approved everything that
15  we got from the buildings. And that was me asking
16  him, "You know, Steve, I've been asking you for this
17  for so-and-so, so-and-so, but you gave it to, you
18  know, Terry or you gave it to Ivory."
19  BY MR. SNELLING:
20      Q.  So you made that comment to Mr. Johnson two
21  or three times. I'm asking: Did you ever file a
22  written complaint about that with Mr. Johnson?
23      A.  No.
24      MR. FUOCO: Objection. Presumes need.

Page 75

1       A.  About could I get some -- could I get --
2   specifically, I would ask him about the -- the
3   machine, the carpet machine.
4       Q.  Carpet machine.
5       A.  Okay? That was -- that was very important
6   because the carpets on the floors were a pet peeve
7   for the residents --
8       Q.  Okay.
9       A.  -- you know. So I would, you know, ask
10  that, you know.
11      Q.  And how many times did you complain to him
12  about getting a carpet machine?
13      A.  I would ask him. I'm not really a
14  complainer. I just let you know what I need and just
15  hear what you say, you know.
16      Q.  Okay.
17      A.  But I --
18      Q.  So how many times did you ask him for the
19  carpet machine?
20      A.  I've asked him -- I asked him -- wow. I've
21  asked him for at least maybe twice a year for maybe
22  three years.
23      Q.  And what about pointing out to him that
24  male janitors have them in other buildings and you

Page 74

1   BY MR. SNELLING:
2       Q.  Did you ever make a written complaint
3   regarding that to anyone at Holsten?
4       A.  No.
5       Q.  Okay. Besides the carpet machine issue,
6   any other complaints that you made to Steve Johnson.
7       A.  Umm --
8       Q.  I'm sorry?
9       A.  I didn't make complaints. I just would let
10  Steve know what was going on when he wasn't there
11  because the building needed doing. The buildings
12  needed doing. I didn't have complaints.
13      Q.  Okay. Did you make any statements to Steve
14  Johnson regarding your belief that you were being
15  treated worse or unfairly in relation to the men
16  because you were a woman?
17      A.  Oh, he knew. He knew that I was. He knew
18  I was unfair. He knew I was being treated unfair.
19      Q.  How do you know that?
20      A.  Because when I would -- when I would talk
21  to him about certain things sometime, he would say,
22  "I know. I know."
23      Q.  Like what?
24      A.  Like -- like -- like when the EarnFare

Page 76



877.955.3855

19 (Pages 73 to 76)

1  people were out there. And like Ivory -- okay. For
2  instance, Ivory building. Okay? Sometime Ivory
3  would have two workers over in his building. Okay?
4  We only make -- we probably supposed to have four.
5  One didn't show up. So then we have three. Okay?
6  One definitely has to go to 30 West Cermak. Okay?
7  That building was always in need of some work. Okay?
8      Ivory always had his own worker. It's
9  always been two people on that building. Ivory do
10 whatever he did, and then the janitor, Juan -- Juan
11 was under Ivory. So them two never came out of
12 2030 South State building. They didn't sprout around
13 and join in and help. Okay? They worked on their
14 building.
15     So at one while, when Ms. Redman was there
16 especially -- okay? -- it was so terrible with me and
17 with Ms. Redman she wouldn't even allow the workers
18 to come into my building and help me. I didn't even
19 have -- have help. The -- I didn't even have help.
20 Q.  Okay. If I can just try to clarify. You
21 said Mr. Ivory -- was he a janitor as well?
22 A.  Mr. Ivory, I don't know what he was. He
23 the head man for 2031 South State, and he always had
24 a worker under him.

Page 77

1  Q.  Okay. I thought you said there were four
2  workers.
3  A.  Those are -- those were EarnFare workers
4  from a summer program with the public aid office.
5  Q.  I see.
6  A.  And they needed a job. So they came and --
7  you know, they came to aid and assist us in keeping
8  these buildings clean. And they would play and sneak
9  off and hide and whatever, whatever.
10     And whatever discrepancies that me and
11 Ms. Redman had or were going through or whatever, she
12 didn't even allow them to come in 2111 and aid and
13 assist me. You know, she would send them anywhere to
14 do anything or tell them, "Y'all just go and sit
15 down," you know.
16 BY MR. SNELLING:
17 Q.  And why was that? Do you know?
18 A.  Ms. Redman just -- I believe Ms. Redman
19 just wasn't happy with herself. I have no idea. She
20 was not a happy person. She was just not a happy
21 person.
22 Q.  Going -- I'm sorry. Going back to your
23 allegation in paragraph 13.
24 A.  Mm-hmm.

Page 78

1  Q.  What do you -- are there any other examples
2  of unequal treatment in lack of work effort and poor
3  results by the men working at other buildings that
4  you're referring to as a basis for your claim in this
5  case?
6  A.  Well, my thing is family building,
7  2031 South Clark, they've always had two janitors
8  there. Okay? They had Terry Hodges; they had
9  someone else. Okay?
10 Q.  Mm-hmm.
11 A.  As I just told you, 2030 South State Street
12 had Ivory, and Ivory always had a worker. He don't
13 do work; his worker do work. Okay?
14     30 West Cermak, that building just always
15 seemed to just catch it. It couldn't really keep a
16 stable janitor. Okay?
17     And then me, I've always been the one for
18 2111. Okay? I would get help with the carpets and
19 stuff like that every once in a while when it get
20 overpowering and not -- and Peter finna get ready to
21 come. You see what I'm saying? Then that's when
22 they'll come and check on me.
23     Other than that, they knew they didn't have
24 to check on me because my building was done. And my

Page 79

1  building -- also, my time was sprouted out to 30 West
2  building because 30 West was back and forth in need
3  of a janitor. So I would go over there and make sure
4  that the windows were done, the baseboards were done,
5  very important stuff that the eye could see as soon
6  as they enter the building. I would make sure those
7  fine details were done, you know.
8      And then if I could -- if I get a wake-up
9  call from a lockout or something like that, then if
10 I've been asleep for a couple hours, I'm not going to
11 go back home and go to sleep, so I just do what I can
12 and help out with that building because my building
13 was shining. I didn't have no -- when Peter would
14 come to my building, Mr. Holsten would come to my
15 building, he always told me, "Your building looks
16 great." I know my building was great. The residents
17 was happy with my building.
18     The only way that something small did not
19 go right in my building, such as maybe the laundry
20 room bathroom or something, someone had went in there
21 or whatever, is I was busy trashing an apartment.
22 Someone had moved out. They needed it fixed up
23 because they had someone else moving in. You know,
24 that's the only way that I kind of lagged behind

Page 80

VERONICA LEE DICKERSON

1 because I was always at work.
2    Q.  Okay.  So are you saying in terms of how
3 you were treated unequally, you're saying you didn't
4 get as much help as the male janitors, Ivory and
5 Hodge, those two in particular?
6    A.  I'm saying in particular, no.  The help
7 thing, that -- that foolishness didn't start -- that
8 was mainly Ms. Redman.  That was mainly at
9 Ms. Redman's time.  Okay?
10    Q.  Okay.
11    A.  Before Ms. Redman's time, if I had asked
12 for help, then I'm sure I would have gotten help.
13 Okay?  But it really just only got bad after I hurt
14 myself pushing a Dumpster up the -- up the thing.
15 And the wheels on a Dumpster were so raggedy, you
16 know.  And --
17    Q.  Was that January 2009 --
18    A.  Correct.
19    Q.  -- that you hurt yourself?  Okay.
20    A.  Okay?  And I just needed help only for like
21 two weeks because she wrote on my paper not to do
22 no -- not to do nothing under 30 pounds.  Okay?  Then
23 that's only for two weeks because she know I needed
24 to get back to work, you know.  No one else could be

Page 81

1 responsible for, you know, the keys I had into these
2 people houses and stuff, you know.  So I wanted to
3 get back to work.
4       And that's what -- that's what -- so those
5 two weeks, that's when my problem came in.  You know,
6 it's like, "Well, she's hurt now."  You know what I'm
7 saying?  And from the little wisecrack jokes that you
8 get, you know, from being a female, you know,
9 "catfight" and you know, stuff like that -- you know
10 what I'm saying? -- then I don't know.  I guess they
11 felt a man would do better.
12    Q.  What other comments besides the "catfight"
13 one were made that were made to you and by whom?
14    A.  No -- no other -- none -- none straight out
15 like that.  I would be patronized when I would walk
16 in or something and the men are talking, or even in a
17 group.  When we had the maintenance group, when I
18 would voice my opinions and stuff like that, then you
19 will get a response like, "Okay.  Okay.  We're
20 working on it.  We're working on it."  Then all the
21 men laugh, "Ha, ha, ha."
22       Because I was the only female there all
23 eight years at all the maintenance meetings.  I was
24 the only -- only woman there.  So they would just

Page 82

1 kind of like downplay me.  But I did such a good job
2 on 2111 that he didn't want to let me go.  He know I
3 cared about that building.
4    Q.  Who is that?
5    A.  Steve Johnson or Holsten in particular.
6 They know that I did a good job.
7    Q.  Okay.  So they appreciated your work
8 effort.  Is that what you're saying?
9    A.  They did.  They did.
10    Q.  And the people that were patronizing to you
11 were your fellow janitors?  Is that what you're
12 saying?
13    A.  No, no.  No, I won't say that.  I'll say
14 that -- no.  My -- my janitors, regardless of
15 whatever we went through just being human -- okay? --
16 they gave me thumbs up for doing what they knew they
17 hardly didn't do.  You know what I'm saying?  They
18 gave me thumbs up, you know.  So no, they knew I was
19 strong.  They knew until I get -- when I -- after I
20 got hurt, then it was done.  After they had to have
21 the men to come and help me, then that made me look
22 very, very weak, I guess.
23    Q.  And is that when the comment was made about
24 kind of that you were talking about that you felt was

Page 83

1 patronizing, after you were hurt?
2    A.  Yeah, like, you know.
3    Q.  And who made that comment, or who made the
4 gesture or whatever?
5    A.  Steve Johnson has made little gestures like
6 that.  Dan -- I don't recall Dan's last name.  But
7 he -- he just --
8    Q.  And what did they do exactly?
9    A.  What do you mean, what did they do exactly?
10    Q.  What did Steve Johnson and Dan do or say
11 that you felt was patronizing?
12    A.  They just kind of look over me.  They'll
13 just -- they would just -- they would call one of the
14 mens up.  Steve would call one of the mens up, which
15 he will call Ivory up.  Okay?  And that's because
16 no -- no one else want to do it.
17       Like I said, the guys that were there, they
18 didn't want to do what they had to do.  And then to
19 ask them to do -- the most strenuous thing at the
20 buildings is pulling and pushing those Dumpsters.
21 Those Dumpsters are like 300, 350 pounds, and they
22 compact.  Okay?  Nobody wanted to do that.  All
23 right?  I don't have no problem doing it.  I can
24 still do it now, I believe.  Okay?

Page 84



1      But at the time that I was hurt and under
2 the doctor's care, they weren't given -- they wasn't
3 given a choice to do it, especially coming from Steve
4 Johnson. Okay?
5      Now, when Steve Johnson wasn't in the
6 picture, maybe Ms. Redman asked them, you know, "Can
7 you possibly pull?" "I ain't going to do it."
8 That's when she would get slack from whoever she's
9 asking, Kevin, you know, or whoever that she was
10 asking. Well, either they would just play her off
11 and just go on about their business. Okay?
12    Q. Steve --
13    A. That was the worst thing to do. And so
14 they would make me -- I would feel funny because now
15 they're like, "Yeah, what are you on right now? Can
16 you come over here and pull Angel's Dumpster?" So
17 now I'm feeling like I'm a headache or I'm the
18 problem because I'm hurt, you know.
19    Q. Okay. Is that the only incidence of Steve
20 Johnson saying or doing something patronizing?
21    A. It's been -- it's been a couple of
22 incidents, but, you know, what can I -- what can I --
23    Q. Do you recall the other ones?
24    A. They go about the same way.

                                      **Page 85**

1    Q. What about Dan? Do you recall what he did
2 or said that was patronizing?
3    A. Dan? Dan would just make little small
4 comments. Like, for instance, when I asked someone
5 there about the shampooer machine, he told me, "Don't
6 wait on it," you know. "Don't wait on it. Don't bet
7 on it," you know, say things like that. And those --
8    Q. What do you mean, about the shampooer?
9 About getting a shampooer?
10    A. About getting a shampooer. You know, maybe
11 Dan can -- since he's at the corporate office with
12 Steve Johnson --
13    Q. Right.
14    A. -- maybe Dan can, you know, talk to him:
15 "Angel been here for a while. She need -- you know,
16 she need -- and she didn't put in two or three times
17 to get this machine. You know, go on and, you know,
18 give her that machine," or whatever. You know what
19 I'm saying?
20      So it was -- I don't know. It was -- I
21 don't even understand what the problem was with me
22 getting the things that I asked for when you know
23 that I took care of everything and I did a good job
24 with what I had.

                                      **Page 86**

1    Q. Any other comment that Dan made that you
2 felt was patronizing?
3    A. Not that I can recall at this time.
4    Q. And when did that shampooer comment -- when
5 was that made?
6    A. That was -- I have no idea. That was maybe
7 like maybe in '08, the summer of '08.
8    Q. Okay. Besides the incidents that you've
9 already testified to today, are there any other
10 incidents that you're relying on for your claim in
11 this case to show that you were treated unequally to
12 men?
13    A. Well, when Dan would come and do my
14 building, come and do the markdown of my building --
15 I had some papers. He -- it would be small things.
16 And I would ask him. And he says, "Well, nobody's
17 building can be perfect." You know what I'm saying?
18      So then I would -- I thought -- I would
19 feel that -- I don't know. When we would look at the
20 papers, it would be like the 16th floor, the only
21 thing that you can write out of the whole 16th floor,
22 with all the walls, all the lighting, the carpets,
23 there's a community room with two bathrooms and wah,
24 wah, wah, and only thing that you can find to write

                                      **Page 87**

1 on here is that there's a little, small window in the
2 hallway that's not clean. "Window not clean." You
3 know what I'm saying?
4      Why is it that I can't pass my building?
5 Why is it that my building does not pass? Little
6 small stuff.
7    Q. Do you know, was Dan passing the other
8 buildings in Hilliard?
9    A. I -- I didn't know about the other
10 buildings.
11    Q. So you don't know what he did there?
12    A. I was focused, correct.
13    Q. Any other unequal treatment that you're
14 relying on in this case?
15    A. No, sir, not at this time.
16    Q. Are you saying in paragraph 13 that you
17 worked -- you worked harder than the male janitors?
18    A. I did.
19    Q. And could you perform all the duties of
20 your job?
21    A. Yes.
22    Q. Did you ever ask for help in moving things
23 because you weren't able to move them by yourself?
24    A. Only when I hurt myself in January, only

                                      **Page 88**



1  then.
2      Q.  Of 2009?
3      A.  Correct.
4      Q.  That's the only time?
5      A.  That's the only time.
6      Q.  And in January of 2009, after you hurt
7  yourself, then help was provided in moving the
8  Dumpsters.  Isn't that correct?
9      A.  To a very aggravating point.  I would have
10 to -- the garbage be built up.  You know what I'm
11 saying?  It's no way that the chute should build up.
12 All of us working on this property, and then we have
13 extra EarnFare workers.  Why is it that the garbage
14 have to build up to this point where so it's coming
15 out of the chute on the second floor?  You know what
16 I'm saying?  That's unfair to the people that live on
17 the second floor.
18     Q.  Other than the moving the Dumpster when you
19 were hurt, there were no other jobs that you ever
20 asked for help from other janitors for?
21     A.  No, I didn't need nobody's help.  They came
22 and got me.
23     Q.  Okay.  Did you ever ask your supervisors to
24 have them get someone else to help you do any of the

Page 89

1  jobs, your janitorial jobs?
2      A.  No.
3      Q.  Going back to Exhibit 7, the complaint.
4      If you could look on the fourth page,
5  paragraph 25.  You state that one or more similarly
6  situated males were paid more than you.  Do you see
7  that?
8      A.  Yes.
9      Q.  Who are these males, their names?
10     A.  I know Ivory, he got paid more than me, and
11 he had an extra worker.  So I don't know how that
12 went.  But Ivory got paid more than me.  I do believe
13 Terry got paid --
14     Q.  Terry Hodge?
15     A.  Terry Hodges.
16     Q.  Hodges.  And do you know what -- was
17 Ivory -- is that the first or last name?
18     A.  Mr. Ivory.
19     Q.  Mr. Ivory?
20     A.  That's his last name.
21     Q.  And do you know what position he held,
22 Mr. Ivory?
23     A.  He was the same as I.  He was the same.  He
24 was janitor/maintenance or just janitor.  I don't

Page 90

1  know.  I'm not sure.  But I believe he's the same as
2  I am.
3      Q.  And what about Terry Hodges?  Did he have
4  the same position as you?
5      A.  Terry was a janitor.  Actually, I don't
6  know how he went to maintenance.
7      Q.  Okay.  Now, are you saying that you were
8  more than a janitor?
9      A.  Yes.
10     Q.  How were you more?
11     A.  Because I moved into keeping the boilers
12 running, making sure the boilers were running.  I
13 started doing -- fixing little holes and stuff in
14 drywalls and putting up doors, doing toilet fixtures,
15 fixing the toilets, doing locks -- removing -- doing
16 a lock change, taking the whole thing out, cylinders,
17 everything, doing a lock change.
18     And -- and I went to a -- I got a paper one
19 day from Holsten which let me know that I was a
20 maintenance because it said "Angel, maintenance."  So
21 I knew I was maintenance.  I knew I could do my job.
22     Q.  The -- so is it your contention that you
23 were a janitor and a maintenance engineer?
24     MR. FUOCO:  Objection.  Argumentative,

Page 91

1  "contention."
2      Go ahead.
3      THE WITNESS:  I don't --
4  BY MR. SNELLING:
5      Q.  Go ahead.
6      A.  Engineer?
7      Q.  Yeah.
8      A.  I don't know.  I fixed the elevators and --
9      Q.  What did you do to fix the elevators?
10     A.  I would keep the correct pieces in place
11 that would come out of place.
12     Q.  What do you mean?
13     A.  Okay.  The elevators had a -- oh, gosh.
14 The elevators had a motion -- a motion thing.  If it
15 was not kept in the correct tack, then I would do
16 that.  People would get stuck in the elevators.  I
17 would have to go upstairs, shut the power off, get my
18 elevator key, find out what floor they were on, put
19 it in, open the doors, try to line the elevator up to
20 a correct position to be able to get the senior off
21 safely and things like that and try and restart the
22 elevator.
23     But if the task was too difficult, then I
24 was given the number to call the proper elevator

Page 92


877.955.3855

23  (Pages 89 to 92)

**Page 93**

```
 1  people.  But you don't just call them just to call
 2  them because they charge every time they come out.
 3      Q.  Okay.
 4      A.  So you do the best you could do.
 5      Q.  Was your job position ever formally changed
 6  from janitor to janitor/maintenance?  Do you know?
 7      MR. FUOCO:  Objection.  Presumes -- it
 8  presumes your preface is true.
 9      Go ahead.
10  BY MR. SNELLING:
11      Q.  Go ahead.
12      A.  Was it ever changed?  Well, like I said, I
13  got a paper that let me know I was maintenance.
14      Q.  What paper is that that you're talking
15  about?
16      A.  I have a couple of papers.
17      Here.  There you go.
18      MR. FUOCO:  That was attached to our
19  response objecting to the motion to amend the
20  complaint.  Look at the copyright date.
21      MR. SNELLING:  I'm sorry?
22      MR. FUOCO:  Look at the copyright date at
23  the bottom.
24      MR. SNELLING:  Okay.
```

**Page 94**

```
 1      Okay.  Let me have this -- can I make a
 2  copy and have this marked?
 3      MR. FUOCO:  Absolutely.
 4      MR. SNELLING:  Or is this a copy?
 5      MR. FUOCO:  I pulled it from my pleading,
 6  so please make a photocopy.
 7      MR. SNELLING:  Can we just go off the
 8  record, take a break?
 9      MR. FUOCO:  Absolutely.
10      THE WITNESS:  Can I answer the other
11  person?  Calvin Lloyd.  I know he made more than I
12  did.
13  BY MR. SNELLING:
14      Q.  Okay.  I'm sorry.  Calvin Lloyd?
15      A.  Calvin Lloyd.  And he was like a floater.
16  He wasn't -- he wasn't actually working full-time.
17  He would just maybe do stripping if I couldn't get to
18  it or something like that, but not for my building,
19  for all of the buildings.
20      Q.  Okay.  So he made more than you?
21      A.  Correct.  He did.
22      Q.  And do you know what Calvin Lloyd's
23  position was?
24      A.  Calvin Lloyd was just -- he wasn't -- he
```

**Page 95**

```
 1  wasn't a janitor or maintenance.
 2      Q.  Okay.  Anyone else making more money than
 3  you referred to in paragraph 25?
 4      A.  Not that I don't -- not that I know for
 5  sure.  So no.
 6      Q.  So these three individuals -- Mr. Ivory,
 7  Terry Hodges, and Calvin Lloyd -- are the people
 8  you're relying on, correct?
 9      A.  Those I know, yes.
10      MR. SNELLING:  Okay.  Fine.  Let's go off
11  the record.
12          (Recess taken from 1:36 p.m.
13           to 1:48 p.m.)
14      MR. SNELLING:  Let's mark that as whatever
15  is next.
16          (Whereupon, Dickerson Deposition
17           Exhibit 10 was marked for
18           identification.)
19          (Whereupon, a discussion was had
20           off the record.)
21  BY MR. SNELLING:
22      Q.  Ms. Dickerson, I'm handing you what's been
23  marked as Deposition Exhibit 10 and ask you if you
24  can identify that document.  Oh, you've got it.
```

**Page 96**

```
 1      A.  Yes.
 2      Q.  Okay.  All right.  Can you identify that?
 3      A.  It's a small booklet/pamphlet from Holsten
 4  with my name on it.
 5      Q.  And when did you get this?
 6      A.  I got this -- not sure.  I got this like
 7  maybe two years ago, two or three years ago.  I'm not
 8  sure.  I had it for a couple of years, though.
 9      Q.  Okay.  And the front of it says
10  "Maintenance - 2111 Clark"?
11      A.  Correct.
12      Q.  And what did you understand "maintenance"
13  to mean there?
14      A.  Understood -- I understood that I had moved
15  up.  I had kind of graduated a little bit.
16      Q.  From being a janitor?
17      A.  From just -- yes.
18      Q.  Okay.  And did anyone tell you that, in
19  fact, you were promoted from being a janitor?
20      A.  No.
21      Q.  And looking into the following pages of
22  Exhibit 10, if you go in to page 6.23 -- do you have
23  it? -- page at the top says Janitorial Procedures.
24      A.  Correct.
```

1  Q.  Do you see that?
2  A.  Mm-hmm.
3  Q.  And does this reflect some of the
4  janitorial duties that you have?
5  A.  It does.
6  Q.  And looking on the next page, 6.24.  For
7  the lobby, it has polish floor annually.  Is that
8  correct?
9  A.  Correct.
10 Q.  So you polished the floor once a year?
11 A.  No, I didn't.
12 Q.  Well, how many times a year did you polish
13 the floor?
14 A.  At least once a week.
15 Q.  Once a week?
16 A.  Yes.
17 Q.  And did you have a floor polishing machine
18 to do that, or a buffing machine?
19 A.  No, I had a dust mop.  You you just mop it
20 real good and then kind of dust-mop it.
21 Q.  Okay.
22 A.  Because it already had a little oily
23 residue to it.
24 Q.  So do you think that floor polishing and

Page 97

1  I'd like to direct your attention to paragraphs 26
2  and 27, which state, "Before May 1st, 2009, plaintiff
3  frequently complained to defendant about unequal
4  treatment in the lack of needed equipment to do her
5  job at 2111 South Clark building that similarly
6  situated men doing the same job as plaintiff had to
7  use at the other three buildings."
8      And then paragraph 27, "Before May 1st,
9  2009, plaintiff frequently complained to defendant
10 about unequal treatment in the lack of work effort
11 and poor results by the similarly situated men
12 working at the other three buildings that defendant
13 allowed."
14     Do you see that?
15 A.  Yes.
16 Q.  Okay.  Looking at paragraphs 26 and 27, do
17 you have any other facts in support of these
18 allegations than what you've previously told me in
19 regard to paragraphs 12 and 13 of your complaint, or
20 what you've previously testified?
21 A.  Do I have any other complaints?
22 Q.  Yeah.  Do you have any other facts in
23 support of paragraphs 26 and 27 other than what
24 you've already testified to in this deposition?

Page 99

1  floor mopping are the same thing?
2  A.  That gave you the shine, yes.  You buffed
3  it up, yes.
4  Q.  Are you relying on Exhibit 10 in support of
5  any of your claims in this case?
6  A.  Exhibit 10?
7  Q.  Yes, this document.
8      MR. FUOCO:  Objection to the evidentiary
9  nature and the legal conclusion required.
10 BY MR. SNELLING:
11 Q.  Go ahead and answer.
12 A.  Answer what?  Did I do these things?
13 Q.  No.  Are you relying on the document,
14 Exhibit 10, in support of any of your claims in this
15 case?
16     MR. FUOCO:  Same objection.
17     THE WITNESS:  No, I'm not.
18 BY MR. SNELLING:
19 Q.  All right.
20 A.  This is what you're supposed to do.
21 Q.  Okay.  Thank you very much.  We're done
22 with Exhibit 10.
23 A.  Okay.
24 Q.  Going back to your complaint, Exhibit 7.

Page 98

1  A.  No.
2  Q.  Now, did you know a Holsten employee by the
3  name of Donald Ivy?
4  A.  Ivy, yes.  I was speaking of him all along.
5  What do I call him, Ivory?
6  Q.  Mr. Ivory you were calling him.
7  A.  Oh, Ivy.
8  Q.  Okay.  So Donald Ivy, I-V-Y.
9      So I take it you know Donald Ivy?
10 A.  Yes, I do.
11 Q.  Okay.  How did you know him?
12 A.  I know him from when him and his wife came
13 to be a live-in janitor for Hilliard.
14 Q.  And when was that?
15 A.  Oh, that was in '07 or '08, I believe.
16 Q.  So you were already at -- working as a
17 janitor at Holsten when Donald Ivy started working
18 there as a janitor.  Is that correct?
19 A.  Correct.
20 Q.  And do you know what his job at Holsten
21 was?
22 A.  I guess he was a janitor.
23 Q.  But you're not sure.
24 A.  No.  He was the same as I, maintenance/

Page 100

Page 101

```
 1   janitor.
 2        Q.  What was your relationship with him?
 3        A.  We were -- we were cool.  I mean --
 4        Q.  So a good relationship?
 5        A.  Yes.
 6        Q.  Did he ever help you with your job?
 7        A.  Yes, he helped me with the Dumpster.
 8        Q.  And when was that?
 9        A.  That was when I was injured, in January of
10   '09.
11        Q.  Did he ever help you with the Dumpster
12   anytime other than when you were injured in January
13   of 2009?
14        A.  Unless he was just over there visiting, and
15   when I was pulling it off, you know, maybe he gave me
16   a hand.  But it wasn't because I asked.
17        Q.  Do you know his salary at Holsten?
18        A.  It's more than mines.
19        Q.  Okay.  What was his salary?  If he started
20   in 2007 or 2008, what was his salary in 2007 or 2008?
21        A.  I have no idea.  The thing about Holsten is
22   it was their policy not to discuss salaries.  So we
23   never went down to the penny, but we knew who made
24   more than who -- whom.
```

Page 103

```
 1        Q.  So you knew him before you started working
 2   for Holsten?
 3        A.  Correct.
 4        Q.  Did he -- when did he start working for
 5   Holsten?  Do you know?
 6        A.  He started working for Holsten maybe three
 7   years ago, I think.  Not sure.
 8        Q.  So after you.  Is that correct?
 9        A.  Yes, after me.
10        Q.  And what was his job at Holsten?
11        A.  His job, he started out doing the grounds.
12        Q.  And then what was he doing when you left
13   Holsten?
14        A.  He still doing the grounds, but I think he
15   in and out now.
16        Q.  Okay.
17        A.  He -- sometime he work inside of the
18   building and somebody -- he rotates now, I believe.
19        Q.  What was your relationship with him when
20   you worked at Holsten?
21        A.  We're good.
22        Q.  Good.  Did he ever help you with your job?
23        A.  No.
24        Q.  Do you know what his salary at Holsten was?
```

Page 102

```
 1        Q.  And how did you know that?
 2        A.  Because they would -- they would let it be
 3   known.  They would --
 4        Q.  Who is the "they"?
 5        A.  Well, all of the janitors.  We would just,
 6   you know, be like, "Where you at now?  You at 12,
 7   13?"  You know.  And we'll kind of like maybe shake
 8   our head yes or no or whatever.  We knew who -- who
 9   was up there and who wasn't.
10        Q.  So you don't know what his specific -- what
11   he was paid in 2007, 2008, or 2009, correct?
12        A.  I don't know his specific salary, no.  I
13   just know.
14        Q.  Did you know a Holsten employee by the name
15   of Dennis Banks?
16        A.  Yes.
17        Q.  And how did you know him?
18        A.  I been knowing him for years.
19        Q.  Okay.  When did you first meet him or know
20   him?
21        A.  I met him -- wow.  I knew him since my
22   28-year-old was about 3 or 4 years old.
23        Q.  So you've known him 25 years?
24        A.  Yeah, I been knowing him for years.
```

Page 104

```
 1        A.  Less than mine.
 2        Q.  Did you know a Rosette Starrou -- don't
 3   hold me to that pronunciation -- at Holsten?
 4        A.  Mm-hmm, yes.
 5        Q.  Okay.  And who was she?
 6        A.  She was the acting property manager,
 7   without paperwork, without certificates.
 8        Q.  And what -- when was she acting property
 9   manager?
10        A.  She was the acting property manager I
11   believe in '07 or '08.  Not sure.
12        Q.  And are those the dates that you knew her,
13   '07 and '08?
14        A.  I knew her at the time that she was working
15   as Holsten acting property manager.  That was the
16   only time I knew her.
17        Q.  Okay.  And that's approximately '07 or '08?
18        A.  Correct.
19        Q.  Okay.  And what -- was she your immediate
20   supervisor?
21        A.  She was the boss, yeah.
22        Q.  She was the boss.  She was the supervisor
23   of you.  Is that correct?
24        A.  Correct.
```

Sarnoff
877.955.3855

1    Q.   What was your relationship with her?
2         Or just to move it along, you had
3    previously testified -- I think you said it was
4    strained, or is that incorrect?
5    A.   Yes, it was somewhat strained. I just stay
6    out of their way.
7    Q.   What do you mean, out of their way? Whose
8    way?
9    A.   I would stay out of the property manager's
10   way, period.
11   Q.   No matter who it was?
12   A.   No matter who it was.
13   Q.   Okay.
14   A.   If they needed me, they sent for me.
15   Q.   Okay. Did you get along with Ms. Starrou?
16   A.   Yes.
17   Q.   Did you have any problems with her?
18   A.   I just had problems with her keeping up
19   with me.
20   Q.   Okay. Could you explain that a little bit?
21   A.   She had problems with me -- she would call
22   and she would say, "Where are you?" And I would say,
23   "Well, I'm -- I'm getting some lunch. I'm at my
24   apartment." Because I lived in the family building,

**Page 105**

1    and I took care of the senior building.
2    Q.   Okay.
3    A.   Okay? And then I would go upstairs to my
4    own house sometimes, maybe get my dinner ready, stuff
5    like that.
6    Q.   Okay. Your apartment was at Hilliard,
7    correct?
8    A.   My apartment is at Hilliard in 2031,
9    Apartment 201.
10   Q.   Okay.
11   A.   Okay. So in between my day, I would try to
12   sneak up -- not sneak, but just go up to my house and
13   do things that I need to do for my own family.
14   Q.   Right.
15   A.   You know, because I probably been here
16   since 4:00, 5:00, 6:00 this morning.
17   Q.   Right.
18   A.   Okay? So -- and she would always say,
19   "Where are you?" And I would say, "Well, I'm
20   upstairs. Is it something that you need?" You know,
21   and she would have something for me to do. She would
22   just keep my day constantly going, you know,
23   regardless what time I been there, what I've done.
24   It doesn't matter. She wants to see me while she's

**Page 106**

1    there, from the time she gets there until the time
2    she leave.
3    Q.   Was that her job as a supervisor?
4         MR. FUOCO: Objection. Speculation.
5         THE WITNESS: It was her -- that was just
6    Rosette.
7    BY MR. SNELLING:
8    Q.   Okay. Any other problems besides that?
9    A.   Not with Rosette, no.
10   Q.   Did she disapprove of your dating another
11   employee named Marvin Thomas?
12       MR. FUOCO: Objection. Speculation.
13   BY MR. SNELLING:
14   Q.   Do you know?
15       MR. FUOCO: Object to the relevance of
16   this.
17       THE WITNESS: She never said anything to
18   me.
19   BY MR. SNELLING:
20   Q.   Did you, in fact, have a dating
21   relationship with Mr. Thomas?
22       MR. FUOCO: Object to relevance.
23       THE WITNESS: I was dating Mr. Thomas
24   before he became an employee of Hilliard.

**Page 107**

1    BY MR. SNELLING:
2    Q.   And did that relationship last to --
3    through when he became an employee at Holsten?
4         MR. FUOCO: Same objection.
5         THE WITNESS: After he got employed there,
6    that's when we call ourself trying to separate
7    ourself because we didn't see it going.
8    BY MR. SNELLING:
9    Q.   How long did this dating relationship with
10   Mr. Thomas last?
11       MR. FUOCO: Same objection.
12       THE WITNESS: It last maybe five or six
13   months before he got the job up to four months after
14   he got the job. And then we left it alone, and maybe
15   two months later, he was fired.
16   BY MR. SNELLING:
17   Q.   Do you know why he was fired?
18   A.   He didn't -- he didn't want to work.
19   Q.   Did Mr. Thomas ever help you complete your
20   work?
21   A.   No.
22   Q.   Where did he work at Holsten?
23   A.   30 West Cermak.
24   Q.   And what was his position?

**Page 108**

1   A.  He was a janitor.
2   Q.  Did you ever have quarrels with Mr. Thomas
3   when he was an employee at Holsten on Holsten
4   property?
5   A.  No.
6   Q.  Did you ever have a quarrel with Mr. Thomas
7   on Holsten property in front of seniors that were
8   residents of 2111 South Clark?
9   A.  No.
10       MR. FUOCO:  Object to relevance.
11  BY MR. SNELLING:
12  Q.  Did your supervisor, Ms. Starrou, ever tell
13  you that she was looking for you but could not find
14  you?
15  A.  Yes.
16  Q.  How often did that occur?
17  A.  As I said, when she looked for me, she
18  expected me to be right there.
19  Q.  So it was a frequent criticism of her?
20  A.  She looked for me all the time, yeah.  She
21  wanted to know where I was and what I was doing.
22  Q.  Did you ever leave work early without
23  permission from Ms. Starrou?
24  A.  No.

Page 109

1   Q.  What dates was she your supervisor?
2   A.  She was my supervisor for only a couple of
3   months.  Not long, maybe four, five months up until
4   May 1st, the date she was fired.
5   Q.  Okay.  Did she replace Ms. Starrou?
6   A.  Yes, she did.
7   Q.  And do you know why Ms. Redman was fired?
8   A.  Ms. Redman, probably because she was so
9   power struck.  And she just had problems with
10  everyone.
11  Q.  What do you mean, power struck?
12  A.  She -- she was real strong on letting you
13  know she was the boss.
14  Q.  Okay.
15  A.  You know.
16  Q.  I see.  Okay.
17  A.  She was power struck.
18  Q.  And she was fired the same day as you were?
19  A.  Correct.
20  Q.  Were those firings linked, do you know?
21      MR. FUOCO:  Objection.  Speculation.
22      THE WITNESS:  I have no idea.
23  BY MR. SNELLING:
24  Q.  Okay.

Page 111

1   Q.  Did she ever talk to you about this --
2   A.  No.
3   Q.  -- about leaving work early?
4   A.  I believe she did state to me that I'm not
5   to leave without letting her know, but that was just
6   once.  She only said that once.  It wasn't a constant
7   thing.
8   Q.  And when was that?  Do you know?
9   A.  That was -- I think that was about -- I
10  think it was the week before they fired her.
11  Q.  And why was she fired?
12  A.  I don't know why she was fired.  I don't
13  know.
14  Q.  Do you know when she was fired?
15  A.  She was fired in I believe '08.
16  Q.  Did you know a Carol Redman?
17  A.  Yes.
18  Q.  And who was she?
19  A.  She was the acting property manager, my
20  last boss.
21  Q.  And she is a woman, correct?
22  A.  Correct.
23  Q.  And she was your supervisor?
24  A.  Yes.

Page 110

1   A.  But we weren't together.
2   Q.  No, I'm just asking if you knew or had any
3   information.
4   A.  They called me, and then they called her
5   in.
6   Q.  Okay.  And who called you in?
7   A.  Steve Johnson and Lionel Spears.
8   Q.  Okay.  And that was on May 1st --
9   A.  Correct.
10  Q.  -- 2009?
11  A.  Correct.
12  Q.  And after you got done talking with them,
13  they called in Ms. Redman.  Is that correct?
14      MR. FUOCO:  Objection.  Speculation.
15      THE WITNESS:  I don't know.  After they got
16  finished with me, I went on about my business.
17  BY MR. SNELLING:
18  Q.  But she wasn't called in before you?
19  A.  No, she wasn't called in before me.
20  Q.  All right.  How did you get along with
21  Ms. Redman?
22  A.  I tried to make peace with Ms. Redman.  I
23  tried to satisfy her in any way that I could.  But
24  Ms. Redman was real evil.  She was mean and spiteful.

Page 112

**Page 113**

1    She -- Christmastime, she decorated the
2  30 West building all down -- it's an L-shape
3  hallway -- all down the hallway, but when she got to
4  the corridor for 2111, she did not put no decorations
5  up that year, nor would she allow me to. And that
6  felt so sad for the people that lived in that
7  building.
8    Q. Did you ask her why this was the case?
9    A. She just was mean. She was mean. She was
10  just mean.
11    Q. Okay. Did you complain about her to anyone
12  else at Holsten?
13    A. They already knew. They knew. You're
14  going to tell somebody something they know already?
15  Corporate already knew how Ms. Redman was. I mean,
16  from the time --
17    Q. And how do you know that corporate already
18  knew how she was?
19    A. Because when Steve Johnson came and had a
20  meeting because Ms. Redman had so many complaints
21  against me, I guess, so Steve Johnson came to say,
22  "We already know what's going on with Ms. Redman. We
23  already know it's a problem. I'm just going to ask
24  that you just do what she asks you to do," you know.

**Page 114**

1  And I'm like, "I do it." And he's like, "I know. I
2  know. But I'm just saying," you know.
3    Q. So you had problems with Ms. Redman. Is
4  that correct?
5    A. I didn't have -- Ms. Redman had problems
6  with me. I had problems with no one.
7    Q. Okay. What kind of problems did Ms. Redman
8  have with you?
9    A. Nothing I done was satisfying to her. She
10  said I could not work. I did not work. Any work I
11  done was not sufficient. Work that I been there
12  doing for eight, nine years turned out to be nothing
13  to her. And she's the only one that did not ever see
14  anything good that I did.
15    Q. Okay. So she criticized your work
16  performance?
17    A. Throughout the day.
18    Q. Did she have trouble -- say that she ever
19  had trouble finding you?
20    A. No, she didn't have trouble finding me.
21  She would call me.
22    Q. Do you know whether she ever contended that
23  you refused to do jobs that she was giving you?
24    A. Ms. Redman created jobs for me to do. She

**Page 115**

1  would go into the bathroom and pull out little hairs
2  and leave them on the sink and then call me in there
3  and show it to me.
4    Q. And then what did you say then?
5    A. I would say, "I will get them."
6    But, see, this bathroom was not for me to
7  do. I only did this bathroom because I came to work
8  so early and I did not want people coming in off the
9  street and residents to come in this main bathroom
10  and see it messed up. So since I'm here so early and
11  nine times out of ten the other janitor, he probably
12  won't even get to it, I do this bathroom.
13    So she made this bathroom my priority. On
14  top of Steve Johnson telling her, "This is not
15  Angel's responsibility. This is not her bathroom,"
16  she still made this my priority.
17    Q. Did you have any other problems with her?
18    A. I had -- oh, jeez. Again, I didn't have
19  problems with her. She had problems with me.
20    Q. Okay.
21    A. She just found things.
22    Q. Did you ever get in any disputes with her?
23    A. I would -- I would try and -- I wouldn't
24  get into a dispute with her. I would just try and

**Page 116**

1  talk up for myself, try to defend myself a little
2  bit. You know, I would let her know, you know, that
3  I don't feel like she's treating me fair, you know.
4    And I always tell her whenever she ask me
5  to do something. I always tell her, "Yes, ma'am.
6  I'm finna do it immediately," you know, or either
7  "I'm doing this, and as soon as I get finished with
8  this, I'll be right on that." And then I would let
9  her know immediately that I've done it, and it's
10  done. But she would go and look at it, and
11  something's still not right about it.
12    Q. Did she supervise anyone else besides you?
13    A. She supervised everyone.
14    Q. Okay. What about -- do you know, did other
15  janitors have problems with her?
16    A. Yeah.
17    Q. So she was doing this to other janitors?
18    A. Yeah.
19    Q. Did you ever refuse to carry out
20  Ms. Redman's directives to you?
21    A. Never.
22    Q. Did you have an issue with Ms. Redman where
23  she wanted the keys to the cleaning supply room in
24  2111 while you were going to be gone on vacation?



1    A.  Yes.
2    Q.  And when was this?
3    A.  This was -- this was -- this is the
4  summer -- May -- yeah, it probably was the beginning
5  of summer of '09, beginning -- it wasn't --
6    Q.  Well, you weren't there in '09, the summer
7  of '09.
8    A.  I'd say the beginning -- I was let go in
9  May.
10    Q.  May 1st, right.
11    A.  So --
12    Q.  So spring or something of '09?
13    A.  Yeah, maybe spring or something.
14    Q.  Okay.
15    A.  Or it was September of last year, of '08 or
16  something. I'm not sure.
17    Q.  Okay. What was the issue?
18    A.  The issue was I -- I spent a lot of time in
19  the senior building, so much so that one of my
20  concerned neighbors called Department of Children and
21  Family Services on me because they said that I was at
22  my job more than I was in the house with my children.
23    So this happening, Holsten decided to give
24  me a small apartment in the senior citizen building,

                        **Page 117**

1  which is 2111 -- okay? -- someplace where when I pick
2  up my little boy from school, my small children, that
3  I can have someplace where I can know where they're
4  at and neighbors would not be in my business. All
5  right.
6    So this apartment here is where I used to
7  store all of my things at, my cleaning supplies. I
8  put a bed in there, a TV in there so the kids could
9  sleep or watch TV or play games, whatever they wanted
10  to do. I fixed it up and kept it as an apartment.
11    The living room part of it I kept my
12  supplies and things in. Okay. I'm finna get ready
13  to go on vacation. Outside -- okay. Outside of the
14  apartment are the two elevators. As you walk into
15  the second lobby, there's a big closet here
16  (indicating). Okay? If that was a resident's
17  apartment, this would be my cleaning supply closet.
18  Okay?
19    So I'm finna get ready to go on vacation.
20  She wants the keys to my apartment. I've got check
21  stubs. I go and get my check stubs from the office.
22  Of course, that's like my apartment now. I have
23  everything in there that belongs to me and my
24  children. I'm finna go on vacation.

                        **Page 118**

1    What is wrong with me taking out some
2  supplies and putting it in this closet and giving you
3  a key to this apartment? She did not want that.
4  Again, she was power. Okay? She didn't want that.
5    So she called Dan Charles and told Dan
6  Charles that she wanted the keys to that apartment.
7  Dan Charles, Ms. Redman, and Dickerson -- okay? --
8  all three of them are old school friends. Okay?
9    Q.  Who is Dickerson that you're talking about?
10    A.  His name Dickerson.
11    Q.  You weren't referring to yourself?
12    A.  No. It's a Dickerson -- he got fired too.
13    Q.  Okay.
14    A.  Okay? But he was there when I left. All
15  right? But Dickerson, Redman, and Dan Charles, those
16  are three friends. Okay?
17    So when she called Dan, Dan was screaming,
18  rah, rah, rah, screamed, you know, just screaming.
19  And I'm trying to say, "Dan, why can't I give -- "
20  "Whatever key she's asking you for." Okay. Fine.
21  So I gave her the keys. Okay?
22    I can't sleep at night. I can't sleep for
23  some reason. I'm not resting well. It's not even
24  nighttime yet. I'm just in my real house thinking

                        **Page 119**

1  about my other house. Okay? So I decide to go down
2  there I guess about 6:00 or 7:00 in the evening after
3  I knew everybody was gone from the office, and I
4  decide to go in with my key.
5    They've went in there. They've busted --
6  you can see it's a big hole of tissue. You know,
7  they've busted in a box that was sealed up. There
8  was no reason to open up this box of tissue when you
9  didn't even take the key that I gave you to this
10  closet to see what was placed in there. You know,
11  but she wanted the key to the apartment.
12    So when she did that, I got me a new
13  tumbler, and I changed my tumbler on my door. Okay?
14  I deal with it how I deal with it. Okay? So I
15  changed the tumbler on the door. Okay? And she
16  still had the key to this closet. That's where the
17  supplies was at. That's that.
18    I'm not going to stay up all night long
19  worrying about what you're searching in, what you're
20  touching when there's no need for you to even be in
21  here.
22    Q.  Who at Holsten are you claiming gave you
23  this apartment in 2111 to use for something other
24  than supplies?

                        **Page 120**



1    MR. FUOCO: Objection. Argumentative,
2  "claiming."
3    Go ahead.
4    THE WITNESS: Everyone knew I had this
5  apartment. Well, Steve Johnson knew I had the
6  apartment, and Matthew Roddy knew that I had the
7  apartment.
8  BY MR. SNELLING:
9    Q. Who told you that you could treat this as
10  your personal apartment as opposed to a storeroom?
11    A. Steve Johnson told my property manager,
12  which was -- I'm trying to think. Was it Loretta
13  Ward? Was it Loretta? I believe it was. Was it
14  Loretta? I'm not sure. It was either Loretta or
15  Regina Stewart, one of those two.
16    I was told that as long as I keep it in
17  apartment range. Okay? Do not turn it into a
18  storage room. Leave it in the apartment look. And
19  that's how I left it. I left it in the apartment
20  look. But I did have supplies in there. But it did
21  not look like a supply closet. It still looked like
22  an apartment with a bed in the bedroom, a dresser,
23  living room furniture. And then --
24    Q. So let me see if I'm understanding this

Page 121

1  right. You're saying Steve Johnson -- do you know
2  when this occurred, what year?
3    A. When it occurred with DCFS? That was --
4  let's see -- April -- if it wasn't the year that I
5  started in 2111, it was the summer afterwards. So if
6  it wasn't in '04, it was '05.
7    Q. Okay. So maybe approximately 2005, Steve
8  Johnson told whoever was the property manager then,
9  Loretta Ward or Regina Stewart, that --
10    A. I don't believe it was so much Steve
11  Johnson. I believe it was Matthew Roddy.
12    Q. Roddy. Okay. So what did they tell the
13  property manager that was then told to you?
14    A. He told me hisself. I believe Steve Roddy
15  [sic] told me hisself that I could take Apartment 201
16  so I would have someplace for my children to be when
17  they get out of school, where they can -- where I
18  won't have to worry about them being upstairs.
19    Q. So the idea was you were going to have your
20  children in Apartment 201 and 2111 North Clark while
21  you were working in the building?
22    A. No. My children would be in
23  Apartment 20 -- 102. My real house in 2031 South
24  Clark --

Page 122

1    Q. Yeah.
2    A. -- apartment is 102.
3    Q. Okay.
4    A. My apartment in 2111 -- no. My real house
5  is 201. I'm sorry. And my real -- and this
6  apartment in 2111 is 102.
7    Q. Okay.
8    A. Okay. After hours, 3:00 when my children
9  get out of school, then I put them in there while I
10  finish up just the maybe small, minor things that I
11  need to do before I leave. Okay. So maybe --
12    Q. When did your workday end?
13    A. My workday never end. It was 24/7. It
14  never end. I worked every day.
15    Q. So are you saying that Holsten said rather
16  than have your younger children unsupervised in your
17  apartment -- in your actual apartment --
18    A. Mm-hmm.
19    Q. -- they would give you an apartment at
20  2111 South Clark where they could be unsupervised
21  while you were working?
22    A. Well, they wasn't unsupervised because I
23  was going in and out checking on them, and I was
24  right here in the main lobby. I was right here. The

Page 123

1  door is right here (indicating), and I was right here
2  (indicating), probably finishing vacuuming the
3  elevators or something like that.
4    Q. And you're saying that Matthew Roddy
5  approved this?
6    A. Yeah.
7    Q. Is that what you're saying?
8    A. Yeah, that's what I'm saying.
9    Q. Do you have anything in writing that would
10  show this?
11    A. Only thing that I have is the key to the
12  door that they gave me.
13    Q. Now, you said that Dan Charles called you
14  up when there was this dispute between Ms. Redman and
15  you about getting keys to this apartment that you
16  described.
17    A. Yes.
18    Q. Okay. And was that after you changed the
19  lock?
20    A. That was before I changed the lock.
21    Q. And he said to give her the key, and you
22  did then?
23    A. Yes.
24    Q. Okay. But then you changed the lock.

Page 124

**Page 125**

```
 1    A.  After hours, yes.
 2    Q.  And then what happened after that?
 3    A.  And then she came to work the next day.
 4  She called me.  She asked me did I change the lock.
 5  And I told her yes and asked her why would she go
 6  through my things when everything that's in that
 7  apartment is in that closet, tissue, everything that
 8  you need.
 9        So and she asked me to give her the key,
10  bring her that key to that apartment over to her, and
11  I told her okay.  And I didn't answer any more of her
12  calls because I was on vacation.
13    Q.  Did Ms. Redman or Mr. Charles ever tell you
14  to take your personal things out of that room, that
15  it wasn't your apartment; it was a storeroom?
16    A.  Yes, Dan Charles said that to me.  Okay.
17  But, again, that wasn't a storeroom.  That was an
18  apartment given to me because I was a parent, because
19  I was a single parent.
20    Q.  Did you move your things after Dan Charles
21  told you to move it out?
22    A.  I took out my -- I took out what I could at
23  that time, yes.
24    Q.  Did you appeal this direction from Dan
```

**Page 126**

```
 1  Charles to Steve Johnson that you were to move your
 2  stuff out of the storeroom in 2111?
 3    A.  I -- I did call Steve Johnson's cell phone
 4  and got voice mail, yes, and I left a message.
 5    Q.  Okay.  And did he ever call you back?
 6    A.  No, he did not.
 7    Q.  And you did give Ms. Redman then the new --
 8  the key to the new lock to that room?
 9    A.  Yes, I did.
10    Q.  And did you ever remove all your personal
11  effects from that room at 2111 South Clark?
12    A.  Yes, I did, through the night.
13    Q.  I'm sorry.  Through the --
14    A.  In that evening.  Yes, I did.
15    Q.  Now, you already said that you also had --
16  you had an actual apartment in the Hilliard complex
17  that you lived in with your family, correct?
18    A.  Correct.
19    Q.  And the address, you said, was 20 --
20    A.  2031 South Clark.
21    Q.  South Clark?
22    A.  Apartment 201.
23    Q.  201.  And how long have you lived at this
24  address with your kids?  When did you first move in?
```

**Page 127**

```
 1    A.  I don't know.  I moved -- I don't know.  I
 2  don't know.  Dates are not that good with me.  I just
 3  get on and do what you do.  I don't know.
 4    Q.  Okay.
 5    A.  I've been on that property, like I said,
 6  since February of '85.  Okay?  So wherever I moved at
 7  for whatever reason, I've been in the Hilliard.
 8  Since February of '85, I've been a resident.
 9    Q.  Okay.  But we know when you applied to work
10  for Holsten, you weren't living at 2031 South Clark,
11  Apartment 201.  Isn't that right?  Or am I wrong in
12  that?
13    A.  Right.  I was -- that building hadn't
14  opened yet, I think.  See, this was during
15  construction.
16    Q.  Okay.  So you're not sure how long you
17  lived at 2031 South Clark, Apartment 201.
18    A.  Okay.  I been living there since maybe --
19  since maybe '04.
20    Q.  How big was this apartment?
21    A.  This is a four-bedroom.
22    Q.  And what rent did you pay while you were
23  working as a janitor at 2111 South Clark for your
24  apartment?
```

**Page 128**

```
 1    A.  I paid rent for a while, until one day I
 2  was told that my rent was going to be exempt or
 3  something like that.  But I paid rent for a while
 4  while I was working for Holsten.
 5    Q.  Okay.  And once you became the janitor for
 6  2111 South Clark, did you get free rent as a -- in
 7  that 2031 South Clark building?
 8    A.  Somewhere in there.
 9    Q.  Okay.  Are you still living there today, at
10  2031 South Clark, Apartment 201?
11    A.  Correct, yes.
12    Q.  And what rent do you pay now?
13    A.  $561.
14    Q.  And does CHA or any public subsidy pay
15  anything on that apartment too?
16    A.  Not -- I don't know.
17    MR. FUOCO:  Object to relevance and
18  admissibility because that would be collateral
19  source.
20    MR. SNELLING:  Okay.
21  BY MR. SNELLING:
22    Q.  In May of 2009, who lived there with you in
23  that four-bedroom apartment?  And, in fact, I can
24  go -- how about this?  Jacobi?
```



1    A.  Jacobi did.
2    Q.  Yeah.  Kaleea?
3    A.  Kaleea, mm-hmm.  Recka --
4    Q.  Recka.
5    A.  -- mm-hmm.  And Aquetta.
6    Q.  Aquetta.
7    A.  And my grandbaby probably.  In '09, I think
8  he was born.  He finna be 2.
9    Q.  So the oldest three children do not live
10  there.  Is that correct?
11    A.  Right.  My oldest three children, yeah,
12  they're grown and gone.
13    Q.  Okay.  Were -- in May of 2009, were any of
14  your four children working?
15    A.  Princess was, Princess Dickerson.
16    Q.  No, I meant living there, not your three
17  oldest.
18    A.  Oh.
19    Q.  The four kids that were living at your
20  apartment, Aquetta, Recka --
21    A.  No, they were going to school.
22    Q.  Okay.
23    A.  They were probably seniors.  They were in
24  high school.  Aquetta probably was a senior or a

1  sophomore or something.
2    Q.  Okay.  In November of 2008, did Ms. Redman
3  ask you to clean the management office at 2111?
4    A.  Yes, probably.
5    Q.  Did you refuse?
6    A.  I -- I probably did.  No, I didn't refuse
7  her.  I probably couldn't do it at the time that she
8  asked me to.  But it had already been cleaned that --
9  every morning that I would get up, every morning I
10  made it a priority to clean that bathroom first thing
11  in the morning over by the office in between the
12  link.
13    And I made it a point to do the office
14  because aside from the people working in the office,
15  I was the only maintenance that had the key to the
16  office.  So I have a key.  Why not go in and clean it
17  so when the people come in first thing in the
18  morning, everything smell good and fresh.
19    Q.  Did -- in November of 2008 when Ms. Redman
20  asked you to do this, did you get angry at Ms. Redman
21  and tell her how much work you do?
22    A.  No.  That -- as a matter of fact, that's
23  what I was just saying.  I didn't refuse her, but I
24  believe that I was doing something -- I had stripper

1  or something, and I couldn't drop what I was doing at
2  that second.
3    And -- and some -- I don't know.  But it --
4  it got deeper because she said, "I don't think you're
5  doing anything," or "I don't see you doing anything,"
6  or something like that.  And I told her, "Ms. Redman,
7  you have no idea of how much work I have to do."
8  That's how that conversation went.
9    Q.  Okay.  And when you say it got deeper, do
10  you mean it got more heated?
11    MR. FUOCO:  Objection.  Misstates.
12    THE WITNESS:  No, it didn't get heated.
13  I'm not finna get heated.  I'm not finna argue with
14  this lady.  I'm finna go back and do what I've got to
15  do.
16  BY MR. SNELLING:
17    Q.  You didn't get emotional in talking with
18  her?
19    A.  Talk about her mother?
20    Q.  You didn't get emotional in talking with
21  Ms. Redman at that time?
22    A.  No.  I told Ms. -- no.  I told -- I let
23  Ms. Redman know that I was doing whatever, and as
24  soon as I finish, I will come and do what she asked

1  me to do.  And I took the garbage out of the garbage
2  can before I left out of the office.  At least I
3  could do that since I was setting there.
4    Q.  Did Ms. Redman around this same time in
5  November of 2008 also point out any deficiencies to
6  you in cleanliness of the building?
7    A.  Yes, always.
8    Q.  So this was pretty much constant through
9  the time she was the --
10    A.  Yes.
11    Q.  -- manager of the building?
12    A.  Yes.
13    Q.  Okay.  And when she would make these
14  criticisms, what did you respond to Ms. Redman?
15    A.  I would just stand there and walk behind
16  her.
17    Q.  I'm sorry?
18    A.  I just stood there and walked with her or
19  walked behind her.
20    Q.  You wouldn't respond?
21    A.  And I'd just say, "Yeah."  I'd just say,
22  "Okay," or "All right.  It will be done by the end of
23  the day.  Okay."  It just --
24    Q.  Did you ever get mad in responding to

Sarnoff
877.955.3855

**Page 133**

1  Ms. Redman when she pointed out these problems?
2    A.  I have gotten mad once or twice when she
3  demanded that I do something right now at this
4  moment, and then I would just -- probably just walk
5  off or something.  I wouldn't go nowhere, though.  I
6  would go right there where the window was at.  I
7  wouldn't go no -- I just -- I just couldn't believe
8  Ms. Redman.
9    Q.  Did you ever have outbursts or temper
10 tantrums in response to Ms. Redman's cleaning
11 requests to you?
12   A.  No, Ms. Redman had temper tantrums.  She
13 would scream and yell and stomp, actually jump up and
14 down.
15   Q.  Did your relationship with Ms. Redman get
16 worse in 2009?
17   A.  I stayed -- I stayed away from Ms. Redman.
18   Q.  Okay.
19   A.  And then you will hear --
20   Q.  So your relationship, it was not good in
21 2008 or in 2009.  Is that correct?
22   A.  It couldn't get better.
23   Q.  I'm sorry?
24   A.  It couldn't get better.

**Page 134**

1    Q.  It couldn't get better --
2    A.  No.
3    Q.  -- or it couldn't get worse?
4    A.  Both.
5    Q.  What do you mean?
6    A.  Couldn't get better.
7    Q.  All right.  Can you --
8    A.  You couldn't satisfy her.  You just
9  couldn't.
10   Q.  All right.  So did you have difficulty
11 working with Ms. Redman?
12   A.  I didn't have no difficulty.  I just did
13 what she asked me to do and got away from her.
14   Q.  Did you ever talk back or swear at
15 Ms. Redman?
16   A.  No, I didn't cuss at all ever.  Wouldn't.
17   Q.  Did Ms. Redman in 2009 complain to you that
18 the bathrooms are not clean and that they look bad?
19   A.  Always.
20   Q.  Okay.  And how did you respond to this
21 criticism from her?
22   A.  I would clean it up or either I would
23 remind her that I cleaned it up this morning.  "This
24 is not for me to be doing, Ms. Redman, over here on

**Page 135**

1  this side, and I need to tend to things in my
2  building."
3    Q.  Where would the bathroom be that she was
4  talking about?
5    A.  In between 30 West and in the office.
6    Q.  Okay.  And is the office in 2111 South
7  Clark?
8    A.  The office is right at the turn of 2111.
9  You have to turn down a corridor, and then you're in
10 2111.
11   Q.  Okay.  And did you believe that this
12 bathroom wasn't in your area of responsibility?
13   A.  It -- it wasn't.  But it didn't have any --
14 I would still do it.  It didn't matter.
15   Q.  Did you ever get loud in responding to
16 Ms. Redman?
17   A.  No.
18   Q.  Did you ever let garbage pile up in the
19 chutes at 2111?
20   A.  I would never do that, no.
21   Q.  Did Ms. Redman ever complain to you about
22 that?
23   A.  Yes, she has.
24   Q.  And when did that occur?

**Page 136**

1    A.  That was when I was -- that's when I was
2  hurt.  But she didn't -- she didn't complain to me.
3  I went and got her and asked her can she walk with
4  me.  And I showed her.  And I'm like, "Ms. Redman,
5  although I'm not supposed to do it" -- because I was
6  under doctor's care.  I told her, "All I need is
7  someone just to help me.  I don't even need them to
8  do it.  Just get somebody to help me, help me pull
9  the Dumpster off.  I can guide it while they push.
10 You know, I can guide it, you know."
11   Q.  So is that the only time that there was a
12 problem with garbage backing up in the chutes at 2111
13 was when you were hurt?
14   A.  That's the only problem.  Yes.
15       Or when -- or when there was a lot of
16 trashing out, like at least three different
17 apartments that needed to be trashed out because
18 people have moved, and 16-story buildings only had
19 two Dumpsters.  The family buildings are 22 stories,
20 so they had three and four Dumpsters.
21       And the thing about it, if I needed a
22 Dumpster, I would have to walk around to one of the
23 family buildings and pull that Dumpster around to my
24 building.  And maybe that was holidays, Christmas,

1  too much stuff, you know, just -- but it wasn't a
2  constant thing, no.
3      Q.  Did anyone ever help you then when you were
4  pulling or pushing these Dumpsters around?
5      A.  I didn't need no help.
6      Q.  So you didn't ask for any help?
7      A.  I didn't need no help.
8      Q.  So are you saying that other than when you
9  were injured that other male janitors didn't help you
10 pull Dumpsters?
11     A.  No, they did not.
12     Q.  Did you refuse to shovel when Ms. Redman
13 asked you?
14     A.  Not -- not that I recall, no.
15     Q.  Now, the injury that you suffered in
16 January of 2009, how did you injure yourself?
17     A.  I -- it had to do with a compactor because
18 that was like the last thing I done before I was
19 hurt.  But the hurt didn't come on immediately.  It
20 came like 15 to 20 minutes after I finished
21 hooking -- I knew I was hurt, though, but I still got
22 it in there and got it chained up and got it started.
23         But I was hurt.  But maybe 20 minutes
24 later, then it seemed like I was losing all control

**Page 137**

1  with the rotation, and then you're trying to push it
2  up a hill, you know, you don't know what get shook
3  out of place.  You know what I'm saying?
4      Q.  Did -- you were put on light duty -- you
5  were off work for how long?
6      A.  I was off -- I wasn't off work.  I told
7  that doctor I had to go back to work because I was
8  not going to lose my job.  But she would not send me
9  back to work.  Two days later, I kept asking her, and
10 she sent me and said don't do nothing more than
11 30 pounds because --
12     Q.  So nothing over 30 pounds?
13     A.  Nothing over 30 pounds.
14     Q.  So you were on a light-duty work.  Is that
15 correct?
16     A.  Mm-hmm.  I did everything.
17     Q.  Okay.
18     A.  I did all my work except that Dumpster.
19     Q.  And how long were you on that status where
20 you --
21     A.  She said that she was just -- I asked her
22 for how long, and she said it would just be for two
23 weeks.
24     Q.  Okay.

**Page 139**

1  of my -- my body.  And the pain was terrible.  So --
2      Q.  How did -- what did you injure on yourself?
3      A.  I injured my -- it felt like my back, but
4  two days later, I went back and I told the doctor
5  that it's not my back; it's my arm.  It felt like my
6  back in the first place, but it wasn't my back; it
7  was my arm.
8      Q.  And so you had -- did you pull a muscle or
9  what -- what went on?
10     A.  Well, now I'm told that it's a -- a
11 herniated disk, and that's what's affecting my arm.
12     Q.  And what were you -- and you were working
13 with a trash compactor --
14     A.  Yes.
15     Q.  -- at the time?
16     A.  Yes.
17     Q.  But you're not sure how you hurt yourself?
18     A.  Well, no, I ain't sure.  But the garbage
19 cans were real raggedy, the wheels.  They just
20 refused to replace the wheels no matter how often
21 that you asked.  And you need someone to come out and
22 turn the Dumpster over and replace the wheels.  It's
23 nothing that you can do your own self, you know.
24         And from the wheels just -- you know, so

**Page 138**

1      A.  So she said in two weeks, I could go back
2  to doing the things that I needed to do, which was
3  doing that Dumpster.
4      Q.  And was that true, or did you go back after
5  two weeks?
6      A.  I was ready, yeah.  I went back -- I pushed
7  that Dumpster after two weeks, but it start affecting
8  me.  I pushed -- I pushed it, but it start affecting
9  me.  The only thing that I needed help with was that
10 Dumpster.  I did everything else just as always.
11     Q.  So did you ask for help pushing the
12 Dumpster after you went back to work or after the two
13 weeks of light duty?
14     A.  Well, Steve Johnson had made it known to
15 everyone to take turns or whatever in helping Angel
16 get her garbage empty.  And I only needed help
17 getting it out, getting a compact Dumpster out the
18 back door.  I could push an empty one in all by
19 myself.  Okay?
20     Q.  And did that occur -- did that -- was that
21 constant after your injury to May 1st, 2009?
22     A.  That became a problem.  That became a
23 problem.
24     Q.  But I meant so you got help doing that

**Page 140**



**Sarnoff**
877.955.3855

**Page 141**

1  until May 1st, 2009? Is that correct?
2      A.  I -- that's the -- yeah.  I needed help,
3  yeah.  Being a woman, I needed help.  And I guess
4  that wasn't going to wash.
5      Q.  Had Carol Redman sent a young man to move
6  the Dumpster for you on the day after you injured
7  yourself?
8      A.  She specifically told that young man to do
9  not do it, to help her do it.
10      Q.  Okay.  Do you know what the name of the
11  young man was?
12      A.  His name was -- he was the boy that took my
13  job.  I mean, he was the boy who they gave my job to,
14  Maurice.  He was --
15      Q.  Did he help you move the Dumpster then from
16  that point?
17      A.  He did help me that day.
18      Q.  That day?
19      A.  That day.
20      Q.  And who was helping you from the day you
21  injured yourself till May 1st, 2009?  It varied?
22      A.  Yeah, it did vary.  Yeah.
23      Q.  In February of 2009, were you told that a
24  tenant named Shirley Jones in the 2111 building,

**Page 142**

1  Apartment 1208, called complaining about the
2  cleanliness of the elevators in that building?
3      A.  No.  I was just told that the elevators
4  need to be a little more cleaner and that
5  residents -- with an "s" -- were complaining.
6      Q.  Besides the complaints about the elevators'
7  cleanliness, were you also told there were complaints
8  about an oily substance coming from the floors?
9      A.  That's been going on since the building
10  opened.
11      Q.  Okay.  Which would have been when, 2004?
12      A.  Correct.
13      Q.  Okay.
14      A.  They said that the tiles on the floor
15  wasn't sealed, whatever.  Okay?
16      Q.  Is that a different problem than the
17  problem with the oily substance from the mats?
18      A.  That's the same problem.
19      Q.  It's the same problem?
20      A.  It's the building itself.  It's the
21  buildings.  It's the two senior buildings itself..
22      Q.  So did you know that there -- did anyone
23  tell you there were particular resident complaints in
24  February of 2009 regarding the oily substance on the

**Page 143**

1  floor?
2      A.  Those complaints went on, period.
3      Q.  Do you know whether there were also
4  complaints about roaches coming -- coming around the
5  sink of this woman Shirley Jones in her apartment in
6  2111 in February?
7      A.  There was roaches in several of the
8  apartments.  I didn't have anything to do with the --
9  with the inside of a person's apartment unless it had
10  something to do with maintenance, a pipe or a toilet.
11      Q.  Did anyone tell you about these problems in
12  February of --
13      A.  If someone told me about any type of roach
14  problem, when the pest control people would come out,
15  I would always ask them, and they would leave me with
16  a tube of whatever so I can possibly help the people
17  who they missed.  Every -- every pest control, I was
18  right there with the pest control people, knocking on
19  each door and entering with a key, making sure each
20  and every apartment got exterminated.
21      So and then on the days that they sent out
22  the notices that they said, "We will not use the
23  passkey," then I would get a thing for people who
24  said, "I really couldn't be at home today."

**Page 144**

1      "That's okay.  I gotcha."
2      Q.  Did you receive a termination letter from
3  Holsten on or about May 1st, 2009?
4      A.  A termination letter May 1st?  Yes, sir.
5      Q.  What did you do when you got the letter?
6      A.  I left and went home.
7      Q.  Then were you given this letter when you
8  had the meeting with Steve Johnson that you testified
9  to earlier?
10      A.  I was given a folder, yes.
11      Q.  Did you speak to anyone at Holsten about
12  the letter or termination other than Steve Johnson,
13  and I think you said Lionel Spears was there?
14      A.  Lionel Spears, right.
15      Q.  Did you talk to anyone else after that?
16      MR. FUOCO:  Objection.  Presumes
17  discussion.
18      THE WITNESS:  No, I left on out the
19  building.  There was nothing to talk about.
20  BY MR. SNELLING:
21      Q.  Did you know -- did you know this letter
22  was coming on May 1st, 2009?
23      A.  No, I had no idea.  They had just given me
24  a raise like a month later.  They just gave me an

Page 145

1  increase.
2      Q.  Actually, didn't you get a raise in January
3  of 2009?
4      A.  In January?  I don't -- I'm not sure.
5      Q.  Okay.
6      A.  But I know that I had -- I was making a
7  little more money.  My bank account told me I was
8  making a little more money just like a couple of
9  months before.
10     Q.  Okay.  Going back -- had you had an
11 argument with Carol Redman shortly before May 1st,
12 2009?
13     A.  I had had -- I voiced my opinion.
14     Q.  Okay.  And when was that?  Was that on
15 May 1st?
16     A.  That was maybe three days -- three days
17 before, three or four days before.
18     Q.  And what were you voicing your opinion
19 about to Carol Redman?
20     A.  I was voicing my opinion because I was --
21 I'm very particular with the things that I need for
22 building 2111.  And Carol Redman had given someone
23 permission -- I was on vacation -- okay.  Mind you,
24 I'm still on vacation.  And I just came to -- I know

Page 146

1  I ain't had no business over there, but she had been
2  calling me anyway all during vacation saying,
3  "There's a lockout, and I know you wouldn't be right
4  there in your apartment and not" -- whatever.  So she
5  had been calling.  I had been working through my
6  vacation anyway, as always.
7      But building 2111, main lobby.  The doors
8  that they go through, they slope.  This here slopes
9  (indicating).  Okay?  So I had a rug here and a rug
10 here (indicating) because right when they get to the
11 door here to come in to come out, they will slide on
12 down because of the greasy floors.  Okay?
13     Someone -- this side (indicating) is
14 really, really greasy.  It just always.  So I kept a
15 mat there.  I happened to come to my building just
16 for a minute, just to look around or whatever to see
17 what I can sneak over later on after hours and clean
18 up and help whoever is helping me during the day.
19     And my rug was gone.  So I asked Kevin,
20 which was right there.  I said, "Kevin, what did you
21 do -- what happened to my rug that was right there?"
22 He was like, "Oh, Ms. Redman told them to get your
23 rug and whatever -- and do whatever with it," you
24 know.

Page 147

1      So I take things kind of personally.  And
2  the last thing that I want to hear is, "Angel,
3  somebody fell in your building," especially somebody
4  that I know.
5      So I went to the office, and I told
6  Ms. Redman.  I said, "Ms. Redman, you told someone
7  that they can take the -- "
8      "What are you doing here?"  Woo, woo, woo,
9  woo, woo.
10     And I was like, "Ms. Redman, I want to let
11 you know this, though.  Someone's going to slip in
12 that spot, and they're going to hurt themself.  Okay?
13 And I'm coming to let you know that.  Okay?  You
14 should not let nobody move anything out of my
15 building, you know, if you don't know exactly what
16 it's there for, you know."
17     And she -- so that was that.  So I turned
18 around and I left.  That was that.
19     My building -- I would take my rugs out and
20 clean them.  I would shampoo them, scrub them down,
21 rinse them off, let them dry.  You understand what
22 I'm saying?
23     Q.  Right.
24     A.  I took care of everything.

Page 148

1      Q.  Now, are you saying that when this
2  occurred, when you had this discussion with
3  Ms. Redman three days before May 1st, 2009, you were
4  on vacation then?
5      A.  I believe I was.
6      Matter of fact, Ms. -- I ain't going to say
7  that.  She probably did.  I don't know if I was over
8  there for a lockout.  I'm not sure why I was over
9  there because it was the daytime, and usually I don't
10 tip over there until after hours.
11     Q.  How long was the vacation you took in 2009?
12     A.  It was probably just maybe three or four
13 days or something.
14     Q.  And is this the one where the whole issue
15 arose about the key to the storage room?
16     A.  Correct.
17     Q.  So you were going to be on vacation three
18 or four days.
19     A.  Probably, yes.
20     Q.  Okay.  And when you had this opinion that
21 you voiced with Ms. Redman on that day, which would
22 be in late April 2009 --
23     A.  Mm-hmm.
24     Q.  -- you -- the conversation was about

1  removal of these carpets that were on the rug -- or
2  on the floor that you felt improved the situation.
3  Is that correct?
4      A.  Correct.  Kept them safe.
5      Q.  And did -- what did Ms. Redman respond to
6  your statements to her?
7      A.  "Get out of -- get out of my office."  It
8  was just screaming.
9      Q.  She just started screaming?
10     A.  Yeah, "Get out of my office."
11     Q.  Were you talking loud to her?
12     A.  No, I turned around and left then.
13     Q.  Okay.  So your testimony is that Ms. Redman
14 just started screaming at you; you were talking to
15 her in a normal voice?
16     A.  I said, "Ms. Redman" -- Ms. Redman wasn't
17 trying to see me no way, see me or hear me.  So I
18 said, "Ms. Redman, you had someone to move -- "
19         "What are you doing here?"
20         So her voice was automatically loud asking
21 me that question.  And I said, "You know what?  I'm
22 going to let you know this.  You're having people to
23 move the rugs, but someone is going to slip and
24 really hurt theirself."

**Page 149**

1  and I to be in Atlanta for spring break.
2      MR. SNELLING:  Sure.
3      MR. FUOCO:  But the week beforehand,
4  absolutely.
5      MR. SNELLING:  We can go off the record.
6         (Whereupon, a discussion was had
7          off the record.)
8         (Proceedings adjourned at
9          2:58 p.m.)

**Page 151**

1          And she didn't appreciate me saying that,
2  so then she just started yelling, "Get out of my
3  office."  So I turned around and I left.
4      Q.  Was anyone else present besides you and
5  Ms. Redman?
6      A.  Everyone was present.  Dickerson was in
7  there.  Kevin was in there, with a K.  I keep saying
8  with a K because there was a Calvin there too, Calvin
9  Lloyd.  Okay.  But Calvin, no.
10     Q.  Okay.  So Dickerson, Kevin?
11     A.  That's all I saw.
12     Q.  But other people were there too?
13     A.  I'm not sure.
14     Q.  There may have been.  Is that correct?
15     A.  Yes.
16     MR. SNELLING:  Okay.  All right.  I am
17 detecting from the actions of the other people in
18 this room that we are at the bewitching hour.
19     THE WITNESS:  Sorry.  Okay.
20     MR. SNELLING:  So by agreement among the
21 parties, we're going to continue Ms. Dickerson's
22 deposition to a date that's mutually convenient.
23     MR. FUOCO:  I would like to avoid the week
24 that begins the 28th.  The plan is for my daughter

**Page 150**

1  STATE OF ILLINOIS
                        SS:
2  COUNTY OF C O O K
3
4      I, LAURA R. RENKE, a Certified Shorthand
5  Reporter within and for the State of Illinois, do
6  hereby certify that heretofore, to-wit, on March 11,
7  2011, personally appeared before me, at 36 South
8  Wabash Avenue, Suite 1310, Chicago, Illinois,
9  Veronica Lee Dickerson, in a cause now pending and
10 undetermined in the United States District Court,
11 Northern District of Illinois, Eastern Division,
12 wherein Veronica Dickerson is the Plaintiff, and
13 Holsten Management Services is the Defendant.
14     I further certify that the said Veronica
15 Lee Dickerson was first administered an oath to
16 testify the truth, the whole truth and nothing but
17 the truth in the cause aforesaid; that the testimony
18 then given by said witness was reported
19 stenographically by me in the presence of the said
20 witness, and afterwards reduced to typewriting by
21 Computer-Aided Transcription, and the foregoing is a
22 true and correct transcript of the testimony so given
23 by said witness as aforesaid.
24     I further certify that the deposition was

**Page 152**

1    adjourned as stated herein and that there were
2    present at the deposition the attorneys hereinbefore
3    mentioned.
4          I further certify that I am not counsel for
5    nor in any way related to the parties to this suit,
6    nor am I in any way interested in the outcome
7    thereof.
8          IN TESTIMONY WHEREOF:  I certify to the
9    above facts this  24th day of  March, 2011.
10
11
12
          _____
          LAURA R. RENKE, CSR, RDR, CRR, CLR
13        LICENSE NO. 084-003184
14
15
16
17
18
19
20
21
22
23
24
                              **Page 153**

**Sarnoff.**
877.955.3855

                              39  (Page 153)