IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VERONICA DICKERSON,

    Plaintiff,

vs.        No. 10 C 01419

HOLSTEN MANAGEMENT    Judge Castillo
CORPORATION,
    Defendant.

The resumed deposition of VERONICA LEE DICKERSON, Volume 2, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before LORRAINE DUNN, Certified Shorthand Reporter for the State of Illinois, at 36 South Wabash Avenue, Suite 1310, Chicago, Illinois, on March 21, 2011, at the hour of 10:08 a.m.

REPORTED BY: LORRAINE DUNN, CSR, RPR
LICENSE NO.: 084-2024
JOB NO.: 158757

Page 154

---

INDEX

WITNESS    EXAMINATION

VERONICA LEE DICKERSON
BY MR. SNELLING    157
BY MR. FUOCO    201
BY MR. SNELLING    249
BY MR. FUOCO    258

EXHIBITS

NUMBER    MARKED FOR ID
Defendant's Deposition Exhibit
Exhibit 11  2009 federal income tax  185
    return
Exhibit 12  testing document from  188
    Advanced Toxicology
    Network
Exhibit 13  Holsten Management  201
    document, Bates stamp
    H0072, dated May 13,
    2003
Exhibit 14  Holsten Management  204
    document, Bates stamped
    H7703, January 25th,
    2005
Exhibit 15  payroll change document,  222
    Bates No. H0076
Exhibit 16  maintenance work orders  224
Exhibit 17  Holsten payroll change  251
    document
Exhibit 17  document dated March 2,  257
    2009

Page 156

---

APPEARANCES:
    FUOCO LAW GROUP, by
    MR. STEVEN C. FUOCO
    1055 Golf Avenue
    Highland Park, Illinois 60035
    847-432-5297
    fuocolawgroup@gmail.com

    Representing the Plaintiff;

    JOHNSON JONES SNELLING
    GILBERT & DAVIS by
    MR. PHILLIP H. SNELLING,
    36 South Wabash Avenue
    Suite 1310
    Chicago, Illinois 60603
    312-578-8100
    psnelling@jjsgd.com
    Representing the Defendant;
ALSO PRESENT:
    MS. LAURIE TAYLOR,
    MS. JACKIE HOLSTEN.

Page 155

---

    (Whereupon, the witness was previously administered an oath.)
    VERONICA LEE DICKERSON, having been previously administered an oath, was examined and testified further as follows:
    EXAMINATION
BY MR. SNELLING:
    Q.  We're resuming the deposition of Veronica Dickerson. Ms. Dickerson, how are you today?
    A.  I'm great, thank you.
    Q.  And, again, you realize you're still under oath from our last session?
    A.  Yes.
    Q.  And is there any reason today that you would be unable to accurately and fully answer the questions that I'm going to ask you?
    A.  No.
    Q.  I just wanted to clarify a couple things from the last deposition before we resumed where we left off.
    Ms. Dickerson, were you ever a building coordinator or resident manager for Holsten?

Page 157

1    A.  No.
2    Q.  During your employment at Holsten, did
3  you ever have a supervisor named Robert Brady,
4  B-r-a-d-y?
5    A.  Not that I recall, no.
6    Q.  And, during the period you were
7  performing janitorial services, have we
8  discussed all the persons that were your
9  supervisors in the deposition thus far?
10   A.  We have.
11   Q.  Going back to where we stopped, it
12 concerned a discussion that you had with your
13 supervisor at the time, this was late April of
14 2009, Ms. Redman?
15   A.  Okay.
16   Q.  I believe you had indicated you had
17 been on vacation or something and had come in to
18 the Hilliard complex and had a discussion with
19 Ms. Redman at that time, is that correct?
20   A.  Correct.
21   Q.  During that time, I believe you stated
22 that you voiced your opinion to Ms. Redmen, is
23 that correct?
24   A.  Correct.

Page 158

1    Q.  And the conversation with
2  Ms. Redman, what did that concern?
3    A.  It concerned the mats, the floor mats
4  been moved.
5    Q.  I'm sorry --
6    A.  In the building, correct.
7    Q.  And you were upset about that?
8    A.  I wasn't upset. I was just -- I just
9  let her know that the particular mat that she
10 moved when you go in the main door of 2111,
11 there's a slope there.
12   Q.  Right.
13   A.  So most seniors will slip and fall
14 because the floors were greasy. The floors
15 would be greasy. So there's a slope there and a
16 lot of residents fall right there.
17   Q.  What did you say during this discussion
18 with Ms. Redman?
19   A.  I said Ms. Redman -- because when I
20 came in the building, Kevin, with a K, was
21 there. I asked him about the mat. And I said,
22 Kevin, "Why did -- where's the mat that belongs
23 here?"
24      He said, "Ms. Redman told me to move it

Page 159

1  and put it somewhere."
2    Q.  Okay.
3    A.  So then I go to the office and say,
4  "Ms. Redman, you told Kevin to move the mat out
5  of 2111?"
6      And she says, "Yes, I did."
7      I said, "Well, Ms. Redman, where you
8  moved that mat from somebody is going to slip
9  and hurt themselves."
10     Then she said, "Why are you here?"
11     So then I said, "Somebody is going to
12 really hurt themselves."
13     And then she just started yelling, "Get
14 out of my office. Get out of my office. Get
15 out of here."
16   Q.  How did you respond to that?
17   A.  I left.
18   Q.  Did you use any heated phrases back to
19 her?
20   A.  No.
21   Q.  Did you swear at all during that
22 conversation?
23   A.  Not at all, ever.
24   Q.  Did you curse at Ms. Redman?

Page 160

1    A.  Not at all, ever.
2    Q.  Did she request you to do anything
3  other than leave?
4    A.  No, not at that moment, no.
5    Q.  And what happened after this
6  conversation?
7    A.  Nothing. I went home.
8    Q.  And how long was it from that incident
9  to May 1st, how many days elapsed?
10   A.  I'm not sure.
11   Q.  Was it pretty close in time?
12   A.  I'm not sure at all.
13   Q.  What happened on May 1st, 2009?
14   A.  May 1st, 2009, I worked. I got up and
15 went to work. Sometime during the day -- I'm
16 not sure if it's 11 a.m. or 2 p.m., but I was
17 called to the office and I went to the office
18 and I stood there for awhile because Jimmy
19 Dickerson, Steve Johnson, and Mr. Speyers were
20 having a meeting. So I waited.
21     After Mr. Dickerson came out, maybe
22 after 10, 15 minutes, then I was called in. I
23 was introduced to Mr. Speyers because I already
24 knew because he from time to time will come and

Page 161

**Page 162**

1  do work in the buildings. But I was introduced
2  to him.
3      I said, "Steve Johnson said Angel,
4  this is --" I can't think of his first name
5  right now. But he says, "Angel, this is Mr.
6  Speyers and he is now the new property manager
7  for Holsten. He brought in his own cleaning
8  crew so we're going to let you go."
9      Q. And what did you respond?
10     A. I don't know. I didn't say anything,
11 really, but Steve Johnson said that he was
12 sorry. He was like (I'm so sorry."
13     And I said, "It's okay, you know, this
14 must not be where the Lord want me at this
15 time."
16     Q. Was anything said regarding problems
17 that you had had with Ms. Redman in terms of
18 letting you go?
19     A. No, but I was assured that Steve
20 Johnson will be speaking to Ms. Redman right
21 after me, and today she also would be fired.
22     Q. And was any reason given for her
23 firing?
24     A. No.

**Page 163**

1      Q. Was there any reference made as to any
2  problems you two had working together?
3      A. No, not at all.
4      Q. Did Mr. Johnson say anything further to
5  you that you recall?
6      A. He said -- he apologized several times.
7  He says here's your envelope and something to
8  the fact of at least you still -- me being a CHA
9  resident, at least I won't lose my apartment.
10     Q. Did he hand you a letter regarding your
11 termination?
12     A. Yes.
13     Q. And when you said an envelope, what was
14 in the envelope?
15     A. Checks.
16     Q. Were you given a severance pay when you
17 left?
18     A. Yes, I'm sure.
19     Q. What did you say then to Mr. Johnson
20 before you left?
21     A. Nothing. There was nothing to say.
22     Q. Did you hug him?
23     A. Yes, I did.
24     Q. Did you talk with anyone else at

**Page 164**

1  Holsten after this conversation with Steve
2  Johnson?
3      A. No. I just left, I just walked through
4  the buildings and went home.
5      Q. So you were done for the day working?
6      A. I'm not sure if I walked through and
7  saw something and I did it, but I was really
8  just on my way home.
9      Q. So May 1st was your last day of work?
10     A. Correct.
11     Q. After you were terminated at Holsten,
12 did you file for unemployment compensation?
13     MR. FUOCO: Objection, collateral.
14 BY THE WITNESS:
15     A. After -- I tried to find a job because
16 a friend of mine had just started janitorial
17 work at another building.
18 BY MR. SNELLING:
19     Q. Okay.
20     A. So I think I called him. I didn't file
21 for unemployment for like maybe two weeks
22 afterward.
23     Q. But you did file?
24     A. Yes, I did.

**Page 165**

1      Q. What did you tell the unemployment
2  people was the reason that you were no longer
3  working at Holsten?
4      MR. FUOCO: May the record reflect I object
5  to each and every question that has to do with
6  unemployment compensation as collateral source
7  and inadmissible. Thank you.
8  BY MR. SNELLING:
9      Q. Go ahead.
10     A. What did I tell unemployment?
11     Q. Yes. Did they inquire as to why you
12 were no longer working at your last job?
13     A. I guess.
14     MR. FUOCO: Don't guess. What's in your
15 mind.
16 BY THE WITNESS:
17     A. What did I tell unemployment? I told
18 unemployment that I was fired.
19 BY MR. SNELLING:
20     Q. Did they ask what was the reason that
21 you were fired?
22     A. I don't remember.
23     Q. When you were terminated from your
24 employment at Holsten, do you remember what was



VERONICA LEE DICKERSON, VOL. 2

1  your yearly salary at Holsten at that time for
2  2009?
3      A.  My yearly salary?
4      Q.  Yes.  Does the figure $38,850 sound
5  about right for what your salary was in your
6  position at Holsten when you left in 2009?
7      A.  I believe so.
8      Q.  In addition to your salary at Holsten,
9  you received a free four bedroom apartment, is
10  that correct, or did not pay rent on a four
11  bedroom apartment, is that correct?
12      A.  After three years or so for working for
13  Holsten, yes, they did decrease my rent.  They
14  did pay my rent.
15      Q.  So, starting in approximately 2004, you
16  received a rent free apartment at Hilliard, is
17  that correct?
18      A.  Yes, I would say.
19      Q.  And this was a four bedroom apartment,
20  is that correct?
21      A.  It's according to my family, yes.
22      Q.  Ms. Dickerson, do you know the salary
23  of any of the male janitors of Hilliard during
24  the period which you were one of the janitors

Page 166

1  you know.
2      Q.  Do you know how much higher you believe
3  Donald Ivy's salary was than yours in 2009?
4      A.  I don't know how much higher, but I
5  know it was much nicer than mine.  I know it was
6  nicer than mine.
7      Q.  What do you mean nicer?
8      A.  It was more.
9      Q.  What position did Donald Ivy have in
10  2009 with Holsten?
11      A.  I would say he was the same as myself.
12  He was janitor maintenance.
13      Q.  When you say I would say, you're not
14  sure what his position was with Holsten?
15      A.  He was janitor maintenance.
16      Q.  How do you know that?
17      A.  Because we all had the same positions.
18  It was either janitor or janitor and
19  maintenance.
20      Q.  Was there a maintenance engineer
21  position at Holsten?
22      A.  Terrace Hodges was the maintenance
23  engineer.  We were told he was.
24      Q.  Were you told anyone else was a

Page 168

1  there?
2      A.  Not specifically, no.
3      Q.  We had talked about a person named
4  Donald Ivy at the last deposition, is that
5  correct?
6      A.  Correct.
7      Q.  Did he work at Hilliard?
8      A.  Yes.
9      Q.  You don't know his salary, is that
10  correct?
11      A.  I know that he made more than I did.
12      Q.  How did you know that?
13      A.  Just from the janitors -- I mean, when
14  we would engage in conversation -- well, I would
15  just be there, okay.  The guys would be around,
16  but I would be there also because I was an
17  employee there.
18          They would just -- conversation would
19  just come up as to are you -- where you at, are
20  you at 13?  And one or another would shake their
21  head.  Are you at 16?  Yeah, you at 16, 16.50.
22          So me standing there in the
23  conversation, you could just about know
24  approximately who was higher and who was lower,

Page 167

1  maintenance engineer?
2      A.  No.
3      Q.  What job did a fellow named Lloyd have
4  there?
5      A.  Calvin Lloyd?
6      Q.  Yes.
7      MR. FUOCO:  Objection.  I think that has been
8  asked and answered.
9      MR. SNELLING:  I'm just trying to go over a
10  little bit.
11  BY THE WITNESS:
12      A.  Calvin Lloyd did the same as myself.
13  He did the same as myself.
14  BY MR. SNELLING:
15      Q.  Ms. Dickerson, why do you think you
16  were terminated from employment at Holsten?
17      MR. FUOCO:  Objection, speculation.
18  BY THE WITNESS:
19      A.  I believe I was terminated because I
20  needed help.  After I hurt my neck, I no longer
21  seemed to be needed because I had to ask help
22  from the guys.  I needed help from the guys for
23  the couple of weeks that I was hurt.

Page 169

BY MR. SNELLING:
  Q.  Do you think that your relationship with Ms. Redman had anything to do with your termination?
  MR. FUOCO:  Objection, speculation.
BY THE WITNESS:
  A.  No, I don't.
BY MR. SNELLING:
  Q.  Any other reason that you think that you were terminated from Holsten besides your injury?
  A.  Me being a woman, I could no longer do what I had been doing for the last 11 years on that property.  After I got hurt, I was -- I guess I looked weaker.  I guess I could no longer live up to what I had been doing for the last 11 years.
  Q.  Do you think if a male was not able to physically perform the job, that he would also be terminated?
  MR. FUOCO:  Objection, lacks foundation, requires speculation, improper hypothetical.
BY THE WITNESS:
  A.  I don't know.

Page 170

BY MR. SNELLING:
  Q.  Do you have any evidence that Holsten fired you for any reason other than what you were told by Mr. Johnson on May 1st, 2009?
  MR. FUOCO:  Object to the form of the question.
BY THE WITNESS:
  A.  Do I have any what, speculation?
BY MR. SNELLING:
  Q.  Evidence.
  A.  Evidence?
  Q.  Yes.
  MR. FUOCO:  Object to the requirement of legal conclusion and the joint effort between plaintiff and counsel.  Go ahead.
BY THE WITNESS:
  A.  I don't understand the question.
BY MR. SNELLING:
  Q.  The question is:  Do you have any evidence that Holsten fired you for any reason other than what Mr. Johnson told you on May 1st, 2009?
  MR. FUOCO:  Same objections.
BY THE WITNESS:

Page 171

  A.  The only evidence that I have is stating that I was hurt and I needed help to pull the Dumpster.  That's the only evidence is my hospital work stating that I was hurt and I needed not to move anything more than 30 pounds at that particular time.
BY MR. SNELLING:
  Q.  Now, I just want to go over the other male janitors at Holsten during the period that you were working at Hilliard.
  A.  Okay.
  Q.  Was a Sean Manuel a manager at Holsten in 2009 when you were there?
  A.  Sean was an evening janitor.
  Q.  Do you know when he was hired?
  A.  No, I don't.
  Q.  Was he working at Hilliard for just 2009 or earlier than that, do you know?
  A.  I'm not sure.
  Q.  Do you know what his salary was at Holsten at any time?
  A.  Not specifically.
  Q.  Was Marvin Thomas a janitor at Hilliard in 2008 while you were there?

Page 172

  A.  Correct.
  Q.  Do you know when he was hired?
  A.  He was hired --
  Q.  If you don't remember, that's fine.
  A.  I don't remember.
  Q.  Did you know his salary in 2008 or 2009?
  A.  I don't remember.
  Q.  Did Mr. Thomas stop working for Holsten in December of 2008?
  A.  I don't remember.
  Q.  Do you know whether he was fired?
  A.  He was, yes.
  Q.  Do you know the reason?
  A.  He didn't work.
  Q.  Was Juan Gonzalez a janitor at Holsten while you were there?
  A.  Yes.
  Q.  And do you know when he started working at Holsten?
  A.  No, I don't.
  Q.  Do you know his salary at Holsten during any of the period that he worked there?
  A.  No, I don't.

Page 173

1    Q.  Ms. Dickerson, was your salary for 2008
2  for Holsten 37,000?
3    A.  Was my salary?
4    Q.  Yes.
5    A.  You know what, I never -- I had direct
6  deposit.  Money was not never a thing with me.
7  As long as I had my check to go to the bank, I
8  had money to pay my bills and money to buy my
9  children something.  I never even paid attention
10  to my money.  I don't know if I was -- it didn't
11  matter to me whether I was nine, twelve, thirteen.  If
12  they gave me increases, I appreciated them, but
13  money was -- I was never money --
14    MR. FUOCO:  Veronica, was the answer to the
15  question yes or no?  He asked you a question.
16  Answer the question.  There is no need to go any
17  further.
18  BY THE WITNESS:
19    A.  Money --
20    MR. FUOCO:  The question was --
21  BY THE WITNESS:
22    A.  I don't know, 30 something.
23  BY MR. SNELLING:
24    Q.  37,000.  If you're not sure then that

Page 174

1    Q.  Do you know the name of this male?
2    A.  Maurice.
3    Q.  Mitchell, is that correct?
4    A.  I believe so, yes.
5    Q.  Do you know when he was hired by
6  Holsten?
7    A.  He was hired by Holsten -- he was
8  actually hired a couple of months after I was
9  fired.
10    Q.  And do you know what his salary was
11  when he was hired?
12    A.  Not specifically.
13    Q.  Was Calvin Lloyd a janitor at Hilliard
14  while you were there?
15    MR. FUOCO:  Objection, asked and answered in
16  Session I.  Go ahead.
17  BY THE WITNESS:
18    A.  He did janitorial work.
19  BY MR. SNELLING:
20    Q.  So the answer is yes?
21    A.  Yes.
22    Q.  Do you know when he was hired?
23    A.  No, I don't.
24    Q.  Do you know his salary at any time

Page 176

1  is a valid answer as well.
2    MR. FUOCO:  Go ahead.
3  BY THE WITNESS:
4    A.  I'm not sure.
5  BY MR. SNELLING:
6    Q.  Did Juan Gonzalez stop working for
7  Holsten in 2008?
8    A.  I don't know.
9    Q.  Was Theodore King a janitor at Hilliard
10  in 2009 when you were there?
11    A.  He was.
12    Q.  Do you know when he started working for
13  Holsten?
14    A.  No.
15    Q.  Do you know his salary at any time
16  while he was employed at Holsten?
17    A.  Not specifically.
18    Q.  Was Telly Wiley a janitor at Hilliard
19  in 2009 while you worked there?
20    A.  I don't believe so.
21    Q.  Now, in your complaint, you state that
22  a male was hired as a janitor after you were
23  terminated in May 2009?
24    A.  Correct.

Page 175

1  while he worked at Holsten?
2    A.  It was more than mine.
3    Q.  And how do you know that?
4    A.  Because he was also one of the ones
5  that would speak in general about -- I mean --
6  he was one of the ones that we would all just
7  stand around and they would talk.
8    Q.  And you specifically recall him talking
9  about his salary?
10    A.  It was just a thing that they would do
11  I guess to keep up with who was making more or
12  whatever.
13    Q.  My question is:  Do you specifically
14  recall him making comments about his salary?
15    A.  Yes.
16    Q.  And when was that?
17    A.  It was -- a day in the summer in
18  general conversation.
19    Q.  What year would that have been?
20    A.  What year?  That would have been 2008.
21    Q.  Is that the only time you recall?
22    A.  No, but I don't recall the dates.  I
23  don't recall.
24    Q.  Do you recall specifically what he

Page 177

1  said.
2      A.  Something to the fact of -- it was just
3  general conversation like you at almost 16,
4  right, or you should be at 14 now, right?  Just
5  making all that money.  See that was just
6  conversation.  It was just conversation.
7      Q.  Summer of 2008, you were considerably
8  above 16,000 a year, correct?
9      A.  I was above 16,000 a year?
10     Q.  Yes, in salary?
11     MR. FUOCO:  Objection, misstates.
12 BY THE WITNESS:
13     A.  I don't know.
14 BY MR. SNELLING:
15     Q.  You don't know what your salary was in
16 2008 is that what you're saying?
17     A.  I don't remember specifically.
18     Q.  But you specifically remember what
19 Mr. Lloyd said about his salary in 2008?
20     MR. FUOCO:  Objection, it's not salary.  It's
21 hourly.  You've misinterpreted the answer.
22 BY MR. SNELLING:
23     Q.  You're saying that you were paid
24 hourly, not yearly salary, is that what you're

Page 178

1      Q.  when you worked there?
2      A.  Correct.
3      Q.  Do you know when he was hired?
4      A.  I believe in '08.
5      Q.  Do you know what his rate of pay was at
6  Holsten?
7      A.  Not specifically.
8      Q.  Are there any other persons who were
9  janitors at Hilliard during the period you
10 worked there that you're contending were male
11 janitors?
12     A.  All of them were male.
13     Q.  Anyone other than what -- people that
14 we've already discussed the names of them?
15 Have I left anyone out?
16     A.  Today?
17     Q.  Yes, today and the last deposition
18 session.
19     A.  We've had a couple of janitors that
20 come in and out, but I don't recall their names.
21 They didn't stay long.
22     Q.  Was there a pretty good turnover of
23 janitors at Hilliard by Holsten?
24     A.  What do you mean "turnover"?

Page 180

1  saying?
2      MR. FUOCO:  Objection, misstates what
3  Mr. Lloyd said.
4      MR. SNELLING:  I'm asking what you're saying.
5  Answer the question.
6      MR. FUOCO:  You're suggesting --
7  BY MR. SNELLING:
8      Q.  No.  I'm asking were you paid yearly,
9  salary or hourly rate?
10     MR. FUOCO:  Objection.  There is an hourly
11 equivalent to salary.  You're purposely
12 misunderstanding the context.
13     MR. SNELLING:  Let the witness answer the
14 question.
15 BY THE WITNESS:
16     A.  It's my understanding that I was at $16
17 an hour.  Now that I do know.
18 BY MR. SNELLING:
19     Q.  So your understanding was that you
20 weren't being paid a set amount for yearly
21 salary by Holsten?
22     A.  I was paid salary.  I don't know.
23 Money, I don't know.
24     Q.  Was James Fuller a janitor at Hilliard

Page 179

1      Q.  Were people fired or terminated?
2      A.  No.
3      Q.  No?
4      A.  It wasn't a pretty good turnover.
5      Q.  Were many janitors terminated at
6  Hilliard during the period you were there?
7      A.  Yes.
8      Q.  Were you one of the more senior
9  janitors at Hilliard?  Had you been there longer
10 than most of the male janitors?
11     A.  Correct, yes.
12     Q.  Now, your lawyer filed a Rule 26
13 disclosure statement where you listed persons
14 that had information related to your case
15 against Holsten.  You listed Steve Johnson,
16 Berkenya Coker and Terry Hodges.
17         Do you recall that?
18     A.  I made a list.
19     Q.  Yes.
20     A.  I made a list?
21     Q.  You provided those names.
22     MR. FUOCO:  Objection, that is the act of
23 counsel.
24

Page 181

BY MR. SNELLING:
Q. Other than those three persons, do you have any other persons with discoverable information related to your claims in this case?
MR. FUOCO: Objection, legal conclusion.
BY THE WITNESS:
A. Steve Knox.
BY MR. SNELLING:
A. Inell Fuller.
Q. Who is Inell Fuller?
A. We called him James Fuller. He was a janitor. He no longer is with Holsten. Anyone I worked with can tell you.
Q. Steve Knox, what was his position again?
A. He was in leasing.
Q. And what did you have to do with him?
A. He was aware of what I did.
Q. Was he at leasing at Hilliard?
A. Correct.
Q. In your interrogatory answers in relation to Question 4, you referred to a Steve Jackson. Did you mean Steve Johnson?
A. Jackson?

Page 182

Q. Yes.
A. I don't recall a Steve Jackson.
Q. Right. I'm just referencing plaintiff's response to defendant's interrogatories and request for production of documents.
    Interrogatory 4 asks you to list and describe every wrongful act you allege Holsten did to you and then to identify any person that was involved with that act. In answering that, you referred to "Steve Jackson fired me at the Hilliard Homes main office on May 1st, 2009."
    Should that be Steven Johnson?
A. It should be.
Q. Other than the documents provided in response to Holsten's production requests, do you have any other documents related to your claims against Holsten in this case?
MR. FUOCO: Point of inquiry. Are you including what we dropped off the morning of?
MR. SNELLING: Sure, yes. That is production, all of that.
MR. FUOCO: Thank you.
BY THE WITNESS:

Page 183

A. No. The question was do I have any other documents?
BY MR. SNELLING:
Q. Yes.
A. I have a few other job papers that I'm trying to pull up other places that I went and lead-offs from those places, searching.
Q. Your lawyer has given me several documents.
A. I have more.
MR. FUOCO: If more surface, we will supplement pursuant to 26(e).
MR. SNELLING: Okay.
MR. FUOCO: Thank you.
BY MR. SNELLING:
Q. Let me hand you what we'll mark as plaintiff's exhibit --
MR. FUOCO: Are you thinking defendant's?
MR. SNELLING: That's right defendant's.
BY MR. SNELLING:
Q. Could you take a look at it and identify Defendant's Exhibit 11?

Page 184

(Whereupon, Defendant's Deposition Exhibit 11 was marked for identification.)
BY THE WITNESS:
A. Okay. Identify it? It's an individual income tax return.
BY MR. SNELLING:
Q. Is it your federal income tax return for the year 2009?
A. Correct.
Q. On this return you list four children as dependents, is that correct?
A. Correct.
Q. And they were living with you in 2009, is that correct?
A. Yes.
Q. In I guess Item No. 19 on the tax form, it has unemployment compensation listed. Is it correct that you received $14,432 in unemployment that year?
MR. FUOCO: Objection, collateral source, move to strike, inadmissible.
    Go ahead.
BY THE WITNESS:

Page 185

1      A.  Correct.
2   BY MR. SNELLING:
3      Q.  Is the figure wages, salary, tips in
4   Line 7 where there is a figure of $17,895, does
5   that reflect the amount of income you received
6   from Holsten in 2009?
7      A.  Yes.
8      Q.  And then on Line 16(b) you have $1,000
9   listed.  Do you see that?
10     A.  Yes.
11     Q.  Do you know what that is for or from?
12     A.  It says pension and something.
13     Q.  You're not sure other than what is
14  listed on the form?
15     A.  Yes.
16     Q.  Did you file a Schedule A with this tax
17  return in 2009, do you know?
18     A.  I don't know.
19     Q.  If there is one, one was not provided
20  to me.  Can you produce that?
21     A.  Where would I get it from?
22     Q.  It should be on your tax return.  On
23  line -- if you look on Line 40, it looks like --
24  41, it looks like you're claiming itemized

Page 186

1   deductions but you don't have a Schedule A.  Do
2   you see that?  It is itemized deduction from
3   Schedule A, Line 40.
4      All I'm asking is if there is a
5   Schedule A for this tax return that you provide
6   that to your lawyer so that it gets produced to
7   me, okay?
8   MR. FUOCO:  We can certainly look at what she
9   got from H&R Block.  If that Schedule A is not
10  attached to the document she was given, then we
11  won't be able to.  But if it is in that folder,
12  I certainly would do so.
13  MR. SNELLING:  Okay.  Great.
14  BY MR. SNELLING:
15     Q.  At the bottom on the second page of
16  this Exhibit 11, it asks for your occupation.
17  You listed janitor, is that correct?
18     A.  Correct.
19     Q.  In your production requests, you
20  produced a form from Advanced Toxicology Network
21  dated August 19th, 2009 --
22     A.  Okay.
23     Q.  -- do you recall that?
24     A.  Yeah, I believe I went to go for a

Page 187

1   forklift job.
2      Q.  And was that part of the application
3   process that you had some kind of test done by
4   Advanced Toxicology Network?
5      A.  Yeah.  You had to.
6      Q.  Was that like a blood test or
7   something?
8      A.  It was a hair sample.  A hair sample
9   test.
10     Q.  What was the purpose of that test, do
11  you know?
12     A.  To make sure that I wasn't on drugs to
13  drive their machine.
14     Q.  Was that the name of the testing
15  company or was that where you were applying for
16  work?
17     A.  That was the name of -- I'm not sure.
18  MR. SNELLING:  Can we have this marked as
19  Exhibit 12, please?
20        (Whereupon, Defendant's
21         Deposition Exhibit 12 was
22         marked for identification.)
23  BY MR. SNELLING:
24     Q.  Was that just the testing company or

Page 188

1   was that the place that you were seeking
2   employment?
3      A.  I'm not sure.  They gave me paperwork
4   to take with me there, so I'm not sure if this
5   is the paperwork they gave me or this is the
6   paperwork they released me from.
7      Q.  Did you get the job that you were being
8   tested for?
9      A.  No, I did not.
10     Q.  What is the first employment that you
11  had after leaving Holsten on May 1st, 2009?
12     A.  The first employment was the job I'm
13  presently working now, which is Technical
14  Service -- Tec Services.
15     Q.  Is that the name of the company, Tec
16  Services?
17     A.  Yes.
18     Q.  What is their address?
19     A.  Their address is 4900 South Wabash --
20  49-something, 4900.
21     Q.  I was going to say so you're right next
22  door here?
23     A.  No.
24     Q.  4900 South Wabash?

Page 189



| 1 | A. Yes. |
| 2 | Q. What does Tec Services do? |
| 3 | A. They train me to teach people how to |
| 4 | work a computer, a computer lab assistant. |
| 5 | Q. Is that your position, computer lab |
| 6 | assistant? |
| 7 | A. Yes. |
| 8 | Q. And how long have you worked at Tec |
| 9 | Services? |
| 10 | A. I've worked there since I believe it |
| 11 | was December 31st, 2010. |
| 12 | Q. You've been working there full time |
| 13 | since then? |
| 14 | A. Not full time. Part time. |
| 15 | Q. How many hours a week? |
| 16 | A. Four. |
| 17 | Q. Four hours? |
| 18 | A. No. Four hours -- 20 hours a week. |
| 19 | Q. So four hours a day? |
| 20 | A. Four hours a day. |
| 21 | Q. Twenty hours a week? |
| 22 | A. Correct. |
| 23 | Q. And how long have you been working |
| 24 | those hours at Tec Services? |

Page 190

| 1 | A. I only work Monday through Thursday, |
| 2 | four hours a day. |
| 3 | Q. And has that been since December 31st, |
| 4 | 2010 -- |
| 5 | A. Yes. |
| 6 | Q. -- to the present? |
| 7 | A. To the present, yes. |
| 8 | Q. Am I correct, then, that from May 1st, |
| 9 | 2009 to December 31st, 2010, you had no |
| 10 | employment of any kind? |
| 11 | A. No. |
| 12 | Q. No, I'm not correct or no -- |
| 13 | A. No, I haven't had any employment, no. |
| 14 | Q. So you were unemployed from May 1st, |
| 15 | 2009 to December 31st, 2010, is that what you're |
| 16 | saying? |
| 17 | A. Yes. |
| 18 | Q. And your only source of income during |
| 19 | that period, May 1st, 2009 to December 31st, |
| 20 | 2010, was unemployment compensation, is that |
| 21 | correct? |
| 22 | A. Yes. |
| 23 | Q. During the period, that period from |
| 24 | May 1st, 2009 to December 31st, 2010, did you |

Page 191

| 1 | look for other employment? |
| 2 | A. Yes. |
| 3 | Q. Can you tell me about your job search |
| 4 | during that period? |
| 5 | A. My job search during that period, I |
| 6 | would search for jobs through the newspaper. I |
| 7 | would get job resources through unemployment. |
| 8 | You could just pick them up at the unemployment |
| 9 | office. |
| 10 | MR. FUOCO: Same objection. |
| 11 | BY THE WITNESS: |
| 12 | A. I would do walk-ins. I went to Women |
| 13 | Hard Hats Work, which I took a test for. My |
| 14 | math was a little low. |
| 15 | Through that job I met a young lady and |
| 16 | she sent me an e-mail as a job referral to be a |
| 17 | janitor kind of ways out. I went and filled out |
| 18 | an application there and had an interview. I |
| 19 | was told that I would be called back if they |
| 20 | should need -- I just was anywhere and |
| 21 | everywhere. |
| 22 | BY MR. SNELLING: |
| 23 | Q. How many places did you attempt to find |
| 24 | employment during any given week during that |

Page 192

| 1 | period from May 1st, '09 to the end of |
| 2 | December 2010? |
| 3 | A. During the week I would say three, |
| 4 | maybe four a day to go back and check on some of |
| 5 | the places that I had applied just to wave so |
| 6 | they could see my face and know that I really |
| 7 | needed a job. So I would say three, maybe four |
| 8 | a day. |
| 9 | Q. During that whole period? |
| 10 | A. During the whole period on top of still |
| 11 | filling out applications. |
| 12 | Q. And the first job that you got was with |
| 13 | Tec Services, that is, T-e-c, Services. |
| 14 | A. Yes. |
| 15 | Q. At Tec Services, are you paid $9 an |
| 16 | hour? |
| 17 | A. Yes. |
| 18 | Q. Do you get any benefits with that, |
| 19 | health benefits? |
| 20 | A. No, none. |
| 21 | Q. Other than your unemployment payment, |
| 22 | was there any other income or source of income |
| 23 | that you had from May 1st, '09 to December 31st, |
| 24 | 2010? |

Page 193

1    A.  No, none.  Summer job, yes, summer job,
2  I did work a summer job.
3    Q.  Okay.  Which summer, '09 or '10?
4    A.  '10.
5    Q.  2010?
6    A.  Yes.
7    Q.  And what was your summer job in 2010?
8    A.  My summer job was to learn computers
9  with the Tec Services.
10    Q.  So --
11    A.  I did Tec Services one day a week and
12  the other days I was at Best Buy.  I worked at
13  Best Buy.  I worked at Best Buy.
14    Q.  When did you work at Best Buy?
15    A.  For three or four months in the summer
16  of 2010.
17    Q.  And what was your position at Best Buy?
18    A.  My position there was clerk.
19    Q.  A sales clerk?
20    A.  I'm not sure of the position.  I just
21  went in and did what was needed.
22    Q.  Where did you work or what was the
23  address?
24    A.  The address is I believe it was 7900 --

Page 194

1    Q.  You were paid something, correct?
2    A.  I don't remember.  I don't know.
3    Q.  And Tec Services then eventually hired
4  you at the end of December 2010, is that
5  correct?
6    A.  Yes.
7    Q.  So the end of summer of 2010 to --
8    A.  December 31st.
9    Q.  2010, were you working for anyone or
10  not?
11    A.  No, I was searching, just filling out
12  applications and searching.
13    Q.  Did you work during the summer of 2009?
14    A.  No.
15    Q.  Ms. Dickerson, can you tell me what
16  damages you're claiming in this case?
17    A.  I'm claiming discrimination.
18    Q.  I'm talking about the damages now
19  rather than your claim.
20    MR. FUOCO:  Objection, legal conclusion.
21  BY MR. SNELLING:
22    Q.  Are you seeking payment for lost income
23  as an example of damages that you're seeking in
24  this case?

Page 196

1  it's across the street from Ford City Mall in
2  Cicero.
3    Q.  You worked at the Best Buy that was
4  across the street from Ford City Mall in Cicero,
5  is that correct?
6    A.  7900 South Cicero I believe is the
7  address.
8    Q.  And you worked there for three or
9  four months in the summer of 2010, is that
10  correct?
11    A.  Yes.
12    Q.  And what was your -- what were you paid
13  there?
14    A.  I was paid I believe $10 an hour.
15    Q.  Why did you leave?
16    A.  It was a summer job.  They said they
17  would call you back, so I'm waiting for them to
18  call me back.
19    Q.  During that time that you were working
20  at Best Buy, you were also working one day a
21  week for Tec Services?
22    A.  Yes, on Fridays.
23    Q.  Were you paid $9 an hour for that?
24    A.  I don't remember.

Page 195

1    A.  Yes.
2    Q.  Are you seeking any other form of
3  monetary damages?
4    MR. FUOCO:  Objection, legal conclusion.
5  BY THE WITNESS:
6    A.  I'm seeking an understanding of why
7  they fired me, why was I fired.
8  BY MR. SNELLING:
9    Q.  Are you seeking any other form of money
10  damages in this case other than lost income?
11    MR. FUOCO:  Objection, legal conclusion,
12  satisfies not what is pled in the complaint --
13    MR. SNELLING:  I'm going to request counsel
14  not to testify for the witness, please --
15    MR. FUOCO:  Ask the legal conclusion
16  questions --
17    MR. SNELLING:  Just allow me to ask the
18  questions --
19    MR. FUOCO:  It's an inappropriate question to
20  a layperson about a matter of pleading --
21    MR. SNELLING:  Absolutely is not.
22    MR. FUOCO:  Yes, it is.
23  BY MR. SNELLING:
24    Q.  Go ahead.

Page 197

1    A.  I'm seeking what's lost, what I've
2  lost; with me being a woman that got hurt, the
3  things that was lost from me losing my job for
4  no reason.
5    Q.  Is there a dollar figure that you're
6  seeking in this case?
7    A.  Well, my lawyer has already stated is
8  what I'm seeking.
9    MR. FUOCO:  That would be an attorney-client
10  privileged matter.  The damages will be
11  calculated at a later date.
12    MR. SNELLING:  I'm entitled to a statement.
13  BY MR. SNELLING:
14    Q.  Is there a dollar figure that you're
15  seeking for damages in this case?
16    MR. FUOCO:  You're entitled to know when we
17  know exactly what the dollar figure is.  It will
18  be quantified by an economist and that will be
19  disclosed to you pursuant to the Court's
20  scheduling order for expert discovery.
21    MR. SNELLING:  For lost income?
22    MR. FUOCO:  For all of it.
23  BY MR. SNELLING:
24    Q.  Anything other than lost company?

Page 198

1  as the storage room?
2    MR. FUOCO:  Object to form.
3  BY THE WITNESS:
4    A.  It wasn't a storage room.  It was an
5  apartment.  I was told to keep it in apartment
6  looking condition.  It was an apartment.
7  BY MR. SNELLING:
8    Q.  How long did you have your personal
9  items in that room?
10    A.  I had my personal items in there
11  possibly from -- it was like from '05 until the
12  day that I was told to remove them.
13    Q.  What year was that in?
14    A.  That was in year 2009.
15    MR. SNELLING:  Okay.  Nothing further.
16    THE WITNESS:  I would like to state --
17    MR. FUOCO:  No, you don't have to.  You don't
18  have to.
19    THE WITNESS:  Okay.
20    MR. FUOCO:  I get to ask you some questions
21  now.  The last exhibit was 11?
22    MR. SNELLING:  12.
23    MR. FUOCO:  If we can make this 13 and 14,
24  please.

Page 200

1    A.  Everything that has already been
2  stated.
3    Q.  Where has it been stated?
4    A.  It has been stated in --
5    Q.  Stated -- to move things along, stated
6  in your complaint and your interrogatory
7  answers?
8    A.  Stated in the complaint filed.
9    Q.  In the complaint.
10    MR. SNELLING:  Let's take a short break, see
11  if we can wrap this thing up.
12    (Whereupon, a short recess was
13    taken.)
14    MR. SNELLING:  Back on the record.
15  BY MR. SNELLING:
16    Q.  Just a further question, Ms. Dickerson.
17  On our first session of deposition, you had
18  discussed that there was a room that was a
19  storage room but also you were keeping your
20  personal possessions in at 2111 South Clark.
21    Do you recall that testimony?
22    A.  Yes.
23    Q.  How long did you use that storage room
24  as your personal kind of possession area as well

Page 199

1    (Whereupon, Defendant's
2    Deposition Exhibit 13 was
3    marked for identification.)
4    MR. FUOCO:  What I'm going to do is show you
5  what has been marked Exhibit 13 which is Bates
6  stamped H0072.
7    EXAMINATION
8  BY MR. FUOCO:
9    Q.  What I want you to do is look at the
10  document.  Does your name appear on it?
11    A.  Yes.
12    Q.  Is there a date handwritten in?
13    A.  May 13th of '03.
14    Q.  What title has been assigned to you by
15  Holsten Management?
16    MR. SNELLING:  I'm going to object.  She
17  hasn't identified this document.  Have you ever
18  seen it before?
19    MR. FUOCO:  This is mine, okay?  Just stop.
20  If you have an objection, that's fine.
21  BY THE WITNESS:
22    A.  Building coordinator.
23  BY MR. FUOCO:
24    Q.  When Mr. Snelling asked you in Session

Page 201

Sarnoff
877.955.3855

**Page 202**

1  II earlier this morning and you said you didn't
2  remember, didn't think you were ever a building
3  coordinator, does this change your mind?
4      A.  Yes, it definitely does.
5      Q.  Does this help refresh your memory
6  about the past titles you had at Holsten
7  Management?
8      A.  It was because this was during
9  construction of the building.  So I was
10  definitely busy.
11      Q.  Do you recognize the person's
12  handwriting on the form?
13      A.  Yes.
14      Q.  Whose handwriting is that?
15      A.  That is Loretta Ward's who was the
16  property manager.
17      Q.  How do you recognize Loretta Ward's
18  handwriting?
19      A.  Because I know that's her signature.
20      Q.  I see.  Do you believe this document
21  was created by Holsten Management?
22      A.  Yes.
23      Q.  What makes you believe that?
24      A.  Because it is signed by the property

**Page 203**

1  manager of Holsten.
2      Q.  Was Loretta -- what is her name, Ward?
3      A.  Ward.
4      Q.  She was the property manager on and
5  around May 13th, 2003?
6      A.  She was.
7      Q.  Presuming that your job title truly was
8  building coordinator, what did you do as a
9  building coordinator?
10      A.  I did -- I made sure the building was
11  maintained in any way that it needed to be.  I
12  did everything.  I did tubs, toilets, doors,
13  elevators, boilers, everything, anything.
14      Q.  The bottom line is this form is roughly
15  just under six years before your firing,
16  correct?
17      A.  Yes.
18      Q.  It is an '03 form and you were fired in
19  May 2009?
20      A.  Correct.
21      Q.  Let's go to 14.  You can compare 13 to
22  14.

**Page 204**

1      (Whereupon, Defendant's
2      Deposition Exhibit 14 was
3      marked for identification.)
4  BY MR. SNELLING:
5      Q.  Do the forms themselves look to be the
6  same?
7      A.  They are.
8      Q.  I'm talking about just the form, the
9  header payroll change notice.  Do the forms
10  appear to be the same?
11      A.  No.
12      Q.  Same boxes in the middle, same header
13  on top?
14      A.  Yes.
15      Q.  Is it your belief that Exhibit 14 Bates
16  stamped H7703 was created by Holsten Management?
17      A.  Yes.
18      Q.  What leads you to that belief?
19      A.  Because the papers are the same.
20  They're coming from the same company.
21      Q.  Is your name on Exhibit 14?
22      A.  It is.
23      Q.  What is the date handwritten?
24      A.  January 25th, 2005.

**Page 205**

1      Q.  Earlier Mr. Snelling asked you if you
2  were a resident manager for Holsten Management.
3  Do you remember that?
4      A.  Yes.
5      Q.  I believe your answer was no, is that
6  correct?
7      A.  My answer was no to Mr. Snelling, yes.
8      Q.  Does this document help refresh your
9  memory to that to change your answer?
10      A.  It does.
11      Q.  What is your answer now after review of
12  the document refreshing your memory?
13      A.  I was a residential manager for a
14  period of time.
15      Q.  So we see a change in job title from
16  '03 to '05?
17      A.  Correct.
18      Q.  What did you do as a resident manager?
19      A.  I did paperwork in the office.  I did
20  help residents sign their leases, make sure they
21  signed in the right places, make sure they
22  understand what was stated in their lease.
23      Q.  Did you also do maintenance and
24  janitorial work --

1    A.  I did.  I never stopped.
2    Q.  So, being a resident manager, did this
3  add things to the job you had?
4    A.  It did.
5    Q.  Are those things classified as
6  administrative jobs in the leasing office?
7  Would that be a fair description?  Let me try it
8  again.
9        You've talked about preparing
10  paperwork.  What was the preparing paperwork
11  for?
12    A.  Residents, for the residents that lived
13  there.
14    Q.  Would it be fair to say in summary form
15  when you served as the resident manager you not
16  only did maintenance and janitorial at the
17  building but all of a sudden you got some more
18  administrative jobs?
19    A.  Yes, correct.
20    Q.  That was primarily helping the
21  residents?
22    A.  Yes, it was.
23    Q.  It was involving leasing papers?
24    A.  It was involved in helping them to

Page 206

1  understand their lease and where exactly to
2  sign.
3    Q.  Anything else that you remember as a
4  resident manager related to your administrative
5  jobs that you haven't already talked about?
6    A.  I did well-being checks.  What else did
7  I do?  Well-being checks, tried to aid and
8  assist helping them to get home care if they
9  needed a nurse or things like that.
10    Q.  Anything else that you can remember?
11    A.  Not that I can remember, no.
12    Q.  Given the date of January 25th, 2005,
13  this job title pertains to work you did for
14  Holsten less than four years before you were
15  fired, is that correct?
16    A.  That's correct.
17    Q.  Now, do you recognize the initials at
18  the bottom of Exhibit 14?  Is that Mr. Roddy,
19  R-o-d-d-y?
20    A.  Yes, it is.
21    Q.  How do you know that?
22    A.  Because this is his signature.  This is
23  the name.  He would write his name in a hurry.
24    Q.  Matthew Roddy, R-o-d-d-y, is his name?

Page 207

1    A.  His name is Matthew Roddy, yes.
2    Q.  There was discussion during Session I
3  of your deposition.  I want to do more with this
4  Exhibit 10.
5        Have you consistently done maintenance
6  work on behalf of Holsten Management while you
7  worked for this company?
8        (WHEREUPON, the document was
9        tendered to the witness.)
10  BY THE WITNESS:
11    A.  I have.
12  BY MR. FUOCO:
13    Q.  What maintenance work did you do while
14  you were their employee?
15    A.  I fixed -- I put in refrigerators,
16  stoves.  I kept the elevators running.  I kept
17  the boilers running, making sure the water was
18  at the right temperature and make sure it was
19  hot when needed to be.  We had a sprinkler
20  system in our apartment.  I knew exactly where,
21  which was on the outside of the apartment.  I
22  knew exactly where to go and shut off the main
23  valve so the water would not continue to run.  I
24  did lock changes, cylinder changes.  It just

Page 208

1  went on.
2    Q.  Would you repair and remove stoves from
3  residents' apartments?
4    A.  Yes, I would.
5    Q.  By repairing a stove, what would that
6  entail?
7    A.  That would entail to shut off the gas,
8  to disconnect the stove, to take it downstairs
9  to see exactly what was wrong with it and if I
10  could fix it myself or did I need to call to
11  have it picked up to be repaired professionally.
12    Q.  How would you attempt to diagnose a
13  problem with the stove you had removed from a
14  resident's apartment?
15    A.  I would check the thermostat -- or is
16  that the refrigerator.  I believe it's the
17  thermostat.
18    Q.  Would that be for the oven?
19    A.  I don't --
20    Q.  Did you check the gas tubing in an oven
21  or the stove?
22    MR. SNELLING:  I'm going to object to the
23  leading nature of the questions.
24    MR. FUOCO:  Let me withdraw the question.

Page 209

BY MR. FUOCO:

Q. As best you can remember related to a stove, starting from the top of the stove and working your way down, please describe for us each and everything you would check on your own to attempt to repair a stove as a follow-up to the question I asked you before?

A. I would check to make sure that there was no gas leak behind the stove. If I would smell gas, I would shut the gas off, I would disconnect the oven, I would put a cap on the main gas valve that is inside of the apartment to make sure that there would be no extra gas leakage.

I would take the stove out of the apartment, take it downstairs to the maintenance department, go to the office, let the office know that a stove was needed at that apartment, get approval for it and take the new stove upstairs, plug it up, make sure there was no gas leaks or anything like that, check the pilot and make sure the stove was safe for the resident in the apartment.

Q. Would you check the gas valving inside

Page 210

the stove?

A. I would, to make sure --

Q. Did you check the burners inside the stove?

A. Of course, to make sure they light, yeah.

Q. When you would take a stove out of a resident's apartment to see if you could repair it, how would you go about doing that?

A. I would go about --

Q. You mentioned thermostat before.

A. Yeah, I would -- that's at the bottom of the stove, though. It would -- a lot of the stoves would need new thermostats.

Q. Did you repair gas burners?

A. I would. I would -- mostly they needed cleaning. The residents would try to clean them themselves and clog the holes up, so I would take them down and clean them myself and reopen the holes and things and then put it back and turn it on, burn it about five minutes or so to make sure it was safe and then let the residents see that it worked and get them to sign off on our paperwork.

Page 211

Q. What tools or equipment would you use to clean gas burners?

A. You would -- I would use an oven cleaner first and then I would soak it in a solvent and take it out, rinse it off real good, unclog the holes with something to -- a pin, fixture of some kind, stick pin, and clean it again and then take it back up.

Q. The burners in the thermostat, what else would you do when looking at a stove to --

A. I would clean the entire stove before taking it back to the person's apartment.

Q. Did you do anything with refrigerators in tenants' apartments?

A. The only thing I would do with refrigerators is check to make sure it was cooling or anything.

Some people were left handed and right handed. So that would make me have to take the door of the refrigerator off, rotate it to the other side, okay, and then put back together so it would satisfy the resident that was in that particular apartment.

Q. Did you ever have to do anything to

Page 212

repair for refrigerators that weren't working?

A. No, because when it came to things such as freon and stuff like that, we were told to contact the company because if we bought the refrigerator and it didn't work right or whatever, then we would be liable for it.

Q. What company are you calling, a repair company?

A. Yes.

Q. Do you remember the name of the specific repair company that Holsten used?

A. No, I don't, not at this time, no.

Q. Other than refrigerators and ovens, what other equipment or appliances in residents' apartments would you fix?

A. I would do light fixtures.

Q. What would you do with that?

A. I would -- sometimes the light would blink but it really was the way that the wire was in there. A lot of the wires were coming loose.

It was this one particular wire that we knew to twist back together, so that's all I would do with that.

Page 213



1    Q.  So you were doing electrical work?
2    A.  Yes, definitely.
3    Q.  Are you taking what they call twist
4  connectors -- are you familiar with those
5  objects, they look like little caps and they put
6  two wires together?
7    A.  Yes, you put two wires together and you
8  put the cap back on top, yes.
9    Q.  You did that?
10   A.  Yes.
11   Q.  Any other electrical work relating to
12  lighting that you would do?
13   A.  Electrical work?  No, just if the
14  lights would go out, then I'll have to go back
15  up and reset the whole box.
16   Q.  What is "the whole box" the fuse box?
17   A.  The fuse box, yes.
18   Q.  Did the management of -- or did the
19  resident apartments at Holsten at 2111 South
20  Clark have circuit breakers or fuses?
21   A.  They had circuit breakers.
22   Q.  Do you know the difference between
23  circuit breakers and fuses?
24   A.  Yes.

Page 214

1    Q.  Fuses are twist --
2    A.  They're round glass balls, yes.
3    Q.  That is correct.
4    A.  Uh-huh.
5    Q.  And circuit breakers are what?
6    A.  Circuit breakers is a switch that
7  you --
8    Q.  Slide?
9    A.  Slide back and forth, right.
10   Q.  To reach electrical wires, did you have
11  to remove panels and other things, switch
12  plates?
13   A.  No.
14   Q.  To reach those wires, what did you have
15  to do when you were trying to see if the
16  connection was loose and you twist the cap back
17  up?
18   A.  You have to take the screwdriver and
19  take out the two screws, take off the white
20  plate, and then check and make sure that the
21  wires were okay and you knew what color wires
22  went with what.
23   Q.  Anything else in a resident's apartment
24  involving appliances or equipment that you

Page 215

1  haven't already testified about?
2    A.  No.  Toilets.
3    Q.  What did you do with the toilets?
4    A.  You can pull them up and make sure the
5  wax ring, so you have to make them loose, pull
6  the whole entire toilet up, replace the wax ring
7  that's under the toilet, put it back down and
8  make sure it's in place.
9    Q.  Did you replace toilets?
10   A.  Yes.
11   Q.  So you take out an old commode and put
12  in a new one?
13   A.  Right.
14   Q.  How would you do that?
15   A.  I would go upstairs and test the toilet
16  first.  If something was stopped up first I
17  would use the rodder and try and rod it out.  If
18  the rodder -- you would make several attempts
19  because you really didn't want to pull the
20  toilet up.
21       If it did not work, then you have to
22  take the two caps off of the side, you have to
23  unscrew the toilet on each side.  There's a
24  nail -- screws, long screws, and then you would

Page 216

1  have to cut around the tile, okay, because the
2  tile will get stuck and you don't want to cap
3  the tile.
4       So you cut around the tile.  Then you
5  gently rock the -- first you have to take off
6  the back of the toilet, also, because it's
7  sitting on the part that you need to get up off
8  the floor.  You have to go under there, unscrew
9  those, take it off, the watertank, take the
10  watertank off.  Then you have to unscrew and
11  then cut around and then pull the toilet up.
12  You replace the wax ring and then you put the
13  toilet back together again.
14   Q.  I see.  What else in residents'
15  apartments beyond the stove, the fridge, the
16  toilets and the lighting that you've already
17  talked about, what else?
18   A.  Windows.  You have to clean windows.
19  You have to remove --
20   Q.  I'm thinking more in a maintenance
21  setting where you were actually repairing
22  something.
23   A.  Yes, screens.  Have you to make screens
24  because you didn't order them so you ordered the

Page 217

1   stuff to make the screens.
2        So you would take the old stuff out of
3   the screen and then you would lay the other
4   screen netting down. You will cut it to fit.
5   Then you would take the rope and carefully place
6   it around and make a new screen.
7        Q. What else related to windows other than
8   screen making? Did you replace glass?
9        A. No, I didn't replace glass.
10       Q. Are we done with windows or are there
11  more things?
12       A. Just cleaning.
13       Q. What about heat and cooling in a
14  resident's apartment?
15       A. I would go up and make sure that we did
16  heat checks to make sure that the heating and
17  the -- make sure that it blew heat, make sure
18  that it blew heat, but a lot of that had to do
19  with the boilers downstairs in the basement.
20       Q. What about cooling?
21       A. Checking the thermostats.
22       Q. Was there air conditioning in this
23  building?
24       A. It is.

Page 218

1        Q. What, if anything, did you do about air
2   conditioning?
3        A. I wouldn't do much because they had
4   someone to come out. They had a professional to
5   come out and do the turnover with the freon and
6   stuff for the air conditioning yearly.
7        Q. So a separate company, apart from
8   Holsten Management, had a contract, as far as
9   you know, to come in and do the changeover?
10       A. Uh-huh.
11       Q. Yes.
12       A. Yes.
13       Q. Earlier you talked about boilers. What
14  repair or maintenance work would you do on a
15  building boiler?
16       A. I would go down, check the red lights.
17  If the red lights were on, then you would try
18  and reset the boiler. You would also yearly
19  have to replace the spark plugs. Spark plugs go
20  inside boilers. You would have to replace spark
21  plugs. You would do that on yearly basis.
22       Q. How would you do that?
23       A. You have to take the whole front part
24  off and reach your hand in there and take out

Page 219

1   the spark plugs and put in new spark plugs. So
2   you would have to do that. You would have to
3   keep the machines oiled.
4        You would have to go test other
5   machines to make sure they were working properly
6   in case an emergency happened. You needed to
7   make sure that this will work when you needed it
8   to work, so you had to do testing.
9        Q. What machine was that or machines?
10       A. That was -- so much -- it wasn't water.
11  You would hear water when you lift the thing.
12  The name escapes me right now.
13       Q. Was the boiler in the building
14  basement?
15       A. The boilers were in the basement, yes.
16       Q. The objects you're talking about, are
17  they above the basement?
18       A. They also in the basement.
19       Q. What function do they serve?
20       A. They kept the water running properly
21  through the building.
22       Q. I see. Is that valving?
23       A. It was valves. It was another
24  particular name that escapes me.

Page 220

1        Q. Was the boiler natural gas?
2        A. It was gas, yes.
3        Q. And spark plugs you're talking about,
4   they're igniters of gas?
5        A. Gas.
6        Q. Did you have to do anything to connect
7   the circuit or electricity for the igniters?
8        A. No, I didn't do anything.
9        Q. What about the filtration system, did
10  you have to do anything?
11       A. You have to change the filters, yes,
12  yes, I did that.
13       Q. Now, Exhibit 10, previously marked in
14  Session I to your deposition, does this describe
15  your job that you performed for Holsten?
16       A. It does.
17       Q. Is it a fair statement that you had two
18  separate types of functions, one was
19  maintenance, one was janitorial?
20       A. I did.
21       Q. Does this document say that?
22       A. Yes.
23       Q. If one were to call you a janitor,
24  would that be a fair characterization of your

Page 221

1   job or not?
2     A. No, it wouldn't be fair, no.
3     Q. You did more than janitorial work?
4   MR. SNELLING: I'm going to object, leading.
5   BY MR. FUOCO:
6     Q. Based on what Exhibit 10 says, did you
7   do more than just janitorial work while you
8   worked for Holsten?
9     A. Far more, yes.
10     Q. In fact, wasn't your job description at
11   some point at Holsten split between maintenance
12   and janitorial?
13     A. It was.
14     Q. Let me show you what I will mark as
15   Exhibit 15.
16       (Whereupon, Defendant's
17       Deposition Exhibit 15 was
18       marked for identification.)
19   MR. FUOCO: It is H0076.
20   BY MR. SNELLING:
21     Q. Let me show you what we've marked as
22   Defendant's Exhibit 15 to your deposition, Bates
23   stamped H0076.
24     Earlier, not long ago, minutes ago, you

Page 222

1     Q. What is it?
2     A. S. Johnson, Steven.
3     Q. And Steven Johnson was the vice
4   president of Holsten Management Corporation?
5     A. He is. He was.
6     Q. Do you recognize the signature?
7     A. Yes.
8     Q. Have you seen it before?
9     A. I have.
10     Q. Is that the basis for which you're
11   testifying that it is his signature on it?
12     A. It is.
13     Q. When you were asked to do maintenance
14   work, did you receive a form telling you what
15   needed to be done?
16     A. Yes.
17     Q. I will show you what I will make as a
18   group exhibit, Group Exhibit 16.
19       (Whereupon, Defendant's
20       Deposition Exhibit 16 was
21       marked for identification.)
22   MR. SNELLING: These are documents that you
23   produced to us?
24   MR. FUOCO: Yes.

Page 224

1   were testifying about payroll change notice
2   forms earlier in time. Do you remember seeing
3   those, 13 and 14?
4     A. Yes.
5     Q. Let me show you 13 and 14 and have you
6   compare that to 15. Before you are now 13, 14
7   and 15.
8     Does the form of 15 resemble 13 and 14?
9     A. Yes, it does.
10     Q. Do you have reason to believe that 15
11   is also a form created by Holsten Management?
12     A. It is.
13     Q. And how do you know that?
14     A. Because it's exactly the same form.
15     Q. What is the date on 15?
16     A. January 31, 2007.
17     Q. Does your name appear?
18     A. Yes.
19     Q. What is the title specific to you on
20   this particular form of handwriting?
21     A. Maintenance/janitor.
22     Q. Do you see a supervisor's name at the
23   bottom?
24     A. I do.

Page 223

1   MR. SNELLING: Let me make copies of these,
2   then.
3   MR. FUOCO: Go right ahead.
4   BY MR. FUOCO:
5     Q. Veronica, let me show you what we've
6   marked as Group Exhibit 16 to your deposition.
7     Are you familiar with the top page?
8     A. Yes.
9     Q. And if you could look at the other
10   pages that follow the top page just to get an
11   idea of what these are.
12     A. Maintenance work orders.
13     Q. So you're familiar with these forms?
14     A. Yes, I am.
15     Q. Did you, when working for Holsten,
16   receive these particular forms?
17     A. Yes, I did.
18     Q. Would you also receive other forms that
19   looked just like this in the course of your
20   employment at Holsten?
21     A. Yes.
22     Q. What purpose, in your understanding,
23   did these forms serve?
24     A. These forms let me know what was needed

Page 225

| | | | |
|---|---|---|---|
| 1 | at any particular time, at any given time. | 1 | Q. Is this an e-mail that you wrote? |
| 2 | Q. So this is a maintenance order form for | 2 | A. It is. |
| 3 | you to perform? | 3 | Q. Who did you write it to? |
| 4 | A. Yes. | 4 | A. Steve Johnson. |
| 5 | Q. The form, would it list the resident's | 5 | Q. What time of day? |
| 6 | apartment that was at issue? | 6 | A. 11:50. |
| 7 | A. It would, the apartment number and | 7 | Q. A.m. or p.m.? |
| 8 | name. | 8 | A. A.m. |
| 9 | Q. Who gave you these maintenance forms? | 9 | Q. Did you write this e-mail before being |
| 10 | A. I would pick them up out of the office. | 10 | fired from Holsten that day? |
| 11 | There's a little box and you just go in and pick | 11 | A. Yes. |
| 12 | them up. | 12 | Q. Based on the time of this e-mail, how |
| 13 | Q. In your experience getting these forms, | 13 | much time passed after you sent this e-mail to |
| 14 | who typically would fill them out? | 14 | the point where you were called to see |
| 15 | A. The person that worked in the office. | 15 | Mr. Johnson and were fired? |
| 16 | Berkenya Coker. | 16 | A. Two to three hours. |
| 17 | Q. That is on Page 3? | 17 | Q. Did you get a reply from Mr. Johnson to |
| 18 | A. Uh-huh. | 18 | this e-mail? |
| 19 | Q. Yes? | 19 | A. I didn't. I did not. |
| 20 | A. Yes. And Berkenya, yes, office staff. | 20 | Q. Maurice, the person who ultimately |
| 21 | Q. Would you go perform the maintenance | 21 | worked the job that you were fired from, on the |
| 22 | job or function required? | 22 | day you were fired, was he working at 2111 South |
| 23 | A. Immediately, uh-huh. | 23 | Clark? |
| 24 | Q. After you had performed the maintenance | 24 | Q. Was Mr. Mitchell -- Maurice Mitchell? |
| | **Page 226** | | **Page 228** |

| | | | |
|---|---|---|---|
| 1 | job or function, what would you do with this | 1 | A. Yes. |
| 2 | form? | 2 | Q. Was Mr. Mitchell an EarnFare worker? |
| 3 | A. I would have the resident sign off on | 3 | A. He was. |
| 4 | it if I could get a signature. But if I | 4 | Q. Had he been working at Hilliard as part |
| 5 | couldn't, I would take it back into the office | 5 | of EarnFare prior to May 1, 2009. |
| 6 | and let them know that it was done. | 6 | A. Yes. |
| 7 | Q. Would you turn the completed form back | 7 | Q. He was already on the property before |
| 8 | into the office? | 8 | you got fired? |
| 9 | A. Yes, I would. | 9 | A. Yes. |
| 10 | Q. Do you have any knowledge whether | 10 | Q. So it wasn't as if Holsten went out and |
| 11 | Holsten Management would save copies of | 11 | got somebody new to take your place? |
| 12 | completed maintenance order forms that you had | 12 | MR. SNELLING: I'm going to object to the |
| 13 | filled out? | 13 | form of the question. |
| 14 | A. I don't know. | 14 | MR. FUOCO: Let me withdraw that. |
| 15 | MR. FUOCO: Off the record. | 15 | BY MR. SNELLING: |
| 16 | (WHEREUPON, discussion was had | 16 | Q. Did Holsten have to go out and get |
| 17 | off the record.) | 17 | somebody new to take your place? |
| 18 | BY MR. FUOCO: | 18 | A. No. |
| 19 | Q. What I am handing you is a marked copy | 19 | Q. Was your replacement already at |
| 20 | that is identical to the Exhibit 8 from the | 20 | Holsten? |
| 21 | first session of your deposition. | 21 | A. Yes. |
| 22 | A. Okay. | 22 | Q. Was Mr. Speyers in charge of an |
| 23 | Q. Do you see it? | 23 | EarnFare worker program? |
| 24 | A. Yes. | 24 | A. No. |
| | **Page 227** | | **Page 229** |

VERONICA LEE-DICKERSON, VOL 2

**Page 230**

1   Q. Now, following up what Mr. Johnson told
2   you as the reason for your firing, you already
3   testified to that, were any of the male
4   employees working at the other Hilliard
5   buildings fired as part of what you were told to
6   be a new cleaning crew?
7       A. They were not.
8       Q. Who was let go as part of this new
9   cleaning crew, according to Mr. Johnson?
10      A. Only me.
11      Q. What male employees working at the
12  other buildings were kept after you were fired?
13      A. Everyone.
14      Q. And who were they?
15      A. They were Theodore, Banks.
16      Q. Donald? What was his first name?
17      A. I don't know. We call him Rico. His
18  last name is Banks.
19      Q. Rico is the nickname?
20      A. Rico is the nickname.
21      Q. Who else?
22      A. Donald. He was still there. Sean.
23  That's all I could remember at this time.
24      Q. What is Theodore's last name, do you

**Page 231**

1   know?
2       A. Yes, I do, but I can't remember it. It
3   escapes me.
4       Q. Donald's last name?
5       A. Ivory.
6       Q. Ivy?
7       A. Ivy.
8       Q. What is Sean's last name?
9       A. I don't remember.
10      Q. You were asked questions about Mr. Ivy
11  and the similarity in your mind of the jobs that
12  you did.
13          Do you remember being asked that
14  earlier today?
15      A. Yes.
16      Q. Would you be able, in performing your
17  job, to observe what Mr. Ivy would do?
18      A. Yes.
19      Q. How did you get to see Mr. Ivy and his
20  job work?
21      A. I would just see him like in passing.
22  Maybe if I was emptying the garbage, pushing the
23  Dumpsters out at the same time and we happen to
24  be out at the same time, we would wave to each

**Page 232**

1   other.
2       Q. What work did you see him do in
3   particular as you were passing through?
4       A. None.
5       Q. When you testified that he did the same
6   work as you, is that based on a title?
7       A. It's based on a title.
8       Q. Is it your belief that he had the same
9   job title, maintenance janitorial, as you?
10      A. It's my belief, yes.
11      Q. Is that your basis for testifying?
12      A. Yes.
13      Q. Mr. Lloyd, do you remember identifying
14  him?
15      A. Yes.
16      Q. What is -- what were your observations
17  of the work that Mr. Lloyd did?
18      A. He did -- he will come in and he would
19  mainly come in when things got overwhelmed or if
20  things -- like if Mr. Peter Holsten, if he's
21  coming to the buildings, then everyone have to
22  hurry and hurry and get things in perfect shape.
23          So he would be called in on things like
24  that.

**Page 233**

1       Q. "He" meaning?
2       A. Calvin Lloyd, he would be called in.
3   He would also be called in if -- you have a lot
4   of turnovers, you have more than two or three
5   turnovers of an apartment where the residents
6   moved out. Then he would come in and aid and
7   assist in possibly painting, painting the
8   apartments or cleaning.
9       Q. So you saw him work frequently?
10      A. Not frequently, no.
11      Q. How often would you say?
12      A. Calvin will come -- sometimes he would
13  be there everyday.
14      Q. Okay.
15      A. Sometimes he would be there everyday
16  and then weeks at a time you don't see him.
17      Q. Do you have any knowledge or
18  understanding where he would go for the weeks
19  you wouldn't see him?
20      A. No, I don't.
21      Q. When you did get to see Mr. Lloyd do
22  work, was it the same type of work that you did?
23      A. It was touch-up. He was there to touch
24  up.

1    Q.  Did you do that work?
2    A.  No -- I did the work.  I did the work.
3  There was no room for me to touch up.  I had to
4  do what needed to be done.
5    Q.  So did he do anything that you would
6  typically do?
7    A.  He would, yes.  He would strip floors.
8    Q.  That's what I'm after.
9    A.  Okay.
10    Q.  What did you see him do, whether it was
11  touch-up or not, what did you see him do when he
12  was performing work?
13    A.  He would strip floors.  He would do
14  carpets in the building, paint trashed
15  apartments.
16    Q.  You saw him do this?
17    A.  Yes.
18    Q.  You guys worked side by side sometimes?
19    A.  Sometimes, yes.
20    Q.  Was that your reason or basis for
21  saying Calvin Lloyd did the same type of job I
22  did?
23    A.  Yes.
24    Q.  Now, in Session I, you were asked

Page 234

1    Q.  Did you discuss any job-related
2  issues --
3    A.  Yes, I did.
4    Q.  -- with someone?
5    A.  Yes.
6    Q.  Who did you discuss that with?
7    A.  Steve Johnson.
8    Q.  Why did you do that with Mr. Johnson?
9    A.  Because Mr. Johnson was the overall
10  supervisor.
11    Q.  Do you have memory that he was the vice
12  president of the Holsten Management Corporation?
13    A.  He is the vice president.  He was.
14    Q.  Did you talk to Mr. Johnson about
15  various things involving your job as part of
16  this open door policy?
17    A.  Yes, several times.
18    Q.  Does this open door policy require you,
19  as the employee, to each and every time submit
20  some sort of written report or complaint?
21    A.  No.
22    Q.  In fact, if you look at Page 9, does
23  this say, "Employees who conclude that their
24  work-related concerns should be brought to the

Page 236

1  questions about the Holsten employee manual.  Do
2  you remember that?
3    A.  Yes.
4    Q.  Did Holsten have an open door policy?
5    A.  Yes, open door.
6    Q.  Was there a section in the manual that
7  talked about open door?
8    A.  Yes.
9    Q.  On Page 8, is this the section of the
10  manual that you were talking about, open door
11  policy?
12    A.  Yes.
13    Q.  Does the section of the manual in
14  Paragraph 3 say employees are further encouraged
15  to discuss -- to pursue discussion of their
16  work-related concerns until the matter is fully
17  resolved?
18    A.  Yes.
19    Q.  Did you do that?
20    MR. SNELLING:  I'm going to object, no
21  foundation.
22  BY MR. FUOCO:
23    Q.  Did you do that?
24    A.  What.

Page 235

1  attention of Holsten by written complaint and
2  formal investigation may avail themselves of the
3  internal complaint review procedure"?  Does it
4  say that?
5    A.  It says that.
6    Q.  Did you ever conclude that you needed
7  to resort to writing, in your discussions about
8  work-related problems, with Mr. Johnson?
9    A.  No.
10    Q.  Why?
11    A.  Because when I would talk to him about
12  whatever it was that I needed assistance, he
13  would just -- he would say okay, okay, I got
14  you, it will be handled or it will be taken care
15  of.  He always assured me that he heard me.
16    Q.  Was there ever a time he told you to be
17  patient?
18    A.  Yes.  He always say okay.
19    Q.  In your mind, was Steve Johnson the
20  person who could resolve the problem?
21    A.  He was.
22    Q.  If he said he would do it or he would
23  get to it, did you think he would?
24    A.  Yes.  I took him at his word.

Page 237

**Page 238**

1    Q.  So, based on this, you didn't have to
2  submit a written --
3    MR. SNELLING:  I'm going to object, leading
4  question.
5  BY THE WITNESS:
6    A.  I didn't have to, no.
7  BY MR. FUOCO:
8    Q.  In Session I, Mr. Snelling asked you a
9  number of questions about whether you ever
10  complained in writing.  Do you remember that?
11    A.  Yes.
12    Q.  According to this policy, did you have
13  to complain in writing?
14    A.  I didn't have to, no.
15    Q.  In fact, you didn't?
16    A.  No, I didn't.
17    Q.  Now, in Session I, there were some
18  questions being asked of you regarding Holsten's
19  sexual harassment policy.
20    A.  Okay.
21    Q.  Do you remember that?
22    A.  Yes.
23    Q.  Is there a definition of sexual
24  harassment?

**Page 240**

1    Q.  Does this handbook also have a
2  nonharassment policy?
3    A.  It does.
4    Q.  Does it begin on Page 13 of Exhibit 5?
5    A.  Yes.
6    Q.  What is prohibited according to what is
7  written in the very first sentence of
8  Paragraph 1 on Page 13?
9    A.  That means they don't stand for it.
10    Q.  Does it say we prohibit harassment of
11  one employee by another employee, supervisor or
12  third party for any reason?
13    A.  Yes, it does.
14    Q.  In being female and alleging your
15  gender caused you to lose your job at Holsten
16  Management, are you claiming that you were
17  harassed by anyone in particular?
18    A.  No, I wasn't harassed, no.
19    Q.  Does this policy then pertain to you?
20    A.  No, not harassment, no, not at all.
21    Q.  Do you believe that male employees
22  doing the same or similar work were favorably
23  treated when compared to you?
24    A.  They definitely were.

**Page 239**

1    A.  Not at all, not in this case.
2    Q.  Is there in the written policy, on
3  Page 15 of Exhibit 5 to your deposition, a
4  definition of what sexual harassment could be?
5    A.  Yes.
6    Q.  Does it say, "Sexual harassment is, it
7  may include:  Unwelcome sexual advances, request
8  for sexual favors and/or verbal or physical
9  conduct of a sexual nature"?
10    A.  Yes.
11    Q.  Did that happen to you --
12    A.  No.
13    Q.  -- in 2008?
14    A.  No.
15    Q.  In 2007 at Holsten Management?
16    A.  No.
17    Q.  Is that what your case is about --
18    A.  No.
19    Q.  -- unwelcome sexual advances?
20    A.  No, I never said that.
21    Q.  Does this policy then pertain to your
22  complaint as being a woman and gender
23  discrimination?
24    A.  No.  This has nothing to do with that.

**Page 241**

1    Q.  Is that the basis for your complaint?
2    A.  That's exactly what I was saying.
3    Q.  So it has nothing to do with sex?
4    A.  Not at all.
5    Q.  And it has nothing to do with one
6  person harassing you, is that correct?
7    A.  Correct.
8    Q.  If for some reason Holsten required
9  something about what you were complaining about
10  to be included in writing, would you or not have
11  expected Mr. Johnson to bring that to your
12  attention and say Veronica, put it down on
13  paper?
14    MR. SNELLING:  I'm going to object, form of
15  the question.
16    MR. FUOCO:  Go ahead.
17  BY THE WITNESS:
18    A.  No, I've never been told that.
19  BY MR. FUOCO:
20    Q.  Would you expect or not Mr. Johnson, as
21  the vice president, if a writing were required,
22  to tell you to do so?
23    A.  Yes, he would.
24    MR. SNELLING:  Same objection.

VERONICA LEE DICKERSON, VOL. 2

**Page 242**

1   BY MR. FUOCO:
2       Q.  Did he ever tell you to put any
3   complaint or discussion you were talking about
4   related job problems in writing?
5       A.  No, never.
6       Q.  Now, earlier today you were being asked
7   questions and asked to compare pay rates and
8   other things and Mr. Snelling was asking you
9   some questions.
10      Do you have an understanding that your
11  salary can be broken down into a per hour
12  equivalent if you took $37,000 a year and
13  divided it up into the number of weeks and then
14  divided that by the hours per week you were
15  expected to work, would that be hourly
16  equivalent?
17      A.  Yes.
18      Q.  When you were testifying about $16 per
19  hour, were you talking about some point in time
20  at your employment at Holsten making $16 an
21  hour?
22      A.  Yes.
23      Q.  So you weren't talking about making
24  $16,000 a year, were you?

**Page 243**

1       A.  Not at all.
2       Q.  By using the term 16, what were you
3   saying?
4       A.  It was, to my understanding, I think I
5   was making $16 an hour.
6       Q.  At some point?
7       A.  At some point, yes.
8       Q.  Have you done the per hour equivalent
9   calculation for what you were being paid in
10  salary at $37,000 a year?
11      A.  Yes.
12      Q.  Withdraw.  Have you personally sat down
13  and said $37,000 a year divided by 52 weeks a
14  year, divided by 40 hours, have you ever done
15  that calculation?
16      A.  No.
17      Q.  But when you were talking to other
18  employees, were you talking to them in terms of
19  annual salary or dollars per hour?
20      MR. SNELLING:  I'm going to object,
21  mischaracterizing the previous testimony.
22  BY THE WITNESS:
23      A.  Dollars per hour, right.  I wasn't
24  talking.  I was just listening.

**Page 244**

1   BY MR. FUOCO:
2       Q.  I see.  Naturally you were curious?
3       A.  I was just right there.  I wasn't
4   talking, though.  No one knows how much I made
5   because I never said anything.
6       Q.  Would, in your mind, the payroll
7   records at Holsten tell the story about who made
8   more and who didn't?
9       A.  I'm sure, yes.
10      Q.  As far as you knew, based on
11  conversation among you and Mr. Ivy, was it your
12  belief that Mr. Ivy made more?
13      A.  Definitely.
14      Q.  Based on conversation you overheard
15  involving Calvin Lloyd, was it your
16  understanding that he made more money than you?
17      A.  Definitely.
18      Q.  We can verify that using payroll
19  records?
20      A.  I'm sure.
21      Q.  Now, did Mr. Ivy live on-site?
22      A.  There was one more.  Terry Hodges.
23      Q.  Terry Hodges, okay.  Did Mr. Ivy live
24  on-site?

**Page 245**

1       A.  He did.
2       Q.  Did Mr. Lloyd live on some site
3   somewhere?
4       A.  No.
5       Q.  Do you know if he lived anywhere within
6   Holsten Management's property?
7       A.  No.
8       Q.  You do not know?
9       A.  He did not.
10      Q.  How do you know that?
11      A.  Because he lived at home with his wife.
12      Q.  Where was home, based on your
13  understanding?
14      A.  Home is far somewhere.
15      Q.  How do you know that that wasn't owned
16  by Holsten?
17      A.  It's not.
18      Q.  How do you know that?  That's what I'm
19  getting at.  How do you know this was not a
20  Holsten home that he lived there with his wife?
21      A.  Because that's Calvin's home.  I know
22  it's Calvin's home.  Calvin told me that's his
23  home.
24      Q.  He owns a private house somewhere else?

1    A.  Yes.
2    Q.  And, Mr. Hodges, did he ever live
3 on-site or not?
4    A.  Yes.
5    Q.  Where did Mr. Hodges live?
6    A.  He lived 2031 South Clark, 11th floor.
7    Q.  Let's go to Exhibit 3 in Session I.
8 This is the last area I have.  Mr. Smelling may
9 have more to ask you.
10    A.  Okay.
11    Q.  Three, is this the charge paper from
12 the EEOC?  Do you see that?
13    A.  Yes.
14    Q.  Did you personally type up this form?
15    A.  No.
16    Q.  Who did that?
17    A.  The lady I spoke to.
18    Q.  When you spoke to the lady, did you
19 have to go to the EEOC office?
20    A.  Yes, I did.
21    Q.  When you spoke to the lady, where did
22 you talk to her?
23    A.  I talked to her in the office in the
24 back.

**Page 246**

1    Q.  What did you understand her job was?
2    A.  Her job was the person that I had to
3 wait and speak to.
4    Q.  To make a charge of discrimination, was
5 it your understanding you had to talk to her?
6    A.  I had to -- I was waiting on someone in
7 particular, yes.
8    Q.  This is the lady?
9    A.  This is the lady.
10    Q.  After talking to her, what did she do?
11    A.  She told me to have a seat.  She's
12 going to go over the things that I told her what
13 she wrote on her pad.  Then when I came back
14 out, she gave me my paper in an envelope and
15 said --
16    Q.  Is this Exhibit 3?
17    A.  Yes, she gave me this in an envelope.
18    Q.  Were you told to sign it?
19    A.  Yes, I was told to sign it.
20    Q.  If you had written what appears as the
21 particulars are, could you have added more
22 detail?
23    A.  Definitely, yes, definitely.
24    Q.  Did you rely upon the lady to just get

**Page 247**

1 the basics, whatever the EEOC needed?
2    A.  Yes.
3    Q.  She did that?
4    A.  She did that.  Almost.
5    Q.  Almost?
6    A.  Yeah.
7    Q.  Who would better decide what the EEOC
8 needed to know in order to have a charge made,
9 you or the administrator?
10    MR. SNELLING:  I will object to the form of
11 the question.
12 BY THE WITNESS:
13    A.  Me.
14 BY MR. FUOCO:
15    Q.  The administrator would make the
16 decision about what to type?
17    A.  She, I guess -- yeah, she made that
18 decision on what to type.
19    Q.  Why did you sign it?
20    A.  I signed it because it summed up what I
21 was trying to say in a few words.
22    Q.  You could have added more but this was
23 good enough, is that fair?
24    MR. SNELLING:  I'm going to object to the

**Page 248**

1 form of the question.
2 BY THE WITNESS:
3    A.  Yes.
4    MR. FUOCO:  We'll let Mr. Snelling go now.
5    MR. SNELLING:  Okay.
6       FURTHER EXAMINATION
7 BY MR. SNELLING:
8    Q.  Going back to Exhibit 13 that you just
9 discussed, do you see that, Ms. Dickerson?
10    A.  13?
11    Q.  Right.
12    A.  Okay.
13    Q.  The middle of that page has your new
14 rate.  Do you see that?
15    A.  Yes, I do.
16    Q.  And there is a cross-out through it
17 looks like $16 per hour and over on the right
18 side it says $33,280, is that correct?
19    A.  Yes.
20    Q.  So were you receiving $33,280 for your
21 salary in the year 2003 from Holsten?
22    A.  Yes.
23    Q.  Let's go to Exhibit 14.  Looking again
24 at the same section of that form, has new rate

**Page 249**

1  it says, "Same." So, for year 2005, you were
2  receiving the same salary as reflected on
3  Exhibit 13, is that correct?
4      A.  That's correct.
5      Q.  You could look at Exhibit 15.  On
6  Exhibit 15, it bears the date January 31st,
7  2007, correct?
8      A.  Correct.
9      Q.  In the middle of that form again for
10 new rate, that box reflects 37,000 and the next
11 box says per year, correct?
12     A.  It does.
13     Q.  And that was your salary for 2007 from
14 Holsten, correct?
15     A.  Yes.
16     Q.  And from the top of the form I believe
17 your attorney pointed out for the title part it
18 has "maintenance/janitor"?
19     A.  Correct.
20     Q.  Were you part of the maintenance
21 department?
22     A.  I was, yes.
23     Q.  Go to exhibit what we'll mark as
24 Exhibit 17.

Page 250

1      A.  Yes.
2      Q.  At the top of this form, it has a date
3  of March 2nd, 2009, is that correct?
4      A.  That's correct.
5      Q.  With your name?
6      A.  Yes.
7      Q.  And then title it has, "Janitor,"
8  correct?
9      A.  Someone did write janitor, yes.
10     Q.  And then in the middle box it has, "Old
11 rate 37,000." Do you see that?
12     A.  Yes, I do.
13     Q.  And your new rate is $38,850, is that
14 correct?
15     A.  Yes, I see that.
16     Q.  And it looks like that salary change
17 was effective January 1st, 2009, is that
18 correct?
19     A.  Correct.
20     Q.  Now, if I could have you look at
21 Exhibit 16, which was the various maintenance
22 orders, on the second page there is a
23 maintenance order.  It doesn't have any date but
24 it has it says, "Milton Hunt" in the top left

Page 252

1      (Whereupon, Defendant's
2       Deposition Exhibit 17 was
3       marked for identification.)
4  BY MR. SNELLING:
5      Q.  Ms. Dickerson, I hand you what has been
6  marked as Deposition Exhibit 17.
7      Can you identify this as another
8  payroll change form from Holsten to you with
9  your name on it?
10     A.  It is.
11     Q.  It is the same as forms under -- on
12 Exhibit 14 -- 13, 14 and 15, correct?
13     A.  No, it's not the same.
14     Q.  It's not the same?
15     A.  It's not the same form, no.
16     Q.  It has payroll change -- I see.  It
17 says payroll change form rather than payroll
18 change notice, correct?
19     A.  Correct, and the form is different.
20     Q.  It has a different format?
21     A.  Yes.
22     Q.  But the information is basically
23 reflecting the same type of information as on
24 Exhibits 13 through 15, correct?

Page 251

1  box.
2      Is that a tenant?
3      A.  It is.
4      Q.  Then it has received by, "Berkenya
5  assigned to," has your name crossed out, is that
6  correct?
7      A.  No.
8      Q.  I'm looking at the second page.
9      A.  I'm at the second page, okay.
10     Q.  Berkenya, and then do you see "Angel"
11 crossed out?
12     A.  Uh-huh.
13     Q.  Angel, referring to you?
14     A.  Uh-huh.
15     Q.  That was your nickname?
16     A.  It was, uh-huh.
17     Q.  After it looks like it says referred to
18 McClain, is that correct?
19     A.  Yes.
20     Q.  Who is McClain?
21     A.  McClain is a person that used to also
22 work for Holsten but he was fired way before
23 this form.  He wasn't even here when I did this
24 stove.  I remember doing this.  He wasn't

Page 253

1  nowhere here.
2      Q.  McClain, did he work as a janitor or
3  what position did he have?
4      A.  Mr. McClain was -- I believe
5  Mr. McClain was the engineer for the building.
6  He was fired right at the beginning of the
7  opening, so the building's reconstruction right
8  up to the construction -- so Mr. McClain was
9  fired like in 2004.
10     Q.  We don't have a date on this one?
11     A.  Or 2003.
12     Q.  There is no date on the form that has
13  his name, correct?
14     A.  His name wasn't even around nowhere for
15  years.
16     Q.  Was Mr. McClain in the maintenance
17  department for Hilliard?
18     A.  Mr. McClain was -- he was the engineer
19  before construction.
20     Q.  Was he part of the maintenance
21  department?
22     A.  It would be safe to say yes.
23     Q.  Now you said that Mr. Ivy and
24  Mr. Hodges both lived at -- in a Holsten

Page 254

1  apartment, is that correct?
2      A.  Say who?  Yes, Mr. Ivy and Terry
3  Hodges, yes.
4      Q.  Lloyd didn't?
5      A.  No, he didn't.
6      Q.  Do you know what size apartments
7  Mr. Ivy, Mr. Hodges lived at at Holsten?
8      A.  Mr. Hodges lived in --
9      Q.  Do you know?
10     A.  Yeah, I know, but it was fixed up
11  differently.  It was different.
12     Q.  All right.
13     A.  Because he had a family.  He was
14  entitled to a one bedroom, okay, but since he
15  had his family and she had three boys, they
16  fixed her low income, combined it with his which
17  allowed him to get a four bedroom.
18     Q.  I see.  So she got some type of --
19     A.  It was some type of stuff fixed up.
20     Q.  But she had her own apartment that was
21  being paid for?
22     A.  I really don't know how that went, but
23  I know that they were in a four bedroom.
24     Q.  What about Mr. Ivy?

Page 255

1      A.  Mr. Ivy is in -- let me think.
2  Mr. Ivy -- I'm not sure how many bedrooms, but
3  he has two sides to his apartment.  So I would
4  say he's in a three or four bedroom.
5      Q.  But you don't know for sure, correct?
6      A.  I don't remember.
7      Q.  Did you ever complain to any official
8  at Holsten regarding your rate of pay?
9      MR. FUOCO:  Objection to form, vague.
10  BY MR. SNELLING:
11     Q.  Anyone in high management at Holsten
12  regarding your rate of pay?
13     MR. FUOCO:  Objection, vague.
14  BY THE WITNESS:
15     A.  No.
16  BY MR. SNELLING:
17     Q.  Did you specifically ever complain to
18  Steve Johnson or anyone in the upper management
19  at Holsten regarding your perception that you
20  were being paid less than an equivalent male?
21     A.  No.
22     MR. SNELLING:  We will a take a break here
23  for a minute.  We'll be right back.
24     (Whereupon, a short recess was

Page 256

1      taken.)
2      MR. SNELLING:  Back on the record.
3  BY MR. SNELLING:
4      Q.  Ms. Dickerson, just to be clear on the
5  record, can you state for the last time,
6  hopefully, all the male employees of Holsten
7  that you believe were making more -- doing
8  equivalent work to you that were making more
9  money than you during your period of working at
10  Holsten?
11     MR. FUOCO:  Objection, asked and answered.
12  Try it one more time.
13  BY THE WITNESS:
14     A.  It's Terrance Hodges, Calvin Lloyd, and
15  Donald Ivy.
16  BY MR. SNELLING:
17     Q.  Anyone else?
18     A.  No.
19     MR. SNELLING:  Nothing further.
20     MR. FUOCO:  All right.  Let's go to
21  Exhibit 17.
22     (Whereupon, Defendant's
23      Deposition Exhibit 17 was
24      marked for identification.)

Page 257

FURTHER EXAMINATION

BY MR. FUOCO:

Q. We've already established the date on the form as March 2nd, 2009?

A. Right.

Q. The day you get fired from Holsten is May 1st, 2009?

A. Yes.

Q. So less than two months passes between the date of this form, 17, and your firing?

A. Yes.

Q. Do you see a box that says change rate?

A. Yes.

Q. There is an old rate and a new rate listed, is that true?

A. It is.

Q. Is there a box indicating why you got this?

A. Yes.

Q. What does it say?

A. Merit increase.

Q. In connection with this increase in pay, did you ever get a written performance evaluation from anybody at Holsten about how you

Page 258

were doing your job?

A. No, never.

Q. Did you get a performance evaluation in 2007?

A. I did, I believe.

Q. You just said you had never gotten a written performance evaluation?

A. He came in and talked.

Q. So let's clarify. Did you ever, to the best of your knowledge and recollection, in the years 2007 or 2008 receive a written performance evaluation?

A. No, never. They didn't.

Q. Was your performance reviewed with you verbally by anybody in 2007?

A. Steve Johnson and Regina Stewart.

Q. Was Regina Stewart on the property in 2007?

A. She was the acting property manager.

Q. What time of year is your best memory of getting your appraisal from Mr. Johnson and Ms. Stewart?

A. Summer, spring, summer.

Q. What was told to you by Mr. Johnson and

Page 259

Ms. Stewart sometime in the summer 2007 about your performance?

A. That I'm doing an excellent job and I will receive -- I got a 5 or 6 percent raise.

Q. Did you receive a written performance evaluation in the year 2008?

A. No.

Q. Did you receive some form of verbal evaluation report or discussion from Holsten?

A. No.

Q. In 2009, sometime on or around March the 2nd, 2009, did you have the same meeting with Mr. Johnson and someone else to go over your performance?

A. No.

Q. Is it your memory that the last performance appraisal of any kind you had from Holsten was in 2007?

A. Correct.

Q. If your performance warranted firing on May the 1st of 2009, what was your expectation about what Mr. Johnson would tell you?

MR. SNELLING: I'm going to object to the form of the question.

Page 260

MR. FUOCO: Let me withdraw.

BY MR. FUOCO:

Q. If Holsten had really fired you for your performance or a lack of performance on May the 1st, 2009, would that be something you think they would have to tell you?

MR. SNELLING: Objection, calls for speculation. Go ahead.

BY THE WITNESS:

A. Yes, I would think that.

BY MR. FUOCO:

Q. Why would you think that?

A. Because I was always told that I was doing a good job. I never heard anything bad, never said anything bad. Then I would get rewarded. My check -- my check I would get more, merits --

Q. So less than --

A. -- increases.

Q. So less than 60 days before your firing, did you get a merit increase from Holsten?

A. I did.

Q. Would you expect if you were doing a

Page 261

**Page 262**

1  bad or lousy job for Holsten, they would give
2  you another $1,850 a year?
3      A.  No, I would not, never think that.
4      Q.  If something happened after March
5  the 2nd, 2009 that was a fireable conduct or a
6  misconduct, would somebody at Holsten talk to
7  you about that?
8      MR. SNELLING:  I'm going to object to the
9  form of the question.
10 BY THE WITNESS:
11     A.  Yes, I would think they would come and
12 let me know if I'm doing anything wrong or
13 inappropriate.
14 BY MR. FUOCO:
15     Q.  Yet the reason Mr. Johnson gave you was
16 there is a new cleaning crew coming?
17     A.  We had a new property manager, and the
18 property manager brought his own cleaning crew
19 with him and therefore they let me go.
20     Q.  Let's be crystal clear.  Did
21 Mr. Johnson, at your meeting where you were told
22 you were being fired, say anything to you in any
23 way about misconduct or poor performance as a
24 reason?

**Page 263**

1      A.  No, they only let me go because I
2  believe they only wanted the men.  He knew that
3  I was a little hurt; being a woman maybe I
4  couldn't handle it anymore like the men.  I
5  don't know.
6      Q.  Now, you were asked earlier in the
7  deposition about what evidence.  Is it your
8  belief that you were replaced by a man because a
9  man could handle it?
10     A.  Definitely.
11     Q.  And were you, in fact, replaced by a
12 man?
13     A.  I was replaced by a man.
14     Q.  So is that evidence that supports your
15 allegation --
16     MR. SNELLING:  I'm going to object to the
17 form of this question.
18 BY THE WITNESS:
19     A.  Yes, definitely.
20     MR. FUOCO:  If you can ask about evidence, so
21 can I.
22     MR. SNELLING:  This is your witness.  You're
23 directing her like crazy.
24     MR. FUOCO:  If you can use a legal term with

**Page 264**

1  a layperson, so can I.
2  BY MR. FUOCO:
3      Q.  If you understand, circumstantial
4  things can be evidence?
5      MR. SNELLING:  I'm going to object to
6  relevance.
7      MR. FUOCO:  Well, I will tell you what,
8  we'll -- I will stop for now, how's that.
9      MR. SNELLING:  We're good.  Nothing further.
10     MR. FUOCO:  Reserve signature.
11     MR. SNELLING:  Order it, mini, regular
12 delivery.
13     MR. FUOCO:  Yes, we would like a copy,
14 regular size and mini e-tran.
15         (Whereupon the proceedings
16          concluded at 12:40 p.m.)

**Page 265**

1  STATE OF ILLINOIS
         SS:
2  COUNTY OF COOK
3     IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
4          EASTERN DIVISION
5  VERONICA DICKERSON,
          Plaintiff,
6
7     vs.          No. 10 C 01419
8  HOLSTEN MANAGEMENT        Judge Castillo
   CORPORATION,
9
          Defendant.
10
11
12
13     I, VERONICA LEE DICKERSON, being first
14 administered an oath, say that I am the deponent
15 in the aforesaid deposition taken on March 21,
16 2011; that I have read the foregoing transcript
17 of my deposition, and affix my signature to
18 same.
19
          _____
          VERONICA LEE DICKERSON
20
21
22 Subscribed and sworn to
   before me this _____ day
   of _____, 2011.
23
24 _____
   Notary Public

ERRATA SHEET

Pg/Ln    Correction
___/___ Change from:_____
     Change to:_____
___/___ Change from:_____
     Change to:_____
___/___ Change from:_____
     Change to:_____
___/___ Change from:_____
     Change to:_____
___/___ Change from:_____
     Change to:_____
___/___ Change from:_____
     Change to:_____
___/___ Change from:_____
     Change to:_____
___/___ Change from:_____
     Change to:_____
___/___ Change from:_____
     Change to:_____
___/___ Change from:_____
     Change to:_____
___/___ Change from:_____
     Change to:_____

Signature:_____ Date:_____

**Page 266**

I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I certify to the above facts this 25th day of March, 2011.

_____
LORRAINE DUNN, CSR
LICENSE NO.: 084-2024

**Page 268**

STATE OF ILLINOIS   )
                    ) SS:
COUNTY OF COOK      )

I, LORRAINE DUNN, a notary public within and for the County of COOK County and State of Illinois, do hereby certify that heretofore, to-wit, on March 21, 2011, personally appeared before me, at 36 South Wabash Avenue, Illinois, VERONICA LEE DICKERSON, in a cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein VERONICA DICKERSON is the Plaintiff, and HOLSTEN MANAGEMENT CORPORATION is the Defendant.

I further certify that the said VERONICA LEE DICKERSON was first administered an oath to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

**Page 267**


877.955.3855

29 (Pages 266 to 268)